1

2

3

4

5

6                      UNITED STATES DISTRICT COURT

7                  FOR THE WESTERN DISTRICT OF WASHINGTON

8                               AT SEATTLE

9   **CHINOOK INDIAN NATION**, an Indian Tribe
    and a Washington nonprofit corporation, and
10  as successor-in-interest to The Lower Band of
    Chinook Indians; and **ANTHONY A. JOHNSON**,
11  individually and  in his capacity as Chairman
    of the Chinook Indian Nation
12

13              Plaintiffs,

                                             Case No.
14          v.
                                             **COMPLAINT**
15  **RYAN K. ZINKE**, in his capacity as Secretary of
    the U.S. Department of Interior; **U.S.**
16  **DEPARTMENT OF INTERIOR; BUREAU OF**
    **INDIAN AFFAIRS, OFFICE OF FEDERAL**
17  **ACKNOWLEDGMENT; UNITED STATES OF**
    **AMERICA**; and **MICHAEL S. BLACK**, in his
18  capacity as Assistant Secretary – Indian
    Affairs,
19

20              Defendants.

21      Plaintiff alleges:

22                            **INTRODUCTION**

23                                 1.

24      This is an action brought by the Chinook Indian Nation ("Chinook" or "Tribe"), and

25  as successor-in-interest to The Lower Band of Chinook Indians.  This action is brought

26  under the U.S. Constitution, the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 500, *et*

Page 1 - COMPLAINT
41S0416.DOCX / 15744-001

1    *seq.*, 554, 701-706, and Declaratory Judgment Act to address the deprivation of rights,

2    privileges, and immunities secured by the Constitution and laws of the United States, and

3    upon 28 U.S.C. § 2412, the Equal Access to Justice Act, which authorizes the award of

4    attorney fees and costs to the prevailing plaintiffs in such actions.

5                                                        2.

6        This Complaint seeks a Declaratory Judgment from the Court that the Treaty of

7    Tansey Point between the Defendant United States of America and the Lower Band of

8    Chinook Indians was thereafter constructively ratified by Congress through the Acts of

9    Congress of 1911, 1912, and 1925, as set forth in greater detail *infra*, and that the Chinook,

10   as successor-in-interest to the Lower Band of Chinook Indians is therefore entitled to be

11   acknowledged as a federally recognized sovereign Indian nation under federal common

12   law, or under governing federal statutes, or, alternatively, Plaintiffs seek a declaration from

13   this court that the actions of Congress and the over 100-year course of dealing between the

14   Defendants and the Chinook has resulted in *de facto* or constructive federal

15   acknowledgment of the Chinook as an Indian Tribe.  In the alternative, without waiving the

16   above, Plaintiffs seek an order and judgment of this Court invalidating the Bureau of Indian

17   Affairs ("BIA") regulation prohibiting the Chinook, as a Tribe once denied formal

18   recognition from re-petitioning for recognition or reaffirmation of their federal tribal

19   status.    In addition, the Chinook seek a declaratory judgment from this Court

20   acknowledging their right to monies appropriated to them by Congress and awarded to

21   them by the United States Court of Claims.  Finally, because of the BIA's historical and

22   continuing mismanagement and malfeasance, the Chinook Indian Nation further seeks

23   injunctive relief and requests that a Special Master be appointed by the Court to monitor

24   agency action or inaction in response to this Court's orders.

25   ///

26   ///

Page 2 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4133 (facsimile

**JURISDICTION AND VENUE**

3.

Jurisdiction is conferred by this Court by 28 U.S.C. § 1331 (federal question jurisdiction) because this action raises substantial questions of federal law under Plaintiff's Chinook Tribe's Treaties with the United States, the APA (5 U.S.C. §§ 554, 701-706, *et seq.*), federal common law and the Federally Recognized Indian Tribe List Act of 1994. 108 Stat. 4791 (1994) (codified at 25 U.S.C. § 5130).

4.

The United States has waived sovereign immunity from suit under 5 U.S.C § 702 because Plaintiffs seek review of agency action and to mandate federal acknowledgment of the Chinook as a recognized Indian Tribe. This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1391(e) as they are federal agencies and officers of the United States.

5.

Venue lies in this district because a substantial part of the events or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(e).

**PARTIES**

6.

Plaintiff Chinook Indian Nation is an Indian Tribe located and long present in the States of Washington and Oregon. Presently and since 2008, its principal location has been in Bay Center, Washington, at the north end of Willapa Bay. The Chinook Indian Nation is also a duly-recognized Washington, nonprofit corporation. The Chinook Indian Nation, including its predecessors-in-interest, is comprised as a single community and has existed as a community on a substantially continuous basis from historical times and certainly from 1900 to the present. The Chinook Indian Nation is the present-day political organization of, and successor-in-interest to The Lower Band of Chinook Indians,

Page 3 - COMPLAINT

1   Wau-ki-kum ("Wahkiakum") Band of Chinook Tribe of Indians, Weelappa ("Willapa") Band

2   of Chinook Indians, Cathlamet Band of Chinook Indians, and Clatsop Tribe of Indians, that

3   historically lived on both sides of the lower Columbia River and which were parties to the

4   treaties of Tansey Point signed in August 1851.  Further, the Chinook Indian Nation is a

5   successor-in-interest to those Chinook Indians who participated in the Chehalis River

6   Treaty negotiations with Washington Territorial Governor Isaac Stevens in 1855 that

7   resulted in the Treaty of Olympia, ratified by Congress in 1859.  The Chinook Indian Nation

8   and/or its members descend from the historic Chinook Tribe, including the Lower Band of

9   Chinook and Clatsop Tribe, that resided in the area of the lower Columbia River since time

10  immemorial and which has combined and functions as a single autonomous political entity

11  and has maintained political influence and authority over its members from historic times

12  to the present.

13                                                7.

14         The Chinook Indian Nation governs itself pursuant to a duly adopted constitution,

15  which was first drafted in 1925 and has since been amended (*see* **Exhibit A** attached).  Its

16  members are descended from the Chinook Indians who signed the 1851 Tansey Point

17  treaties and who participated in the 1855 Chehalis River treaty negotiations and are a

18  distinctive, indigenous Indian Tribe that has resided near the mouth of the Columbia River

19  since time immemorial.

20                                                8.

21         The Chinook have satisfied all mandatory criteria established for federal

22  recognition, acknowledgment, or reaffirmation as an Indian Tribe by the U.S. Department of

23  Interior ("DOI") pursuant to applicable statutes and their implementing regulations and as

24  set forth in 25 C.F.R. § 83, including the regulations first promulgated in 1978, those

25  adopted in 1994, and the 2015 regulations which are currently in place.  The Chinook

26  ///

Page 4 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4133 (facsimile

1  constitute an "Indian Tribe," as that term is defined and applied in all laws and regulations

2  applying to Indian Tribes administered by the DOI, and its members constitute "Indians" or

3  "members of an Indian Tribe," as those terms are defined and applied in those same laws

4  and regulations.

9.

6      Plaintiff Anthony "Tony" A. Johnson is the elected Chairman of the Chinook Indian

7  Nation, authorized to bring this action on behalf of the Chinook and a direct descendent of

8  Lower Band of Chinook leaders who were signatories to the 1851 Tansey Point Treaty,

9  referenced herein and of Chinook tribal members who participated in the 1855 Chehalis

10  River treaty negotiations. Plaintiff Johnson and his Chinook ancestors have actively

11  pursued justice for the Chinook for more than a century.

10.

13      Defendant Ryan K. Zinke ("Zinke") is the Secretary of the U.S. Department of the

14  Interior.

11.

16      Defendant Michael S. Black ("Black") is the Acting Assistant Secretary – Indian

17  Affairs and is the highest ranking official in the BIA,[1] which has direct responsibility for

18  administering the acknowledgment procedures for Indian Tribes.

12.

20      Both Zinke and Black are officers or employees of the DOI and have direct or

21  delegated statutory duties for carrying out relations with the Indian Tribes and the United

22  States' obligations to Indian Tribes under 25 U.S.C. §§ 2 and 9.  Both Zinke and Black are

23  named here in their official capacities.   In that official capacity, Secretary Zinke is

24  responsible for the overall administration of the BIA, an agency within the DOI tasked with

25  ///

26

[1] The Office of Indian Affairs was renamed the Bureau of Indian Affairs by the DOI on September 17, 1947.

Page 5 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
Attorneys at Law
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 • 503.224-4133 (facsimile

managing the federal government's relationship through various agreements with Indian Tribes, Nations, and Bands within the United States.  43 U.S.C. § 1457.

13.

Among Assistant Secretary Black's duties and responsibilities is to make a final decision on petitions for acknowledgment and reaffirmation of an Indian Tribe under the authority delegated to him by the Secretary under 25 C.F.R. § 83, and to oversee monies appropriated by Congress and held in trust for Indian Tribes and their members.

14.

Defendant Department of the Interior ("DOI") is a cabinet-level agency of the United States and is responsible for managing the relations with Indian Tribes through the BIA and its Assistant Secretary.  The DOI is also responsible for promulgating regulations pursuant to statutory authority granted to it by Congress, and insuring compliance with those regulations.

15.

Defendant DOI, acting through the BIA and its Office of Federal Acknowledgment ("OFA") (formerly the Branch of Acknowledgment and Research), is the administrative agency that currently receives and processes applications from Indian groups for recognition, acknowledgment, or reaffirmation of tribal status in accordance with 25 C.F.R. Part 83 and the U.S. Constitution, statutes, regulations, treaties, and legal requirements.

16.

Defendant United States of America includes all government agencies and officers, including the within named Defendants, charged with the administration of Indian affairs and responsible for protection of property and rights of the Chinook, including under the terms of the 1851 and 1855 treaties that are, in part, the subject of this action.  Plenary authority over Indian affairs is reserved to the U.S. Congress under Art. I, § 8, of the U.S. Constitution.

Page 6 - COMPLAINT

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

17.

Federal acknowledgment or recognition of an Indian Tribe is essential for a tribe and its members to be eligible for programs and services provided by the United States. The Defendant Secretary maintains a list of all of those tribes which have been so recognized. See 25 U.S.C. §§ 5130-31.

> Federal recognition affords important rights and protections to Indian tribes, including limited sovereign immunity, powers of self-government, the right to control the lands held in trust for them by the federal government, and the right to apply for a number of federal services. 'Federal recognition may arise from treaty, statute, executive or administrative order, or from a course of dealing with the tribe as a political entity.'

*Kahawaiolaa v. Norton*, 386 F.3d 1271, 1273 (9th Cir. 2004), quoting William C. Canby, Jr., *American Indian Law in a Nutshell* 4 (4th ed. 2004).

18.

The significance of formal recognition or acknowledgment of an Indian Tribe by the DOI is underscored by the Federally Recognized Indian Tribe List Act of 1994, Pub. L. 103-454, 108 Stat. 4791, 25 U.S.C. § 479(a), *et seq.* Under that Act, a Tribe's inclusion on the list of federally-recognized Tribes maintained by the DOI imposes upon the Secretary of the Interior "specific obligations to provide a panoply of benefits and services to the Tribe and its members.... Appearing on the List is a functional precondition to receipt of those services. In addition to the BIA, other federal agencies which provide services to the Tribes use the List to determine eligibility." House Rept. No. 103-781 at 3 (Oct. 3, 1994). These services include, *inter alia*, health, probate, individual money accounts, economic development support, and education.

19.

The Federally Recognized Indian Tribe List Act of 1994 also provides in pertinent part that "Indian tribes presently may be recognized...by a decision of a United States

Page 7 - COMPLAINT

1   Court." Pub. L. 103-454, § 103(3). The Chinook have sought federal recognition diligently
2   but unsuccessfully through the BIA's "broken" and "inconsistent" acknowledgment process.
3   In fact, the Chinook have exhausted the administrative remedies available through the BIA
4   and OFA. Nonetheless, the Chinook have satisfied and presently are able to satisfy all of the
5   criteria established for recognition or reaffirmation through common law, through treaties,
6   through executive orders and/or Congressional legislation, and through a very lengthy
7   course of dealing with the federal government. The Tribe therefore has resorted to this
8   United States court to seek a Declaration that it is entitled to be recognized as a tribe by the
9   defendants and that defendants should accordingly be enjoined to provide that formal
10  recognition to the plaintiff Chinook Indian Nation.

11                 **FEDERAL RECOGNITION OF THE CHINOOK THROUGH COMMON LAW**

12                                              20.

13          In *Montoya v. United States,* 180 U.S. 261 (1901), the Supreme Court adopted a four-
14  part common law test for whether an Indian group constituted a tribe for the purpose of
15  the Indian Depredation Act of 1891 (26 Stat. 851). *See also U.S. v. Holliday,* 70 U.S.407 and
16  *U.S. v. Sandoval,* 231 U. S. 28. The Court in *Montoya* defined "tribe," providing that members
17  must be:

18          (1)     A body of Indians of the same or similar race;

19          (2)     United in a community;

20          (3)     Existing under one leadership or government; and

21          (4)     Inhabiting a particular though sometimes ill-defined territory.

22  180 U.S. 266. The Department of the Interior, in its Reconsidered Final Determination
23  Against Federal Acknowledgment of the Chinook, did not dispute that the Chinook are
24  comprised of a body of Indians of substantially the same race (in other words, not made up
25  of members of other tribes). Further, the DOI found that even though the Chinook could
26  demonstrate that it was united in a community and existing under one leadership or

Page 8 - COMPLAINT

1   government for the extended historical period required, the Chinook certainly had shown

2   that they had been doing so for decades. Finally, the DOI recognized that a large portion of

3   the Chinook still live in their historic territory around the mouth of the Columbia River.

4   21.

5   The Chinook clearly satisfy the requirements for common law recognition. It is

6   within the power of this Court to declare that the tribe is accordingly federally recognized,

7   25 U.S.C. §§ 479a, 479a-1, and to order that the Chinook Indian Nation be added to the

8   Federally Recognized Indian Tribe List, 25 U.S.C. § 5131.

9   **FEDERAL RECOGNITION OF THE CHINOOK THROUGH TREATIES**

10   **1851 Tansey Point Treaties**

11   22.

12   The 1850s was a decade of rapid settlement in the western United States, and – not

13   coincidentally – a period of frantic treaty negotiations.  The federal government wanted

14   Indian lands for white settlers and instructed negotiators to relocate those Indians

15   remaining west of the Cascades in the then-Oregon Territory to less populated, arid land

16   east of the mountains.  By that time, diseases contracted from the early explorers, fur

17   traders, and settlers had diminished Indian populations to a tiny fraction of their former

18   numbers.  The Chinook, because of their historic dominance and location at the mouth of

19   the Columbia River where they began trade with whites in the late 18th century, were

20   particularly devastated by exposure to diseases to which they had no natural resistance.

21   By 1851, their numbers were estimated to be less than 400.   Oregon Territorial

22   Superintendent of Indian Affairs Anson Dart was dispatched in 1851 to conclude treaties

23   with the Chinook and related bands at Tansey Point, near Astoria, Oregon.

24   23.

25   Superintendent Dart thereafter succeeded in securing signatures from the ancestors

26   of present tribal members in the treaties he negotiated with all of the Chinook, including

Page 9 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4133 (facsimile

1  the Lower Band of Chinook Tribe, Wheelappa ("Willapa") Band of Chinook Tribe,

2  Wau-ki-kum ("Wahkiakum") Band of Chinook Tribe, and Clatsop Tribe.  Under the terms of

3  the treaties, the Chinook ceded lands and received certain reserved rights from the federal

4  government. Dart forwarded these treaties to Washington, D.C., in November 1851.  The

5  treaties passed to President Fillmore on July 20, 1852, who, in turn, submitted them to the

6  Senate on July 31 for ratification.  Millions of acres ceded by the Chinook in the Tansey

7  Point treaties were seized by the federal government shortly after the treaties were

8  submitted to Congress for ratification.  None of the treaties secured formal Congressional

9  ratification, but rather remained in limbo.  32nd Congress, 1st Session, Senate Confidential

10  Executive Documents Nos. 46, 50, 52, 53, and 54.  *See also* Bernholz at 125 and Deloria and

11  DeMallie, pp. 218-219, 223-228.

### 1855 Stevens Chehalis River Treaty Negotiations

24.

14       The Chinook participated in treaty negotiations with the federal government again

15  in 1855 after creation of the Washington Territory, this time led by newly-appointed

16  Washington Territorial Governor Isaac Stevens.  Governor Stevens' goal was to remove the

17  Indians from areas of white settlement.  During negotiations, it became clear that the

18  Chinook would be forced to leave their lower Columbia River homelands and join several

19  other Tribes – including their historic adversaries, the Quinault – on a reservation to the

20  north on the Washington coast.  The Chinook did not want to abandon their traditional

21  food sources and the land of their ancestors' graves for that of their historic enemies, the

22  Quinaults, and refused to sign, as did the Chehalis and Cowlitz Tribes. *From "Boston Men"*

23  *to the BIA: The Unacknowledged Chinook Nation*, pp. 268-69 (Robinson, John R.).  The

24  Quinault did sign, however.

25  ///

26  ///

Page 10 - COMPLAINT

25.

Finally, in 1859, the resulting treaty, the Treaty of Olympia, was ratified by Congress and the Chinook were included among the "fish-eating tribes" whom the federal government hoped would take advantage of its provisions.  Later this treaty was favorably cited by the Supreme Court when considering Chinook land and compensation claims and allotments.  *Halbert v. United States*, 283 U.S. 753, 51 S.Ct. 615 (1931):

> [T]here were also provisions in the treaty ... consenting that the President might "consolidate" the Quinaielts and Quillehutes and "other friendly tribes," whenever in his opinion the public interest and the welfare of the Indians would be promoted by it.... Our conclusion ... is that the Chehalis, Chinook and Cowlitz Tribes are among those whose members are entitled to take allotments within the Quinaielt Reservation, if without allotments elsewhere.

Both the Chehalis and Cowlitz Tribes have since been federally recognized, as have all other tribes ruled eligible for allotments on the Quinault Indian Reservation: Ozette (part of the Makah Indian Tribe), Queets (part of the Quinault Indian Nation), Shoalwater Bay, Quilleute, Quinault, and Hoh.

26.

In its review of the Cowlitz Indian Tribe's Petition for Acknowledgement, the Branch of Acknowledgment and Research ("BAR")[2] determined that the government's mere willingness to participate in treaty negotiations constituted unambiguous prior federal acknowledgment, dramatically lowering the Cowlitz's burden for demonstrating its case for official acknowledgment (*see* Reconsidered Final Determination for the Cowlitz Indian Tribe at 17).   That same consideration was not given to the Chinook, whose acknowledgment petition ultimately failed before the BAR.   In fact, of the Tribes that

///

---

[2] The Branch of Acknowledgment and Research was nested within the Bureau of Indian Affairs until July 27, 2003, when it was renamed the Office of Federal Acknowledgment, and now reports directly to the Deputy Assistant Secretary – Indian Affairs.

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 ▪ 503.224-4133 (facsimile

1   participated in the Chehalis River Treaty negotiations, only the Chinook remain
2   unacknowledged today.

### FEDERAL RECOGNITION OF THE CHINOOK
### THROUGH EXECUTIVE ORDER

5                                      27.

6       Congress abolished the practice of treaty-making after several Tribes aligned
7   themselves with the Confederacy during the Civil War and the military advantage of the
8   treaties declined.  *See The Incomplete Loom: Exploring the Checkered Past and Present of*
9   *American Indian Sovereignty*, 64 Rutgers L. Rev. 471, 476, n. 28 (Jackson, Harry S. III)
10  (2012).  Following the cessation of treaty-making, federal recognition of Tribes occurred
11  when the Executive Branch set aside certain federally-owned lands for the use of Indians
12  and Indian Tribes by Executive Order.  This method was ended by Congress in 1919.

13                                     28.

14      Following the treaty negotiations with the Chinook in 1851 and 1855, two
15  Presidents were subsequently moved to grant some measure of relief to the Chinook
16  through Executive Orders.   In 1866, President Andrew Johnson created the small
17  Shoalwater Bay Reservation, an area where a small number of Chinook and Chehalis had
18  congregated at the extreme north end of the Chinook's ceded territory. Pursuant to that
19  Order, provisions were made for locally-residing Chinook families to be enrolled and reside
20  on that reservation.  *Indian Affairs: Laws and Treaties*, Vol. I, Part III, at 924 (Kappler)
21  (1904).

22                                     29.

23      Seven years later, in 1873, President Grant greatly expanded the Quinault
24  Reservation (from 10,000 acres to 220,000 acres) to include sufficient land to
25  accommodate the Chinook and other non-Quinault "fish-eating" Indians. *Id.* at 923. While
26  large numbers of Chinook subsequently moved there in order to receive federal benefits,

Page 12 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4133 (facsimile

1  they noted their Chinook identification on tribal documents and continued to participate in

2  Chinook community events in Bay Center on Willapa Bay and along the Columbia River All

3  the while, Executive Branch officials treated the Chinook as a separate tribal entity.

### FEDERAL RECOGNITION OF THE CHINOOK THROUGH
### CONGRESSIONAL ACTION

6  30.

7  In addition to recognition through treaties and executive orders, Congress has

8  recognized certain Indian Tribes through federal legislation, either implicitly by legislating

9  with respect to a particular Tribe regarding some matter other than recognition, or by

10  expressly extending federal recognition.

11  31.

12  Over the past century, Congress has demonstrated its recognition of the Chinook in

13  several ways. First, Congress authorized two separate series of treaty negotiations with the

14  Chinook (first in 1851 and again in 1855), a standard which the BIA found in 2001 to

15  constitute "unambiguous prior federal acknowledgement" for the Cowlitz Indian Tribe

16  during its recognition petition – a petition which was considered concurrently with that of

17  the Chinook.  Second, Congress appropriated money *twice* for the express purpose of

18  compensating the Chinook for land seized by the federal government following the 1851

19  treaties negotiated with the Chinook at Tansey Point, a standard which Assistant Secretary

20  of the Interior Gover later found to constitute constructive, statutory ratification of those

21  treaties.  Third, Congress authorized lawsuits brought by the Chinook, recognizing the

22  Chinook as a tribal entity with standing to sue the federal government.  Fourth, Congress

23  created the American Indian Policy Review Commission ("AIPRC"), a commission which

24  included members of Congress, and which found severe inadequacies in the process by

25  which Tribes could become federally recognized.  AIPRC identified the Chinook as having

26  treaty rights and expressly recommended that they be formally recognized.  Congress has

Page 13 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

1  been clear: The Chinook are a Tribe deserving of federal recognition – an action which
2  would simply formalize their long-existing government-to-government relationship with
3  the United States.

4                                         32.

5        Further, there have been several instances of Congress appropriating funds for the
6  benefit of the Chinook, beginning in 1899.  S. 1941, *A Bill for the Relief of The Lower Band of*
7  *the Chinook Indians of the State of Washington* (Dec. 20, 1899).   On December 20, 1899,
8  Senator Turner from Washington introduced a bill, S. 1941, for the relief of The Lower
9  Band of the Chinook Indians of the State of Washington.  That bill was initially referred to
10  the Senate Committee on Claims, but was later transferred to the Senate Committee on
11  Indian Affairs.  Cong. Rec., Proceedings and Debates of the 56th Congress at 585.  The Lower
12  Band of Chinook had filed a land claim against the federal government seeking
13  compensation for the millions of acres of land taken by the federal government following
14  the Tansey Point treaties – treaties which had (and have) remained in congressional limbo,
15  neither ratified nor rejected, since their signing in 1851.

16                                         33.

17       Congress also sought to make amends with the Chinook, admitting they had been
18  treated "shabbily" by the federal government in failing to ratify their 1851 treaties and the
19  manner in which they had been dealt with thereafter.   In 1900, Congress granted the
20  Chinook authority to petition for annuities and it sent a federal investigator (McChesney)
21  out to Chinook country in 1906 to compile a federal enrollment roster so that federal
22  benefits could be properly distributed to them.   Based in part on those findings, Congress
23  appropriated funds for the Chinook in 1912 in the exact amounts specified in the 1851
24  treaties.   Those funds were expressly meant to compensate the Chinook for land seized
25  following the 1851 treaties. In 2001, DOI Assistant Secretary – Indian Affairs Gover (a
26  recognized national expert in federal Indian law) appropriately characterized this as

Page 14 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4133 (facsimile

evidence of "constructive ratification" by Congress of the 1851 treaty with the Lower Band of Chinook.

34.

The Indian Appropriation Act of 1906 is one of the first examples of Congress' explicit discussion of reimbursing the Chinook for land ceded in the unratified treaties at Tansey Point in 1851. In a Senate committee hearing on that legislation, an insightful exchange took place:

> Senator Fulton.... Years ago the Government entered into a treaty with the Lower Band of Chinook Indians, whereby the Government agreed to pay to the Indians a certain stipulated sum of money, and all their lands were to be ceded to the Government. The treaty was never ratified, but the Government, nevertheless, took their lands and the Indians were crowded off.
>
> Senator Teller. They were never paid for their lands?
>
> Senator Fulton. They never were paid a dollar for them....
>
> * * *
>
> Senator Clapp. It seems from this bill that the lands were sold and the proceeds covered into the Treasury. Is there anything to show how much was covered in?
>
> Senator Fulton. Yes, sir; the Land Department could ascertain that.
>
> Senator Clapp. Have you any idea what it was?
>
> Senator Fulton. It was a good many millions. I do not know just how much territory the Lower Band of Chinooks gave, but it was several millions.
>
> * * *
>
> Senator Clapp. You claim that we took the land and sold it?
>
> Senator Fulton. Yes, sir; there were several Tribes in the same situation.
>
> Senator Teller. Did we take any more of the Indians' lands than were sold?
>
> Senator Fulton. We sold it all; it is all sold – every foot of it.

Page 15 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 ▪ 503.224-4133 (facsimile

1 | Indian Appropriation Bill, 1905, Hearing before the Subcommittee of the Committee on
2 | Indian Affairs of the Senate of the United States, 58th Cong. 3rd Sess. (1905) (Statement of
3 | Sen. Charles W. Fulton).

4 | 35.

5 | Congress thus clearly recognized – and further, admitted – that the defendant
6 | federal government, despite the absence of formal ratification, nonetheless acted as if the
7 | treaties had been fully ratified and seized all of the Chinook's land under the terms of the
8 | 1851 treaties, sold that land, and never compensated the Chinook.

9 | 36.

10 | Between January and June 1906, Dr. Charles E. McChesney, Supervisor of Indian
11 | Schools for the BIA, visited the Pacific Northwest to prepare an enrollment of Indians
12 | pursuant to pending distribution of funds in land claims litigation before the Court of
13 | Claims (now the Court of Federal Claims). The Indian Appropriation Act of 1906 (33 Stat.
14 | 1073), passed in recognition of the 1851 Treaties, expressly authorized the Secretary of the
15 | Interior to "investigate the number of ... Lower Band of Chinook Indians of Washington, and
16 | Kathlamet band of Chinook Indians of the state of Oregon, or their heirs." McChesney's
17 | 1906 report documented every member of the Chinook who was alive in 1851 and living in
18 | 1906, or those who were heirs of tribal members alive on the date of the 1851 treaties
19 | were signed. Of the total of 124 Chinook heirs identified in 1906 by Agent McChesney, 86%
20 | lived within or immediately adjacent to the aboriginal Chinook tribal homeland.

21 | **Allotment Act of March 4, 1911**

22 | 37.

23 | Another such Congressional Act is the Allotment Act of March 4, 1911. In that Act,
24 | Congress authorized Tribes, including the Chinook, whose lands had been taken from them
25 | by the federal government without compensation, to obtain allotments of land.

26 | ///

Page 16 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
Attorney at Law
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 ▪ 503.224-4133 (facsimile

38.

Shortly thereafter, the Chinook again sought permission from Congress to bring a compensation claim for their land, seeking an award that more accurately reflected the magnitude and fair value of land that had been taken from them by the federal government. *Halbert v. United States*, 283 U.S. 753 (1931), was centered around one primary question: Whether the Chinook Tribe was one of the unspecified "other Tribes of Indians in Washington who are affiliated with the Quinaielt and Quileute Tribes" under the Treaty of Olympia, as provided for in the Allotment Act of March 4, 1911?   By answering that question in the affirmative, the Supreme Court in *Halbert* explicitly included the Chinook as a beneficiary under that 1911 Act, and concluded Chinook tribal members were entitled to take allotments of land on the Quinault Reservation.   Of the three Tribes held entitled to allotments on the Quinault Reservation through the *Halbert* decision, the Chehalis and Cowlitz have since been federally recognized; again, only the Chinook have not.

39.

Between 1932 and 1934, the BIA issued hundreds of allotments to both adults and minors in the Chinook Indian Nation. Chinook allottees were not Quinaults and were not members of the Quinault Indian Nation, and many did not reside on the Quinault Reservation.  Hundreds of these allotments remain in trust today and are administered by the BIA for members of the Chinook Indian Nation.

### The Appropriations Act of 1912

40.

The Act of August 24, 1912 (37 Stat. 518) was adopted by Congress expressly for the purpose of "making appropriations for the current and contingent expenses of the BIA, *for fulfilling treaty stipulations with various Indian tribes*, and for various other purposes, for the fiscal year ending June thirtieth, nineteen hundred and thirteen." *Id.* at 518-550 (emphasis added).  The 1912 Act appropriated money – in the exact amounts specified in

Page 17 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4133 (facsimile

the 1851 Tansey Point Treaties – for the Kathlamet Band of Chinook Indians of Oregon ($7,000), the Waukikum Band of Chinook Indians of Washington ($7,000), the Wheelappa Band of Chinook Indians of Washington ($5,000), and The Lower Band of Chinook Indians of Washington ($20,000), with the following caveat:

> That said Indians shall accept said sum, or their respective portions thereof, in full satisfaction of all demands or claims against the United States *for the lands described in the agreements or unratified treaties between the United States and said Indians*....

*Id.* at 546 (emphasis added). This money was appropriated by Congress for the Chinook in order to reimburse them for the land seized from them by the federal government following the unratified Tansey Point treaties in 1851. This Act of Congress was highlighted by Assistant Secretary Gover as constituting constructive, statutory ratification of the 1851 treaties because it sought to fulfill the terms of those treaties through compensation for the land which had been seized.

### The Western Washington Claims Act of February 12, 1925

41.

Pursuant to its reserved power to legislatively recognize or terminate Tribes, the 1925 Western Washington Claim Act expressly acknowledged the Chinook as a Tribe under its jurisdiction requiring:

> that all claims of whatsoever nature, both legal and equitable, of all the tribes and bands of Indians [citing the treaties of 1855 and 1859] ... which the ... Chinooks ... may have against the United States shall be submitted to the Court of Claims, with right of appeal by either party to the Supreme Court of the United States for determination and adjudication.

U.S. Statutes at Large, 68th Cong., 2nd Sess., Ch. 214, 886-87.

42.

The Western Washington Claims Act of February 12, 1925 was perhaps the most consequential Congressional action for the Chinook, because, through it, Congress

Page 18 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4133 (facsimile

1  authorized that "all claims of whatever nature, both legal and equitable" could be submitted

2  to the Court of Claims (later the Indian Claims Commission), and the Act expressly

3  acknowledged the Chinook as identified claimants.   Ch. 214, H.R. 2694, 43 Stat. 886

4  (Feb. 12, 1925).   The Chinook's authorized claim ultimately became "Docket 234," and

5  resulted in a final determination that the Tribe had "aboriginal or Indian title to certain

6  lands lying in parts of the present states of Washington and Oregon," that had not been

7  properly compensated for by the 1912 Act. Ch 214, H.R. 2694, 43 Stat. 886.   Thus, in the

8  1925 Act, Congress effectively declared that the Chinook were a Tribe with the standing to

9  make both legal and equitable claims against the United States government.

### American Indian Policy Review Commission

43.

12  Creation of a special commission to effect a simple and modern codification of law

13  relating to Indians was suggested in the 1928 *Problem of Indian Administration*, widely

14  known as the Meriam Report (Brookings Institution). *The Problem of Indian Administration:*

15  *Report of a Survey* made at the request of Honorable Hubert Work, Secretary of the Interior,

16  and submitted to him on February 21, 1928 (Baltimore, Md., The Johns Hopkins Press,

17  1928).   The Meriam Report recognized that a large number of Tribes had outstanding

18  claims with the federal government, many dating back to treaties, and recommended

19  settling those claims "at the earliest possible date so that the Indians may know where they

20  stand and settle down to a reasonably well defined economic situation, free from the

21  uncertainties arising from the existence of material unsettled claims."   *Id.* at 749.   The

22  Meriam Report continued:

> With these claims largely out of the way, it would seem practicable for a specially appointed commission, after considerable arduous labor, to effect a codification of law relating to Indians which will be at once reasonably simple and well adapted to modern conditions.

26  *Id.* at 749-750.

Page 19 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

44.

The American Indian Policy Review Commission ("AIPRC") was established under the 93rd Congress in order to conduct a thorough assessment of the policy and legal history of federal government relations with Indian Tribes, and the ramifications of those relations. United States Cong. Joint resolution to provide for the establishment of the American Indian Policy Review Commission, 93rd Cong., S.J. Res. 133. 88 Stat. 1910 (1975).   The Commission was ultimately tasked with defining the federal government's trust responsibility to Indian Tribes and making legislative recommendations in accordance with that freshly defined responsibility. *Id.*

45.

The Commission made several findings and recommendations in its Final Report, which it submitted to Congress May 17, 1977.  United States Senate, American Indian Policy Review Commission, Final Report, 95th Cong., 1st Sess., Vol 1.  Among the Commission's findings were the recognition that "unrecognized" Tribes are excluded from the protection and privileges of the Federal-Indian relationship and the recommendation that the recognition of all Tribes should be affirmed by a special office. *Id.* at 457, 461. The Chinook are specifically identified on the Commission's list of "unrecognized" Tribes under the states of both Oregon and Washington.  The entry for the Chinook in Washington confirms that the Chinook have both U.S. Treaty Rights and are mentioned in BIA records, reports, or publications.

46.

Congress also legislates generally with respect to all Indian Tribes and individual Indians, delegating the authority to federal administrative officials and agencies to determine which Indian Tribes or individuals are to be served pursuant to such laws.  In conjunction with such delegated authority from Congress, the Secretary of the Department of the Interior is authorized to determine, acknowledge, or recognize the existence of

Page 20 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ◾ 503.224-4133 (facsimile

particular Indian Tribes.   Formal federal acknowledgment qualifies Tribes for many programs designed to fulfill the federal government's trust responsibility to those Tribes. The authority of the DOI over such recognition or acknowledgment, however, derives entirely from statutes enacted by Congress, and is limited by, and to be guided by, that statutory grant or authority.  No statute ever has been enacted by Congress that has given the DOI the power or authority to terminate a federal relationship with an Indian Tribe that has been recognized by Congress, either implicitly or expressly. Similarly, no statute has ever been enacted to give the defendants authority to prohibit a tribe once denied acknowledgment under its admittedly "broken" process from re-petitioning for acknowledgment or seeking reaffirmation of their tribal status based upon new or additional evidence.

47.

In 1934, Congress codified its treatment of Indian Tribes through the Indian Reorganization Act ("IRA").  To qualify for benefits under the IRA, Tribes must meet certain conditions set by federal law.  The most important condition is federal recognition which is a "formal political act confirming the Tribe's existence as a distinct political society, and institutionalizing the government-to-government relationship between the Tribe and the federal government."  *California Valley Miwok Tribe v. U.S.*, 515 F.3d 1262, 1263 (D.C. Cir. 2008) (*quoting Cohen's Handbook of Federal Indian Law*, § 3.02(3) at 138 (2005 ed.)).  The IRA "sought to strengthen tribal governments and restore the Indian land base." S. Rep. NL. 111-247 at 2 (2010) (internal quotations omitted).

48.

Section 19 of the IRA broadly defines "Indians" to describe those who are eligible to reorganize under the Act:

(1)   All persons of Indian descent who are members of any recognized Indian Tribe now under federal jurisdiction;

Page 21 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 ▪ 503.224-4133 (facsimile

1  (2)  All descendants of such members who were, on June 1, 1934, residing
within the present boundaries of any Indian reservation; and

2

3  (3)  Shall further include all other persons of ½ or more Indian blood.

4 25 U.S.C. § 479.

5              49.

6    Members of the Chinook satisfied one or more of those criteria at all times material

7 to this lawsuit.  This is particularly so, since the BIA's own interpretation of § 19 of the IRA

8 reads:

9    Section 19 of the Act provides that ... a recognized tribe is one with which the
government at one time or another has had a treaty or agreement or those

10   for whom reservations or lands had been provided and over whom the
government exercises supervision through an official representative.

11

12 BIA Branch of Acknowledgment and Research ("BAR") John Collier to Ben Shawanessee

13 (Apr. 24, 1935).

14             50.

15    In 1978, the DOI promulgated Part 83 of its implementing regulations under the

16 IRA, which set out a uniform procedure known as the "Federal Acknowledgment Process,"

17 through which Indian groups could seek federal recognition or acknowledgment.  Part 83

18 "applies only to indigenous entities that are not federally recognized tribes."  25 C.F.R.

19 § 83.3.

20             51.

21    There are two primary means of achieving federally acknowledged status under

22 Part 83.  A Tribe can be "recognized for the first time," which requires that a Tribe must

23 produce evidence sufficient to satisfy seven criteria set forth in 25 C.F.R. § 83.7(a)-(g).

24 Alternatively, a previously recognized Tribe "can be re-affirmed" pursuant to 25 C.F.R.

25 § 83.12, whereby the petitioner would have to prove past recognition through treaties,

26 ///

Page 22 - COMPLAINT

1  acknowledgment of rights by the federal government, past allocation of land by the
2  government, and satisfy two of the same criteria set forth in § 83.7.

3  ## FEDERAL RECOGNITION OF THE CHINOOK THROUGH
4  ## EXECUTIVE OR ADMINISTRATIVE ACTION
5  ### Chinook Petition for Federal Acknowledgment
6  52.

7      In 1979, the Chinook gave formal notice of intent to seek federal recognition.  They
8  retained an attorney and a tribal historian to document their case, and over a 19-year
9  period submitted twelve standard file boxes of materials containing 1,307 exhibits –
10  178 pounds of paper.  During the next five years, the DOI's BIA required supplemental
11  information that the Chinook combined in yet another filing in 1998.  That additional
12  material was later found unconsulted in a BIA employee's desk drawer.

13  53.

14      After Kevin Gover became Assistant Secretary – Indian Affairs in 1997, he
15  determined that he could not rely on the Branch of Acknowledgment and Research,
16  ("BAR"), which was charged with performing the technical review of recognition petitions.
17  He authorized the retention of  an outside consultant to independently review the work
18  performed by the BAR to ensure regulatory compliance. The BAR recommended against
19  recognition for the Chinook as it did then for almost all such petitions.  Based on the
20  outside consultant's review, however, Gover came to a contrary conclusion and a Final
21  Determination was issued finally granting formal recognition to the Chinook Indian Nation
22  in January 2001 (*see* **Exhibit B** attached).

23  54.

24      Specifically, Assistant Secretary Gover found the 1911 and 1912 Congressional Acts
25  to be significant expressions of federal recognition of the Chinook as a Tribe, but singled
26  out the Western Washington Claim Act of 1925 as the most important of the three

Page 23 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorney at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 • 503.224-4133 (facsimile

1  Congressional Acts, as evidence of "unambiguous prior Federal recognition" in making the

2  case for federal recognition of the Chinook in 2001.   It also meant that under the

3  then-extant 1994 regulations, the Chinook need only demonstrate their continued

4  existence since 1925 – the date of last federal acknowledgment of the Tribe – to prove their

5  entitlement to federal recognition.   Assistant Secretary Gover articulated that the 1925 Act

6  paired with the 1911 Allotment Act:

> constitute a statement by the United States. There was a tribal organization,
> as the district court in *Halbert* recognized, and, in fact, the petitioner was
> faced with a bewildering and confusing response every time the BIA was
> approached on the question of tribal recognition.

Summary Under the Criteria and Evidence for Final Determination For Federal Acknowledgment of the Chinook Indian Tribe/Chinook Nation at 52, 79.

## Bush Administration Revocation of Chinook Recognition

### 55.

For 18 months, the federal government acted in accordance with the BIA decision formally acknowledging the Chinook Tribe.  Indeed, then-Chinook Tribal Chairman Gary Johnson was invited to the White House to participate with other Indian leaders in an event honoring the beginning of the bicentennial of the Lewis and Clark Expedition, an occasion where he presented an elaborately carved heirloom canoe to President George W. Bush.  In that first week of July 2002 while Chairman Johnson was still in Washington, DC representing the Chinook, he received a phone call from a BIA employee informing him that their recognition had been rescinded.  The Quinault Indian Nation had filed an 11th-hour appeal, concerned about the consequences of their acknowledgment.

### 56.

Newly-appointed Assistant Secretary – Indian Affairs Neal McCaleb was persuaded that his predecessor was mistaken about the Chinook's tribal history. The BAR conducted no additional investigation or research before Assistant Secretary McCaleb issued a brief

Page 24 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 • 503.224-4133 (facsimile

1    opinion claiming the Chinook failed to prove they had continued to exist and be governed

2    as a Tribe during the first decades of the 20th Century – despite voluminous evidence to the

3    contrary, including supplementary materials that were cached by one of his employees,

4    perhaps deliberately to prevent their consideration and despite the fact that other Tribes

5    were found to have shown adequate evidence of continued existence during those same

6    decades with similar or even less evidence.[3]

7                                    57.

8        When the Chinook Petition for Acknowledgment was ultimately denied on

9    reconsideration in 2002 (*see* **Exhibit C** attached), the BIA found that the Chinook satisfied

10   four of the seven criteria set forth in 25 C.F.R. § 83.7:

11       1.    Section 83.7(d), which required that the Chinook Indian Nation provide a copy of

12             its governing document, a constitution ratified by its members;

13       2.    Section 83.7(e), which required that the Chinook provide a list of all known

14             current members and all available former membership lists, membership of

15             individuals having been established using evidence acceptable to the Secretary

16             demonstrating descendancy from a historical Tribe or Tribes;

17       3.    Section 83.7(f), which required that the tribal membership be comprised

18             principally of persons who are not members of any acknowledged North

19             American Indian Tribe; and

20       4.    Section 83.7(g), which required the absence of evidence that the Chinook were

21             the subject of congressional legislation expressly forbidding or terminating the

22             federal relationship.

23   ///

24   ///

25   ────────────────────

26   [3] Many other Tribes who were granted recognition had no records of consistent government before the Indian Reorganization Act of 1934, whereas the Chinook adopted their first constitution in 1925 and had been actively pursuing land claims and litigation since 1899.

Page 25 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

58.

The BAR under the new presidential administration ultimately found that the Chinook did not meet the following three criteria:

1.  Section 83.7(a) – the "Indian Entity" criteria – which required the Chinook Indian Nation to have been identified as an American Indian entity continually since its last acknowledgment;

2.  Section 83.7(b) – the "Distinct Community" criteria - which required that a "predominant portion" of the group must exist as a distinct community; and

3.  Section 83.7(c) – the "Political Authority" criteria - which required that a petitioner must maintain political influence and authority over its members.  The BIA found that the Chinook failed to meet this criterion because there was insufficient evidence of the governing body on a continual basis since 1851.  The BIA initially found that the Chinook satisfied this criterion, but later concluded that it did not – a determination which was based on subjective rather than objective criteria.  By comparison, the Cowlitz Indian Tribe also petitioned for recognition under Part 83, and the BIA granted its petition and recognized it an Indian Tribe despite the fact that the evidence submitted by the Chinook was at least as strong, if not stronger, than that submitted by the Cowlitz.

59.

The Reconsidered Final Determination by new Assistant Secretary McCaleb omitted significant evidentiary and documentary material and analysis included in the Final Determination made by Assistant Secretary Gover, and also applied a much more stringent and demanding standard to establish the Chinook Indian Nation's continuity with the historic Chinook Tribe than had been used with respect to other Tribes who were successful in seeking federal recognition.

///

Page 26 - COMPLAINT

60.

No evidentiary hearing was held at any time in the Chinook's recognition determination process, although the result of the process controls access by tribal members to fundamental services.   The Tribe was not provided an opportunity to cross-examine witnesses, and decision-makers did not allow live testimony, and therefore were not able to determine the credibility of the anthropologists, historians, or other professionals, many of whom held differing opinions concerning whether the Tribe did, or did not, meet the established criteria.  No impartial decision-maker had the opportunity to evaluate Assistant Secretary McCaleb's Reconsidered Final Determination.

61.

Further complicating their effort to obtain federal acknowledgment, on February 11, 2000, the Assistant Secretary of the Interior – Indian Affairs ("AS-IA") issued a directive, 65 Fed. Reg. 7052 (Feb. 11, 2000), that significantly changed the acknowledgment process, including greatly reducing the Branch of Acknowledgment and Research's ("BAR") active research and analysis in connection with its evaluation of tribal petitions.

62.

Because the period for supplementing the record had passed, the Chinook were not allowed to supplement their petition to respond to the changed role of the BAR staff.

63.

Prior to the issuance of this new directive, and for other cases, the BAR staff made field visits, conducted interviews, and engaged in independent research and analysis to evaluate and provide technical assistance "to ensure that the petitioner presents the strongest case possible and is not turned down for technical reasons."  Bureau of Indian Affairs, Branch of Acknowledgment and Research, Official Guidelines of the Federal Acknowledgment Regulations, 12-13 (1997).

///

Page 27 - COMPLAINT

64.

The staff used those visits to gain greater understanding of the petition and community than might be readily available from the documents submitted.

65.

Until the February 11, 2000 directive, the Chinook had every reason to believe the BAR would continue its existing practice and that BAR was interested in seeking all information and developing all possible analyses relevant to the proper determination of its Tribal status.

66.

Changing the evaluation greatly increased the burden on the Chinook Indian Nation, which could no longer expect researchers to apply the broadest range of their expertise to assist the Tribe to receive the most favorable possible consideration. Had the Tribe known that the BAR would not function as research professionals, it would have made efforts to introduce increased evidence. This dramatic change in BAR practice was made without notice and comment under the APA, and it violated the APA, 5 U.S.C. § 553.

67.

This directive was partially revoked on March 31, 2005, 70 Fed. Reg. 16,513 (Mar. 31, 2005). By that time, however, it was too late to benefit the Chinook, whose petition had already been ultimately denied.

68.

During its final consideration of the Tribe's petition, BAR made no field visits and conducted no interviews of tribal members, unlike the assistance extended to other Tribes. Further, in accordance with the Assistant Secretary's directive, BAR did not conduct any independent research and analysis to support the Tribe's petition in the course of considering the Chinook Petition for Acknowledgment and ultimately issuing its Reconsidered Final Determination denying recognition to the Tribe.

Page 28 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4135 (facsimile

1                                         69.

2          Reeling from McCaleb's arbitrary reversal, and with limited funds to further appeal,

3    the Chinook Indian Nation ultimately abandoned its recognition efforts with the DOI.

4    Former Congresswoman Elizabeth Furse, a champion of tribal recognition efforts, and

5    tribal attorney Michael Mason, told them that they could expect Congressional restoration

6    of their federal status within four to six months.   The Tribe relied upon that advice and

7    opted to forego further appeals and instead pursue legislative action.   That legislation,

8    sponsored in 2008 and again in 2009 by Congressman Brian Baird, would have extended

9    federal acknowledgement to the Chinook, including eligibility for all benefits and services

10   provided by the federal government to federally recognized tribes, allowing for ceremonial

11   fishing and hunting in designated areas, and the ability to have land taken into trust for the

12   Tribe. Congressional efforts to restore Chinook tribal sovereignty, however, went for

13   naught, as Rep. Baird's bills never made it to a vote.   As of July 31, 2015, the BIA's new

14   regulations now prohibit a tribe that has been denied recognition from reapplying (25

15   C.F.R. 83.4(d)).

16                                         70.

17         In 2004, former Assistant Secretary Gover testified before the Senate Committee on

18   Indian Affairs regarding S. 297, a bill which would provide reforms and resources to the

19   BIA in order to improve the federal recognition process for Tribes.   Sen. Hrg. 108-534.   In

20   his prepared statement, Assistant Secretary Gover testified:

21         I remain convinced that the Chinook Tribe is deserving of Federal
           recognition, and I believe that, if Assistant Secretary McCaleb had the
22         resources provided in this bill available to him when he addressed the
           Chinook petition, the outcome well may have been different.
23

24   Sen. Hrg. 108-534 at 72.

25   ///

26   ///

Page 29 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
Attorneys at Law
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224.4100 • 503.224.4133 (facsimile

1

71.

2    Scholars analyzing the BIA tribal acknowledgment process during this era have

3    concluded:

> Prior to the George W. Bush administration, Indian nations petitioning for
> acknowledgment could expect about a 50 percent chance of success.
> Between 2001 and 2009, however, the process ended favorably for only two
> of fifteen petitioners. Federal acknowledgment policy has become an
> entrenched bureaucratic tool for denying legitimate Indian nations
> sovereignty that is rightfully theirs.

*Recognition, Sovereignty Struggles, & Indigenous Rights in the United States*, p. 280, Den

Ouden and O'Brien (U. N. Carolina Press, 2013).

## FEDERAL RECOGNITION OF THE CHINOOK THROUGH

## COURSE OF DEALING

### Bureau of Indian Affairs

72.

> We are fully aware that the Chinooks are an Indian Tribe, and it is
> unfortunate that no treaties were ever executed with them. However, you are
> familiar with the circumstances, undoubtedly, surrounding the [1855
> Chehalis River] treaty negotiations, and it was not at that time assumed that
> any serious consequences could arise in the future years because of the
> failure to enter into this treaty.

Letter from Melvin L. Robertson, Superintendent of the Bureau of Indian Affairs Western

Washington Agency, Everett, Washington (October 13, 1954).

73.

The BIA, created in 1824 as the Office of Indian Affairs under the then-Department

of War, has a more prolific history of governmental interaction with the Chinook Indian

Nation than any other branch or bureau of the federal government. That relationship began

in 1851, when Superintendent of Indian Affairs for the Oregon Territory Anson Dart was

sent by Congress to negotiate treaties with Tribes of the Oregon Territory, including the

Chinook, and that relationship continues to this day.  Throughout that more than 150 years

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4133 (facsimile

1  of history, the BIA has taken and held land in trust for Chinook Indian Nation members,

2  managed and distributed judgment funds, authorized fishing and negotiated fishing

3  contracts, supervised loans and attorney contracts, administered allotments, enrolled

4  Chinook Tribal members in BIA schools, and admitted Chinook Tribal members to BIA

5  hospitals.  That lengthy course of dealing between the BIA and the Chinook establishes that

6  the BIA has long-recognized the federal status of the Chinook Indian Nation.

7                                             74.

8         Typical actions of the BIA fulfilling fiduciary duties associated with its trust

9  responsibility include holding land in trust, supervision of attorney contracts, supervision

10  of loans, management and distribution of judgment funds, and issuing, administering, and

11  maintaining allotments.  These are all actions the BIA has performed for the Chinook Indian

12  Nation, demonstrating the BIA's fiduciary responsibility to Chinook Indian Nation.

13                                             75.

14         The General Allotment Act (24 Stat. 388) limited public domain allotments to

15  Indians maintaining tribal relations with a recognized Tribe.  Yet, two public domain

16  allotments secured by members of the Chinook Indian Nation in 1890 were subsequently

17  taken into trust by the BIA.  A third public domain allotment was secured by an unnamed

18  member of the Chinook Indian Nation in 1895. Numerous parcels of land in historically

19  Chinook territory were, and in some cases still are, held in trust for Chinook tribal

20  members.

21                          **BIA-Distributed 1912 Judgment Funds**

22                                             76.

23         The BIA maintained detailed records of the per capita payments made in the first

24  land claims case of the Chinook Indian Nation. These funds were appropriated by Congress

25  on August 24, 1912 (37 Stat. 518-35) and were paid out by the BIA the beginning in

26  November 1914.  The BIA maintained notes on each entitled tribal member and recorded

Page 31 - COMPLAINT

the number of the check, date of payment, and other information relevant to heirship of deceased beneficiaries. The associated Annuity Payment Roll of 1914, in which Congress commissioned the BIA to identify and list all Chinook tribal members who were eligible for payment under the 1912 judgment, is still used as tribal enrollment criteria under the Chinook Constitution (*see* **Exhibit A** attached). The BIA again conducted a census among tribes in Washington from 1916 to 1919, this time dispatching special allotting agent Charles E. Roeblin to document tribal members in Washington state not recorded on the 1906 McChesney Roll. The Roeblin Roll, which was reported to the Commissioner of Indian Affairs on January 31, 1919, includes many Chinook tribal members and is also still used as criteria for establishing enrollment eligibility by the Chinook Indian Nation (*see* **Exhibit A** attached).

### BIA-Supervised Attorney Contracts

#### 77.

For many decades, Congress required approval of the Secretary of Interior for all attorney contracts of Tribes to pursue federal claims. 25 U.S.C. § 70(n). The Chinook hired their first attorney for a claim against the federal government in 1899. In 1925, W.B. Sams, Superintendent of the Taholah Indian School, approved the Chinook attorney contract with Arthur E. Griffin. This contract was entered into to pursue the Tribe's Docket 234 lawsuit in the Court of Claims through the jurisdictional act P.L. 402. From 1951 to 1954 attorney contracts were signed by the Commissioner of Indian Affairs and BIA Superintendent, and an additional attorney contract was declined. In the 1960s, the BIA supervised the Chinook's attorney hired to handle its Docket 234 case.

### Indian Reorganization Act Consultation

#### 78.

The Indian Reorganization Act of 1934 ("IRA") was passed as part of a larger attempt by the federal government to encourage in part tribal economic development and

Page 32 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

1  self-determination.  *Cohen's Handbook of Federal Indian Law*, § 1.05, at 81 (2012 ed.).  The

2  IRA ended allotment of Indian land and encouraged Tribes to develop tribal governments,

3  including the adoption of formal constitutions.  *Id*. at 82.  Under the Indian Reorganization

4  Act, the term "Indian Tribe" means "any Indian or Alaska Native Tribe, band, nation, pueblo,

5  village or community that the Secretary of the Interior acknowledges to exist as an Indian

6  Tribe." 25 U.S.C. § 5130(2).

7                                                    79.

8           In October 1934, the BIA cited the binding solicitor's opinion that non-resident

9  Indian voters could cast ballots under elections held pursuant to the IRA.  The Chinook,

10  possessing a post-treaty affiliation on the Quinault Reservation as determined in the

11  *Halbert* decision, were accordingly determined by the BIA to also possess the right to vote

12  in the Quinault referendum under the IRA.  The BIA subsequently enrolled members of the

13  Chinook Indian Nation as voters to cast ballots on the question of organization of the

14  Quinault Reservation pursuant to the IRA.  The Chinook voted overwhelmingly in favor of

15  confederating with the Quinault and other Tribes, but that confederation was never carried

16  out.  Further, in 1953, the BIA received and held the governing documents of the Chinook,

17  including their constitution and bylaws, as provided for under the Indian Reorganization

18  Act.

19                              **Termination Act Consultation**

20                                                    80.

21           As the Termination program grew in the 1950s, the BIA sought to involve the

22  Chinook Indian Nation in that process. BIA Superintendent wrote the Chinook Chairman

23  Grant Elliott in March 1952, inviting him to attend a meeting with the Quinault Tribe and

24  Quinault allottees in order to set up a Planning Committee to work out a program for the

25  disposition of the Quinault Tribe and Tribal Reservation.  In June of that year, BIA officials

26  visited western Washington to assess prospects of termination, during which time they met

Page 33 - COMPLAINT

with the Chinook and other Tribes.  The Chinook were invited to and participated in additional meetings and consultations held in September 1953, October 1953, November 1953, and November 1954 regarding the proposed termination.  Most significantly, two of those meetings, on October 3 and October 25, were held in the historical Chinook village of Bay Center, Washington, where the Chinook are headquartered today.

**BIA-Supervised Loans**

81.

In 1965, the BIA Portland Area Office supervised Contract No. 14-20-0500-2430 between the United States and Chinook Indian Nation. The Chinook sought the loan pursuant to the Act of November 4, 1963 (77 Stat. 301), which established a revolving fund from which the Secretary of the Interior could make loans to finance assistance for Tribes in cases before the Indian Claims Commission.  The purpose of the BIA-supervised loan to the Chinook was to facilitate the study of timber values and fisheries on the lands found in tribal ownership by the Indian Claims Commission in Docket 234.

**BIA-Managed Indian Claims Commission Judgment Funds**

82.

When the Indian Claims Commission rendered its ruling in the matter of Docket 234 on November 4, 1970, it awarded $48,692.02 to the Chinook for the confiscation of 76,630 acres of land in Oregon and Washington that was historically occupied by the various bands of the Chinook and that the Chinook agreed to cede to the federal government in signing the 1851 Treaties.  Following an appeal of the decision, the court entered its final order for the award on December 3, 1971.  Within four days, the Chief of the Tribal Claims Section of the Division of Tribal Operations at the BIA notified the Area Director about the resolution of Docket 234.  The BIA then worked until 1984 to determine the method by which the judgment funds would be disposed, ultimately proposing a draft

Page 34 - COMPLAINT

1   bill that would direct the judgment funds to be utilized for tribal education purposes

2   developed and implemented by the Secretary of the Interior.  Those funds now sit

3   untouched by and held in trust for the Chinook Indian Nation by the BIA.

### Inconsistency and Unreliability in Other BIA Actions

83.

6   A "Tribe" for the purpose of establishing eligibility for BIA programs "means any

7   Indian Tribe, band, nation, or other organized group or community ... which is recognized

8   as eligible for the special programs and services provided by the United States to Indians

9   because of their status as Indians."  25 U.S.C. § 1903(8).  It would seem that the Chinook

10  Indian Nation, if it is an "unrecognized Tribe," should not then qualify for the assistance of

11  the United States through programs like the Indian Health Service (25 U.S.C. § 1603(14)),

12  probate jurisdiction (25 C.F.R. § 15.2), and economic development assistance (25 U.S.C.

13  § 1452(c)). And yet, the Chinook have received all of those benefits, albeit inconsistently at

14  times, and in fact continue to receive many such benefits, all despite the fact the Chinook do

15  not appear on the BIA's list of federally recognized Tribes pursuant to 25 U.S.C. § 5129.

### Boarding Schools

84.

18  The federal policy of removing Indian children from their home and Tribe and

19  relocating them to government-run boarding schools was a hallmark of the Assimilation

20  Era of United States Indian policy. Captain Richard H. Pratt's infamous mantra of "Kill the

21  Indian, save the man," was applied to children taken from Tribes from across the United

22  States, and the Chinook were no exception.  Participation in the boarding schools – most

23  prominently for the Chinook, at the Chemawa Indian School near Salem, Oregon –

24  continued in many instances well into the 20th century.

25  ///

26  ///

Page 35 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

85.

The BIA over many decades enrolled Chinook children (often forcibly) in BIA boarding schools, including the Cushman Trades School, Tulalip Indian School, Haskell Institute in Kansas, and the Chemawa Indian School. Children voluntarily applying to BIA schools later in the 20th century had to submit a required "Application for Admission to Non-Reservation School and Test of Eligibility." Chinook children were admitted as eligible based on citizenship in the Chinook Indian Nation. Further, upon acceptance to a BIA school in several instances BIA arranged for transportation of Chinook children to those schools. Today, at least one Chinook youth is currently enrolled at the Chemawa Indian School.

### Healthcare

86.

In establishing the Indian Health Service ("IHS"), Congress found that "[f]ederal health services to maintain and improve the health of the Indians are consonant with and required by the Federal Government's historical and unique relationship with, and resulting responsibility to, the American Indian people." 25 U.S.C. § 1601(1). Congress further declared "that it is the policy of this Nation, in fulfillment of its special trust responsibilities and legal obligations to Indians ... to ensure the highest possible health status for Indians and urban Indians and to provide all resources necessary to effect that policy." 25 U.S.C. § 1602(1). IHS provides care directly to members of federally recognized Indian Tribes and Alaska Native villages. 25 U.S.C. § 1603(13). IHS defines eligible individuals as persons who are of Indian descent and are members of their Indian community. 42 C.F.R. § 136.12(a)(1).

87.

The Chinook have historically and continuously been admitted to and treated at BIA hospitals. In its Petition for Acknowledgement, the Chinook Indian Nation documents

Page 36 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

several of its tribal members who were treated at the Cushman Indian Hospital in Tacoma, Washington beginning in 1938 and who were admitted because of their status as members of the Chinook Indian Nation.  More recently, Chinook births have been documented at the Cushman Indian Hospital, and Chinook tribal members have been born as late as the 1990s while receiving IHS funding as Chinook residents of Pacific County, Washington.

### Probate

88.

The Secretary of the Interior has original probate jurisdiction over trust and restricted Indian property, including exclusive authority to determine heirs and to approve wills for such property.  25 U.S.C. §§ 372, 373; 25 C.F.R. § 15.10.  The BIA continues to not only correspond with the Chinook about pending Indian probate matters but consults with the Chinook Indian Nation governmental office to verify enrollment eligibility and request Birth Certificates and Certificates of Indian Blood (CIB) for individuals involved in Indian probate matters Further, the DOI Office of Hearings and Appeals has held Indian probate hearings in the Chinook tribal office.

### Financial Management and Administration

89.

The American Indian Trust Fund Management Reform Act of 1994 ("AITFMRA") was passed in recognition of the trust responsibility existing between the federal government and Indian Tribes as explicitly including the Secretary of the Interior's responsibility to account for the daily and annual balance of all funds held in trust for Indian Tribes and individual Indians.  25 U.S.C. § 4011(a).  The AITFMRA defines "Indian Tribe" as "any Indian Tribe, band, nation, or other organized group or community ... which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."  25 U.S.C. § 4401(2).  The AITFMRA further created an Office of Special Trustee for American Indians to prepare and administer the trust reform

Page 37 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
Attorneys at Law
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

1  plan.  25 U.S.C. §§ 4042, 4043.  That Office of Special Trustee for American Indians has,
2  under the current presidential administration, corresponded directly with the Chinook
3  Indian Nation In addition, many Chinook tribal members have Individual Indian Money
4  (IIM) accounts that are administered by the DOI.

### Economic Development Support

90.

The BIA standard for assisting Tribes with economic development provides that a Tribe is eligible if it has been "recognized by the Federal Government as eligible for services from the Bureau of Indian Affairs." 25 U.S.C. § 1452. The BIA funded an economic development report for the Chinook Indian Nation by Professor Brown from the University of Washington, entitled "Feasibility of a Charter Boat Operation for the Chinook Indian Tribe of Washington in Ilwaco, Washington." The Chinook then applied in 1978 for funds for a Records Clerk, Tribal Planner, Researcher, and Housing Foreman under the Comprehensive Employment and Training Act. They received $27,490.46 for the period from January through September 1979. In January 1982, the Chinook received a grant for $15,600 from the Small Tribes Organization of Western Washington for maintenance of tribal offices and improvement of tribal operations.

### National Park Service

91.

The National Park Service has a history of consulting with the Chinook Indian Nation on issues ranging from establishment of national monuments and parks, including the establishment of Fort Clatsop, a project which brought the Chinook back to the fort in which they aided Corps of Discovery through the harsh winter of 1805, to environmental recovery projects such as the Colewort Creek Salmon Recovery Project, which the Superintendent of the National Parks Service request initiation of government-to-government consultation for habitat restoration along the Netul River in Oregon.

Page 38 - COMPLAINT

92.

Fort Clatsop was established by Meriwether Lewis and William Clark as part of the Corps of Discovery during December 1805. The Corps of Discovery wintered at Fort Clatsop from December 7, 1805 until March 23, 1806, visiting and trading with the Chinook almost daily. In his journal, Meriwether Lewis chronicled several interactions with the Chinook, including the following on February 20, 1806:

> This forenoon we were visited by "Ta-cum," a principal chief of the Chinnoks [sic] and 25 men of his nation ... he came on a friendly visit. We gave himself and party something to eat and supplied them plentifully with smoke. We gave this chief a small medal with which he seemed much gratified. In the evening at sunset we desired them to depart as is our custom and closed our gates.

*The Journals of Lewis and Clark* (Lewis, Meriwether and Clark, William).

93.

The National Park Service also consults with the Tribe on projects including repatriation of remains under the Native American Graves Protection and Repatriation Act.

**Native American Graves Protection and Repatriation Act**

94.

For the purpose of establishing eligibility under the Native American Graves Protection and Repatriation Act ("NAGPRA"), the term "Indian Tribe" "means any Tribe, band, nation, or other organized group or community of Indians ... which is recognized as eligible for the special programs provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 3001(7). Rather than strictly providing for consultation with Tribes appearing on the BIA's list of federally recognized Tribes, the regulations broaden somewhat the standard definition of federal recognition for purposes of NAGPRA by accepting recognition by a federal agency, not just by the BIA. 43 C.F.R. § 10.2; *see* 60 Fed. Reg. 62,13462,136 (1995).

///

Page 39 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

95.

This operating definition includes the Chinook, who are regularly consulted with under NAGPRA by the National Park Service and other federal agencies. The Chinook, in fact, appear *on the cover* of the National Park Service's booklet regarding *Consultation with Native Americans: A Historic Preservation Responsibility*, where they are shown performing a traditional post-raising ceremony at Cathlapotle in the Ridgefield National Wildlife Refuge in 2003. NAGPRA consultations regularly include other federal agencies, including the U.S. Fish and Wildlife Service, the Army Corps of Engineers, the Environmental Protection Agency, the Department of Energy, and the list goes on. The Chinook are the only unrecognized Tribe regularly consulted on particular projects, appearing alongside formally recognized Northwest Tribes such as the Confederated Tribes of the Grand Ronde, the Chehalis Confederated Tribes, the Cowlitz Indian Tribe, the Quinault Indian Nation, and the Shoalwater Bay Indian Tribe, to name a few.

96.

Other recent consultations between the National Park Service and Chinook Indian Nation include Station Camp – Middle Village Park in Washington, where other, federally recognized Tribes such as the Confederated Tribes of the Grand Ronde and the Shoalwater Bay Indian Tribe deferred to the Chinook for interpretation of an uncovered Chinookan town site The Chinook worked directly with the National Park Service to provide that interpretation, and Chinook tribal members were paid by the National Park Service to stay with uncovered remains around the clock until they could be repatriated.

97.

Other executive agencies, including the U.S. Fish and Wildlife Service and the U.S. Forest Service, are also documented as consulting on an ongoing basis with the Chinook Indian Nation regarding the repatriation of cultural and human remains found in their traditional territories.

Page 40 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

**United States Fish and Wildlife Service**

98.

Located within the current boundaries of the Ridgefield National Wildlife Refuge is the Cathlapotle Plankhouse, which the U.S. Fish and Wildlife Service ("FWS") partnered with the Chinook Indian Nation to construct. FWS continues to partner with the Chinook to offer an accurate representation of Chinook culture at the site. Also within the Refuge boundaries is the site of the former Chinookan town of Cathlapotle, which was encountered by Lewis and Clark on their expedition and later excavated and written about by Professor Kenneth Ames.

99.

In February 2017, FWS wrote to the Chinook Indian Nation regarding a proposed visitor access infrastructure at Ridgefield National Wildlife Refuge. FWS cited its responsibilities under § 106 of the National Historic Preservation Act and 36 C.F.R. § 800 as initiating consultation with the Chinook pursuant to 36 C.F.R §§ 800.2, 800.4(a)(3), and 800.4(a)(4). The Chinook have been consulted on other ground disturbing activities and shoreline management plans in the area as well, and have been included in decision making processes.

**United States Navy**

100.

In addition to agencies under the DOI, the United States Navy consults with the Chinook on an ongoing basis. In April 2017, *e.g.,* the Department of the Navy wrote to the Chinook Indian Nation to "initiate Section 106 consultation" in accordance with 36 C.F.R. § 800, on a proposed undertaking involving small-unit land and maritime training activities for naval special operations personnel along the southwest Washington coast. 36 CFR § 800 regulates the protection of historic properties, and defines "Indian Tribe," in accordance with § 4 of the Indian Self-Determination and Education Assistance Act (25

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

U.S.C. § 5304(e)), elaborating that "for purposes of this rule, *Indian tribe includes federally recognized Indian tribes* and Alaska Native Corporations." 36 C.F.R. § 230.2 (emphasis added). By initiating § 106 consultation with the Chinook, the Department of the Navy has demonstrated its explicit recognition of the Chinook Indian Nation as a Tribe.

**BIA Recognition Standards Interpreted and Applied Unequally**

101.

As set forth above, the BIA was long charged with maintaining a list of federally recognized Tribes, but until 1994 when Congress mandated standards, it was never clear how Tribes were added or subtracted from the roster. A BIA clerk testified in 1995 that records of the Agency comments had been lost, so her "revised list was generally consulted to determine groups' legal status, although paradoxically she conceded that she had no authority to make such decisions." Administrative Law Judge Findings in Samish recognition petition, August 31, 1995. ALJ David L. Torbett heard testimony for eight days and then issued a 44-page opinion in which he found that the BIA could not adequately explain why the Samish Tribe in Washington's Puget Sound had been excluded from a list of federally recognized Tribes (ALJ Findings 1-3; Final Determination at 16, 38-9). He noted that upon "further questioning Ms. Simmons [BIA clerk] conceded that she had no personal knowledge of the legal status of the groups she had listed under the Portland Area...."

102.

The inconsistent and unequal standards for obtaining federal acknowledgment set by the BAR have been similarly problematic. What constitutes unambiguous prior federal acknowledgment for one tribe is found not do so for another, based on largely similar – if not identical – facts. In the 1980 Jamestown Clallam Proposed Finding for Federal Acknowledgment, the BAR cited a "solicitor's opinion" concluding that the Jamestown Clallam tribe was a federally recognized tribe, based in part on its inclusion in "1925 claims

Page 42 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

1   litigation," in order to establish unambiguous prior federal acknowledgment of the tribe.

2   Recommendation and summary of evidence for proposed finding for Federal

3   acknowledgment of the Jamestown Band of Clallam Indians of Washington, Anthropological

4   Report at 3. The BAR's Proposed Finding then suggested that the Jamestown Clallam's

5   inclusion in 1925 claims legislation amounted to "denomination as a tribe by Act of

6   Congress." *Id.* The Chinook were given no such consideration, despite being identified by

7   name in the Western Washington Claims Act of 1925. Such inclusion, under the standards

8   applied by the BAR to the Jamestown Clallam, should have been considered as

9   unambiguous prior federal acknowledgment of the Chinook.

10                                    103.

11          The respective histories of the Chinook and the neighboring Cowlitz Indian Tribe

12   have also followed nearly identical trajectories, so it is no surprise that their

13   acknowledgment petitions were submitted and evaluated almost simultaneously. Their

14   histories are so intertwined that they even hired the same expert, Stephen Dow Beckham,

15   and lawyer, Dennis J. Whittlesey, to assist in documenting their histories and preparing

16   their petitions, the revised versions of which were each filed with the Office of Federal

17   Acknowledgment in 1987. Unfortunately for the Chinook, that is largely where their

18   histories diverge.

19                                    104.

20          On February 12, 1997, the BAR, under Assistant Secretary Ada Deer, released the

21   Summary under the Criteria and Evidence for Proposed Finding Cowlitz Tribe of Indians.

22   As a preliminary matter, the BAR determined that:

23          The Cowlitz present at the (1855 Chehalis River Treaty) negotiations,
            specifically the Lower Cowlitz band, had refused to sign the proposed treaty,
24          but the Federal Government's willingness to negotiate with them constituted
            previous recognition....
25

26   ///

Page 43 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

1  Reconsidered Final Determination to Acknowledge that the Cowlitz Indian Tribe Exists as

2  an Indian Tribe, at 17 (summarizing the findings of the Proposed Finding).

3                                        105.

4       Such a determination substantially reduces the burden required of a petitioning

5  Tribe by eliminating several acknowledgment criteria altogether.  BAR then evaluated the

6  Cowlitz petition according to its determination of this unambiguous prior federal

7  acknowledgment, ultimately finding in favor of federal acknowledgment.

8                                        106.

9       On August 11, 1997, the BAR under Assistant Secretary Deer released the Summary

10  under the Criteria and Evidence for Proposed Finding *Against* Federal Acknowledgment of

11  the Chinook Indian Tribe, Inc. (emphasis added).  *Despite the fact that the Chinook were*

12  *party to the same 1855 Chehalis River Treaty negotiations that were used to establish*

13  *unambiguous prior federal acknowledgment of the Cowlitz, the Chinook were found not to*

14  *have been subject to such prior acknowledgement.*  There is no explanation in the Proposed

15  Finding for why the Chinook were not unambiguously acknowledged by virtue of their

16  participation in the Chehalis River Treaty negotiation with the Cowlitz in 1855, or further,

17  why the signed treaties which the Chinook had negotiated with the federal government

18  through Anson Dart in 1851 did not establish unambiguous federal acknowledgment twice

19  over:

20       Because the 1851 treaties were not ratified by the United States Senate, the
         Federal Government again engaged in treaty negotiations with
21       representatives of the "Lower Chinook" in 1855…. Although these
         negotiations did not result in a signed treaty, Federal negotiators once again
22       had accepted that a sovereign Chinook political entity existed with which it
         could negotiate a treaty.
23

24  Summary under the Criteria and Evidence for Proposed Finding Against Federal

25  Acknowledgement of the Chinook Indian Tribe, Inc. at 26.

26  ///

Page 44 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4135 (facsimile

1          107.

2          Under the standard set forth by the BAR in reviewing the Cowlitz Petition for

3  Acknowledgment, this should have been sufficient for a finding of unambiguous prior

4  federal acknowledgement. Of course, it was not, and ultimately the Chinook were

5  determined by the BAR as having failed to establish federal acknowledgment.

6          108.

7          This inconsistent approach by the BAR violates the Equal Protection component

8  within the Due Process Clause of the 5th Amendment to the U.S. Constitution, as well as the

9  Administrative Procedures Act (5 U.S.C. § 500, *et. seq.*), because it constitutes actions by an

10  agency that are arbitrary, capricious, an abuse of discretion, and not in accordance with the

11  law. Both prohibit agencies from treating similarly-situated petitioners differently without

12  providing sufficiently reasoned justification for that disparate treatment. In fact, irrational

13  and unjustified disparate treatment perfectly describes the BAR's approach to evaluating

14  the Cowlitz and Chinook's respective petitions for federal acknowledgment. For example,

15  where the BAR found Chinook evidence insufficient to meet the criteria, when evaluating

16  the Cowlitz, the BAR explained:

17          The paucity of descriptions of the full entity is considered to be a
           consequence of the historically dispersed residential pattern of the groups in
18          the Cowlitz River valley.

19  Summary Under the Criteria and Evidence for Proposed Finding Cowlitz Tribe of Indians at

20  19.

21          109.

22          As demonstrated in their petition, the Chinook historically exhibited the same

23  residential patterns, yet the BAR found it to be insufficient information for finding in favor

24  of federal acknowledgement.

25  ///

26  ///

Page 45 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

1                                   110.

2        Additionally, participation in BIA schools and other programs was used by the BAR

3   to demonstrate Cowlitz's historical and continuing existence:

4        Chemawa Indian school and Puyallup Agency land records referred to the
         Cowlitz Indians, as did Yakima allotment records between 1898 and 1914.
5        Cushman Indian school correspondence in 1911 referred to...members of the
         Cowlitz Tribe eligible for allotment at Quinault, and recommended that they
6        be enrolled and allotted there.

7   Summary Under the Criteria and Evidence for Proposed Finding Cowlitz Tribe of Indians at

8   17.

9                                   111.

10       Yet, that same criterion was insufficient for the Chinook to demonstrate their

11  historical and continuing existence:

12       Some Chinook descendants attended the Government's Indian schools, but
         they did so because of their degree of Indian ancestry, not because the Indian
13       Office recognized a Chinook tribe.

14  Summary under the Criteria and Evidence for Proposed Finding Against Federal

15  Acknowledgment of the Chinook Indian Tribe, Inc. at 6.

16                                  112.

17       The BAR under Assistant Secretary Deer essentially made the determination that

18  the Chinook were unable to show external identification of their Tribe from 1855, the time

19  of the Stevens treaty negotiations, as well as show that the Tribe was a political entity in

20  the early part of the twentieth century.  Again, despite nearly identical histories, the BAR

21  made an entirely contrary assessment of the Cowlitz, the Snoqualmie and other Tribes.

22                                  113.

23       Assistant Secretary McCaleb, Assistant Secretary Gover's successor under the

24  George W. Bush Administration, reversed the Final Determination for Federal

25  Acknowledgment of the Chinook Indian Tribe/Chinook Nation on July 5, 2002, by ruling

26  that Assistant Secretary Gover's determination had been inconsistent with the

Page 46 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
Attorneys at Law
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4133 (facsimile

1  acknowledgment regulations' standard for demonstrating unambiguous previous federal

2  acknowledgment.    In contrast, Assistant Secretary McCaleb's Reconsidered Final

3  Determination for the Cowlitz Indian Tribe, released six months earlier on December 31,

4  2001, affirmed the proposed finding of unambiguous prior federal acknowledgment under

5  largely similar facts.

6                                                    114.

7          The government's mere willingness to negotiate a treaty with the Cowlitz was

8  determined by the Office of Federal Acknowledgment to constitute unambiguous prior

9  acknowledgment, a finding which ultimately led to a successful conclusion of the Cowlitz's

10 Petition for Acknowledgment.    The Chinook – who participated in that same treaty

11 negotiation as well as another that resulted in multiple, signed treaties – were determined

12 not to have been subject to unambiguous prior federal acknowledgment.  The cruel irony,

13 of course, is that the Cowlitz and the Chinook, neighboring tribes with nearly identical

14 histories, walked out of the same treaty negotiation with Governor Stevens in 1855.  Today,

15 after concurrently participating in the same administrative recognition process utilizing

16 the same expert historian, one Tribe is federally recognized because of that history and the

17 other is not.

**Samish Tribe Recognition Litigation**
*Greene v. Babbitt*, **943 F. Supp. 1278 (W.D. Wash 1996)**

18

19

20                                                   115.

21         The federal judge presiding over the Samish tribe's litigation noted in a published

22 opinion that the Samish people's "long journey for recognition has been made more

23 difficult by excessive delays and governmental misconduct."  *Id.* at 1281.  In 1996, the

24 Samish Indian Nation sued the DOI, seeking reinstatement of findings that were made in its

25 favor by an Administrative Law Judge considering recognition matters.  In the course of

26 those proceedings, it was discovered that a longstanding opponent of Samish recognition.

Page 47 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 • 503.224-4133 (facsimile

1   DOI attorney, Scott Keep, obstructed the processing of the Samish application and

2   deliberately wrote his own counter-findings which he then presented *ex parte* to the

3   decision-maker.   United States District Judge Thomas S. Zilly (appointed by President

4   Reagan in 1988 and now a senior judge) publicly reprimanded Keep, citing him for

5   contempt.

> Mr. Keep, obviously unfazed by statements of disapproval from this Court
> and the Ninth Circuit, and with apparent disregard for both statutory and
> traditional standards of fair play, met directly with the ultimate decision-
> maker and urged her to deny federal recognition to the Samish.[4]

9   *Id*. at 1286.

10                                  116.

11      The Court ruled that a remand to the BIA would "cause further delay and expense

12  while subjecting the [Tribe] to a substantial risk of suffering the same procedural violations

13  that they have now endured twice over the past ten years."  *Id*. at 1288.  Judge Zilly further

14  found:

> ...when agency delays or violations of procedural requirements are so
> extreme that the court has no confidence in the agency's ability to decide the
> matter expeditiously and fairly, it is not obligated to remand. Rather than
> subjecting the party challenging the agency action to further abuse, it may
> put an end to the matter by using its equitable powers to fashion an
> appropriate remedy.

19  *Id*.

20                                  117.

21      The Samish had to return to Court in 2011 to recover compensation for the time

22  during which the Tribe should have been recognized and receiving federal benefits, but

23  was not.  *Samish Indian Nation v. United States*, 657 F.3d 1330 (Fed. Cir. 2011).

24  ///

25

26  [4] As of the date of filing of this Complaint, Mr. Keep remains a Senior Solicitor for the Department of the Interior.

Page 48 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4133 (facsimile

**Little Shell Tribe of Chippewa Indians**

118.

In Montana, the Little Shell Tribe of Chippewa Indians was buffeted by virtually identical bias from the BIA concerning its quest for recognition.  The Tribe's bid for recognition was thwarted initially by the same BIA bureaucracy, but their denial was overturned by BIA head Kevin Gover.  The Little Shell was officially recognized in the waning days of the Clinton Administration, but, just as with the recognition of the Chinook, Gover's decision was then reversed by his successor.  The Little Shell, too, turned unsuccessfully to Congress after losing confidence in the BIA's ability to fulfill its trust responsibility.  Then-Congressman Ryan Zinke of Montana (now Secretary of Interior and a named Defendant in the instant case) sponsored the Little Shell's recognition bill.

**Delaware Tribe**

119.

It is an established fact that the BIA has acted inconsistently and unpredictably in a non-transparent way since the adoption of its regulatory Tribal recognition process.  *See, e.g., Cherokee Nation of Oklahoma v. Norton*, 241 F. Supp. 2d 1368 (N.D. Okla. 2002), *rev'd on other grounds*, 389 F.3d 1074 (10th Cir. 2004).  In that case, the Delaware Tribe (an East Coast Tribe), was forced to combine with Cherokees in Kansas after the so-called "Trail of Tears."  The Delaware had signed a treaty with the United States in 1867 (just as the Chinook did in 1851), but it was granted a final decision by the BIA under which the BIA agreed to "reconsider and retract" its Part 83 denial of acknowledgment and grant federal recognition to the Delaware without forcing the tribe to go through another Part 83 process on the grounds that its treaty was conclusive evidence of its federal acknowledgment. *Id.* at 1370.

///

///

Page 49 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4133 (facsimile

120.

While the Tenth Circuit ultimately reversed the grant of recognition on an unrelated ground (the Supreme Court had previously ruled that the text of the Delaware Tribe Treaty actually made their group a part of the Cherokee Tribe and it was not sovereign), the decision left undisturbed the BIA's conclusion that barring other disqualifiers like the explicit text of the Delaware Treaty, the existence of a federal treaty alone satisfied the criteria established by Part 83 and was unambiguous, conclusive evidence of federal recognition of a Tribe.  There is no comparable disqualifying language in the Tansey Point Treaties of 1851 or in the 1855 Treaty of Olympia. They should be considered conclusive evidence of their federal recognition as a tribe.

121.

Also, significantly, during the almost 40 years since the time that the Chinook first petitioned the BIA for recognition, virtually all other Pacific Northwest Tribes have been recognized or restored in a variety of ways to the point that presently, the Chinook are among the very few historic Tribes in the Northwest that have not had their tribal status acknowledged, despite the fact that they, historically, were "the most powerful nation on the entire Pacific Coast." Anson Dart, 1851, quoted in Clifford E. Trafzer, *The Chinook* (New York: Chelsea House, 1990), 87.

**2015 AMENDMENTS TO PART 83**

122.

Just two years ago, the BIA itself admitted that the acknowledgment process it applied in the years leading up denial of the Chinook's Part 83 petition in 2002 was "broken," "non-transparent," "inconsistent," and "unpredictable."  80 Fed. Reg. 37,862-863 (July 1, 2015):

> To summarize ... the [Part 83 federal acknowledgment] process is slow, expensive, inefficient, burdensome, intrusive, non-transparent, inconsistent, and unpredictable.

Page 50 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 • 503.224-4133 (facsimile

1  Hearing on the federal acknowledgment process before the H.S. Comm'n. on Indian, Insular,

2  and Alaskan Native Affairs, 114th Cong. 2 (Apr. 22, 2015) (testimony of Asst. Secretary –

3  Indian Affairs Kevin Washburn).

123.

5  The preamble to the proposed 2015 rule changes stated that the purpose for the

6  changes to the recognition process was to promote "fairness and consistent

7  implementation, and increasing timeliness and efficiency, while maintaining the integrity

8  and substantive rigor of the process." *Id.* at 37,862.

124.

10  The 2015 amendments had been under consideration within the BIA since 2009 in

11  an attempt to improve the process that had recognized only 17 petitions and denied

12  34 other petitions since 1978. *Id.* Assistant Secretary Washburn's testimony set forth four

13  guiding principles for amending the Part 83 process:

14  1.   Transparency;

15  2.   Timeliness;

16  3.   Efficiency; and

17  4.   Flexibility.

125.

19  The need for flexibility emphasized that the amended Part 83 process should

20  understand the "unique history of each tribal community and avoid the rigid application of

21  standards that do not account for the unique histories of tribal communities." *Id.* at 4.

126.

23  Under the Part 83 procedure that the Chinook underwent, as other courts have

24  recognized:

25  a federal acknowledgment petition can be over 100,000 pages long and cost
over $5,000,000 to assemble; the BIA estimated time for completion of
26  review is 30 years.

Page 51 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

*See Mackinac Tribe v. Jewell*, 829 F.3d 754, 758 (D.C. Cir. 2016) (*citing The Incomplete Loom: Exploring the Checkered Past and Present of American Indian Sovereignty, supra* at 497).

127.

In fact, the BIA itself admitted that "72% of ... currently recognized federal Tribes could not successfully go through the [federal acknowledgment] process as it is being administered today." *Id.* at 507 (*quoting* Rev. John Norwood, Delegates Report, the National Congress of American Indians Annual Conference 1 (2010)).

128.

The 2015 amendments differ from the process in place when the Chinook's petition was considered in several important ways. First, based on "inconsistent and unpredictable criteria, the amended process promotes a consistent baseline," meaning "if a particular amount of evidence or a particular methodology was sufficient to satisfy a criterion in a decision made in 1980, 1990, or 2000, that baseline threshold remains the same for petitioners today." *Information Fact Sheet: Highlights of the Final Federal Acknowledgment Rule* (25 C.F.R. § 83, BIA, June 29, 2015[5].  This would mean that if the Chinook were to petition for acknowledgment or reaffirmation today, the BIA would be required to consider that the Cowlitz Indian Nation in 2002, the Snoqualmie Tribe, and the Jamestown S'Klallam Tribe, satisfied the federal recognition process because of their treaty relationships with the United States, and to accord the same significance to the Chinook for their treaty relationships and grant them recognition.

129.

Second, but critically for the Chinook, the amended Part 83 prohibits any Tribe from re-petitioning for federal acknowledgment under Part 83 if it previously had applied for that process and its petition was denied.  25 C.F.R. § 83.4(d).  As amended, that section provides:

---

[5] Available at https://www.bia.gov/es/groups/public/documents/text/idc1-030769.pdf.

Page 52 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4133 (facsimile

The Department will not acknowledge ...

* * * *

(d)    An entity that previously petitioned and was denied Federal acknowledgment under these regulations or under previous regulations in part 83 of this title....

130.

During consideration of the amended Part 83 process, the DOI considered a proposal that would allow "limited re-petitioning."  Opponents of "limited re-petitioning," including the Quinault, argued that re-petitioning was "unnecessary, inefficient, and unfair to other tribes," and contended that re-petitioning "could result in acknowledgment of previously denied petitioners." 80 Fed. Reg. 37,874. Exactly so.

131.

Those in the DOI who strongly objected to the ban on re-petitioning did so on the ground that such a prohibition would treat petitioners, like the Chinook, unequally; that it would violate Equal Protection and Due Process components of the Fifth Amendment; that it would "prevent getting to the truth of whether a Tribe should be acknowledged;" that it exceeds the BIA's authority; is "politically motivated;" is "based on an invalid justification" (established equities); and fails to consider the petitioners' interest. *Id.* at 37,874-75.

132.

The Chinook submitted comments on the proposed changes and provided those comments to the BIA's Office of Regulatory Affairs & Collaborative Action.  The Chinook saw the opportunity to have its status reaffirmed as a Tribe under the new rules.

133.

Nonetheless, instead of allowing Tribes that had devoted decades of their lives and enormous sums of money seeking recognition only to find themselves victimized by that broken, inconsistent, and unpredictable process, to have an avenue for eventual recognition, the BIA did just the opposite in the 2015 regulations by forever barring those

Page 53 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224.4100 • 503.224.4133 (facsimile

1    victims (such as the Chinook) from reapplying, shirking all responsibility for their plight

2    and leaving any remedy for redress to the political process: "Congress may take legislative

3    action of recognized groups it finds have merit even though they do not meet the specific

4    requirements of the acknowledgment regulations." *Id.*[6]

5                                    134.

6        The BIA's decision adopting the Final Rule prohibiting re-petitioning adversely

7    affected the Chinook by depriving it of the right to supplement or revise a petition for

8    recognition or to file a new petition pursuant to the reaffirmation process.

9                                    135.

10       That regulatory prohibition of re-petitioning is arbitrary, capricious, and an abuse of

11   discretion, especially when it is evident that the entire purpose behind the new rules was

12   to address the unfairness, inconsistency, and unpredictability of the previous system that

13   resulted in recognition of the Cowlitz, and Jamestown S'Klallam, for example, on factual

14   grounds virtually identical to those of the Chinook and which resulted in a contrary

15   decision.

16                                   136.

17       This is especially damaging to the Chinook because the Tribe can demonstrate

18   satisfaction of the BIA's reaffirmation criteria if allowed to re-petition.  Indeed, the Chinook

19   can satisfy the recognition criteria as well, if they are to be considered, interpreted, and

20   applied in the same manner as they were applied to those Tribes who were approved, such

21   as the Cowlitz.

22                            **DOCKET 234**

23                                   137.

24       The Indian Claims Commission Act of 1946 required federal officials to make

25   threshold determinations of tribal status before a group could assert a claim against the

26

---

[6] Interestingly, Assistant Secretary Washburn informed the Chinook in a telephone conference in July 2015

Page 54 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

United States under the Act. According to the Solicitor's Opinion from 1948, claimants under the Act must be:

> a group whose political existence has been recognized by Congress or the Executive Branch of the Government, or one which in the absence of such recognition has a de facto collective existence and carries on a type of group life characteristic of ... Indians.

Op. Sol. Interior, M-35029 (Mar. 17, 1948). Following the service of many of its members in World War II and the creation of the Indian Claims Commission ("ICC"), the Chinook Tribal Council dedicated itself to amending its constitution, first created in 1925.

138.

In 1951, the Chinook gained congressional approval to file a case before the Indian Claims Commission for fairer federal compensation assessing the misappropriation of its lands by the federal government following the Chinook's entry into the 1851 Tansey Point Treaty. (Dkt. 234, Ind. Cl. Comm. 56). The Chinook ultimately prevailed in that litigation almost 20 years later in 1970 and were awarded $48,692.02, in addition to the $26,307.95 that had been awarded by Act of Congress in 1912. That amount was determined based on 76,630 acres of ceded territory, plus timber rights (fisheries were not considered). Those funds were put into trust for the Chinook to be administered by the BIA.

139.

There is no indication that Congress intended for payment of those funds, or for any claims for uncompensated land, to be made to individual tribal members. Rather, in *Duwamish Tribe of Indians v. United States,* 79 Ct. Cl. 530, the Court of Claims found it hard to believe that money was intended to be paid to individuals:

> The Government was securing a cession of lands improved by the individual efforts and industry of the Indians, and, in addition to the value thereof free from improvements, the clear intention of the parties was to fix a value upon all substantial ones and increase the compensation to the tribe accordingly....

(continued)
that the Tribe could still reapply, but would have to go to "the back of the line."

Page 55 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 • 503.224-4133 (facsimile

1
2

> The dwellings housed the members of the tribe and the treaty dealt with the tribe as such, and in the absence of more positive provisions to the contrary, we think the claims are tribal.

3
4
5
6
7
8
9

79 Ct. Cl. 530 at 575-576. Further, the Indian or aboriginal title held by the Chinook over their lands was held collectively, not individually.   The simple existence of a favorable judgment before the Indian Claims Commission therefore demonstrates federal recognition of the Chinook for the simple facts that a threshold determination of recognized political existence was made by Congress when it allowed the Chinook to move forward with their claim, and subsequently when the Chinook were treated as having collective rights in the resulting judgment.

10

140.

11
12
13
14
15
16
17
18
19
20
21

As its trustee, the BIA has a fiduciary responsibility to the Chinook. The BIA is further charged by Congress with safekeeping and appropriate investment of these funds that were awarded to the Chinook without strings attached.   As a fiduciary, its conduct is "judged by the most exacting fiduciary standards," which dictates that it must act with good faith in the best interests of the beneficiary at all times.   *United States v.* Mason, 412 U.S. 391 (1978); *see also Seminole Nation v. United* States, 316 U.S. 286, 296 (1942).   This money is **not** part of "protections, services and benefits" that the BIA provides to recognized Tribes. It is money that the ICC concluded the Chinook were entitled to **recover** in return for the "lands aboriginally used and occupied by the Clatsop Tribe and The Lower Band of Chinook Indians" and "taken from them without their consent as of 1851."   ICC Findings 31 (Apr. 16, 1958).   Those funds are held **in trust** pursuant to 25 U.S.C. § 1401(b).

22

141.

23
24
25
26

Of necessity, the ICC Decision entailed *de facto* acknowledgment of the Chinook as a federally-recognized Tribe.   As a matter of fact, the Commission found that the Chinook Indian Nation's Lower Columbia Band and Clatsop Tribe were the legal successors to the 1851 treaty signatories. In no uncertain terms, it stated: "[T]he defendant assumed definite

Page 56 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 • 503.224-4135 (facsimile

1   control over the areas of land exclusively used and occupied by said [Tribes] ...

2   disregarding the aboriginal rights of said Indians."

3                                       142.

4       After appeal, the U.S. Court of Claims entered its final order for the award in

5   December 1971. Within four days, the Chief of the Tribal Claims Section of the Division of

6   Tribal Operations at the BIA officially notified the Area Director of the resolution of

7   Docket 234.  The BIA then dithered for over 13 years to determine the method for

8   disposition of the judgment funds.  Finally, the BIA proposed that the monies be redirected

9   to the budget of a BIA administered program in trust for the Chinook.

10                                     143.

11       For almost 50 years, the BIA dutifully sent monthly statements regarding the Tribe's

12   Docket 234 funds to its current mailing address. The Tribal Secretary filed these away, first

13   at the tribal office in Chinook, WA until 2008, then at their tribal offices in Bay Center,

14   Washington, after they relocated there.  The monthly statements included the accrual of

15   investment gains.  When last available (Feb. 29, 2012), the Chinook account showed a

16   balance of $497,374.02.  Even given modest returns, the total is easily now over $500,000.

17                                     144.

18       Abruptly in 2015, without explanation, those statements stopped being received by

19   the Chinook Indian Nation from the BIA.  When newly-elected Chinook Tribal Chair Tony

20   Johnson investigated the BIA's actions, he did not learn why until late August 2015 when he

21   received the following response from a senior official in the Office of the Special Trustee, in

22   a letter dated August 25, 2015:

23            As you are aware, the Chinook Tribe is not Federally recognized.
            Section 25.83.2 of the Code of Federal Regulations, provides that

24            "Acknowledgement of tribal existence by the Department [BIA] is a pre-
            requisite to the protection, services and benefits of the federal government

25            available to Indian tribes by virtue of their status as tribes." Thus, because

26            you are not recognized, the funds held with our office cannot benefit your
            tribe. The only suggestion that I can make to you is that you continue to

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224.4100 • 503.224.4133 (facsimile

1   pursue recognition in accordance with the regulations set forth under CFR

2   Section 25, Part 25.

3   *See* **Exhibit D** attached. The Office of the Special Trustee has since corresponded directly

4   with the Chinook Indian Nation on other matters.

5                                                     145.

6          In sum, because the DOI no longer deemed the Chinook to be a recognized Tribe,

7   they were not entitled to an accounting or possession of their own money – money which

8   was awarded to the Chinook (first by Congress in 1912 and then additional compensation

9   by the ICC in 1970) after extensive proceedings and upon 66 detailed findings recounted in

10  a valid court order. Moreover, the BIA's "suggestion" that the Chinook pursue recognition

11  under its regulations is completely hollow, since the tribe is prohibited from doing so by

12  those same regulations. In any other context, this would be an indictable defalcation. In the

13  current situation, it is what the AIPRC earlier labeled a "Catch 22" where the BIA absolves

14  itself of its fiduciary responsibility by refusing to acknowledge tribal status – many years

15  after the fact.

16                                                    146.

17         In desperation, but still hopeful, the Tribe turned to the newly-elected President

18  Obama. The Chinook began an intensive, but unsuccessful, letter-writing campaign seeking

19  an Executive Order restoring the Tribe.

20                                                    147.

21         The Tribe then decided to appeal to the court of public opinion, and, together with

22  the Duwamish Tribe, their plight was featured in an award-winning documentary,

23  *Promised Land*, depicting both Tribes' protracted fight against federal indifference. (See

24  attached disc.)

25  ///

26  ///

Page 58 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorney at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

148.

Almost 40 years after they began the recognition process, over 200 years after Lewis and Clark landed on their shores (and almost 120 years after hiring their first lawyer), and surviving strategies designed to eliminate their very existence, the Chinook have come full circle.  They seek simple justice by petitioning this court to affirm what was internationally recognized at the time of first contact:  The Chinook are a respected and legitimate Indian Tribe with a long and proud history, entitled to formal acknowledgment as such by our federal government.

## FIRST CLAIM FOR RELIEF

### ● Declaration of Federal Recognition ●

149.

Plaintiffs reallege and incorporate herein by reference the allegations contained in ¶¶ 1-148 above.

150.

The Constitution vests Congress with plenary authority over Indian affairs. *See, e.g.,* the Federally Recognized Indian Tribe List Act of 1994, Pub. L. 103-454, § 103(1), 108 Stat. 4791 (1994) (codified at 25 U.S.C. § 5130, *et seq.* – Congressional Findings).

151.

Federal acknowledgment requires that the Secretary of Interior place a Tribe on a regularly updated list of recognized Tribes which are eligible for programs and services provided by the United States. *See* 25 U.S.C. § 1531.

152.

Congress set forth three separate means for a Tribe to achieve federal recognition in the 1994 Act:

Indian Tribes presently may be recognized by Act of Congress; by the administrative procedures set forth at Part 83 of the Code of Federal Regulations denominated "Procedures for Establishing that an American

Page 59 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ● 503.224-4135 (facsimile

1   Indian Group Exists as an Indian Tribe;" or by the decision of a United States
2   court.

3   Pub. L. 103-454, § 103(3).

4                                        153.

5          The Chinook have diligently fought for their rights through Congress and through
6   the Part 83 procedure.  However, the failure of the Congress to adopt legislation, and the
7   unlawful and arbitrary and capricious decisions of the BIA, have served to foreclose the
8   Chinook's opportunities for recognition and/or reaffirmation by non-judicial means.

9                                        154.

10         The Chinook have not been congressionally terminated.   The Secretary of the
11  Interior's failure to acknowledge the Chinook and include the Chinook on the list of
12  federally–recognized Tribes pursuant to 25 U.S.C. § 1531 violates the Fifth Amendment to
13  the Constitution and the APA as set forth herein, it violates Congressional policy to assist
14  Indian tribes and it perpetuates more than a century of historical injustice to the Chinook.

15                                       155.

16         A principle that "has long dominated the government's dealings with Indians ... [is]
17  the undisputed existence of a general trust relationship between the United States and the
18  Indian people."   *United States v. Mitchell*, 463 U.S. 206, 255 (1983).   The historic and
19  ongoing relationship between the federal government and the Chinook Indian Nation, as
20  set forth above, demonstrates the full trust relationship that exists between the federal
21  government and Chinook Indian Nation. Actions on the part of the Defendants, the
22  Executive Branch and Congress, as alleged herein, demonstrate that the federal
23  government has recognized the Chinook as an Indian Tribe; it has *de facto* acknowledged
24  the Chinook Indian Nation as a Tribe and has constructively ratified the 1851 Tansy Point
25  Treaty with The Lower Band of Chinook, to which the Plaintiff is a successor-in-interest,
26  and the 1855 Chehalis River Treaty (Treaty of Olympia), the negotiation of which the

Page 60 - COMPLAINT

1   Chinook participated in.   Recognition of the Chinook has also been demonstrated by
2   Congress, by Executive Orders, by a long course of dealing, and by satisfaction of all the
3   elements necessary for common law recognition.

4                                          156.

5       Plaintiffs therefore seek a declaration from this court that the Chinook is federally
6   recognized tribe for all of the reasons set forth herein.   Further, this Court has the power
7   and authority to order that the Chinook be placed on the Federally Recognized Indian Tribe
8   List based upon their recognition through treaties, Executive Order, Congressional action ,
9   federal common law and based upon the lengthy, detailed history of dealings with the
10  federal government since at least 1851, as set forth above, and Plaintiffs respectfully
11  request that this Court enjoin the Defendants to do so.

12                                         157.

13      The Chinook Indian Nation further seeks an injunction ordering the BIA to provide
14  benefits accorded to federally recognized Tribes in all areas, specifically including, but not
15  limited to: (1) administration of trust accounts; (2) land allotments and the ability to take
16  land into trust for community benefit, including drug and alcohol treatment; (3) probate
17  under the terms of reform legislation; (4) access to health care through IHS; (5) educational
18  benefits available to eligible tribal members through federal scholarship programs; (6)
19  rights to inventories and consultations mandated by the Native American Graves
20  Protection and Repatriation Act and other federal legislation and regulations protecting
21  cultural resources; (7) standing in Indian Child Welfare Act determinations and
22  placements; (8) recognition of fishing, hunting and gathering rights afforded by treaty and
23  subsequent adjudication since 1851; (9) access to federally managed lands under the
24  provisions of the American Indian Religious Freedom Act; (10) opportunities to qualify for
25  federal grants programs for economic development and other purposes; (11) access to
26  ///

Page 61 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
Attorneys at Law
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4135 (facsimile

1   federal housing assistance and housing funds available from HUD and other Departments;

2   and (12) maintenance of Individual Money Market accounts.

3                                      158.

4        The   Chinook   Indian   Nation   also   respectfully   requests,   pursuant   to

5   Fed.R.Civ.P. 53(a)(1)(c), that the Court appoint a Special Master versed in federal Indian

6   law to expedite this process, oversee it, and facilitate negotiations with the BIA over

7   specific items listed above. After decades of struggle and maintaining their identity against

8   all odds, the Chinook deserve an able, impartial enforcer to oversee implementation of the

9   Court's decisions in this matter.

10                           **SECOND CLAIM FOR RELIEF**

11                     ● **Violation of the Administrative Procedures Act** ●

12                                     159.

13       Plaintiffs reallege and incorporate herein by reference the allegations contained in

14   ¶¶ 1-158 above.

15                                     160.

16       The APA grants a right of judicial review to "[a] person suffering legal wrong

17   because of agency action, or adversely affected or aggrieved by agency action…."  5 U.S.C.

18   § 702.  "Final agency action for which there is no other adequate remedy in a court [is]

19   subject to judicial review." *Id.* at § 704.

20                                     161.

21       Under the APA, a court must "hold unlawful and set aside agency action … found to

22   be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

23   law…." *Id.* at § 706(2)(A).

24                                     162.

25       25 C.F.R. § 83, amended in 2015 and effective July 31, 2015, unlawfully prohibits the

26   Chinook from obtaining a fair review of its status as a sovereign Indian Tribe under the

Page 62 - COMPLAINT

1   revised criteria where it was previously denied such status after acknowledgment and

2   under a procedure that the BIA has admitted was "broken," "inconsistent,"

3   "non-transparent," and "unpredictable," a system effectively designed to deny federal

4   recognition.  The Tribe has a legal right to bring this challenge under the revised Part 83

5   regulation, even though it has not filed a new petition with the BIA since doing so, in light of

6   the ban on re-petitioning, would have been futile and resulted in certain denial.

7                                          163.

8          In fact, the Chinook have exhausted their administrative remedies.  *See Safari Club*

9   *Int'l. v. Jewell*, 832 F.3d 1280 (D.C. Cir. 2016) (futility is an exception to the requirement of

10  exhausting administrative remedies); *accord, Honig v. Doe*, 484 U.S. 305, 327 (1988)

11  (futility may occur when agency administrative processes cannot provide the relief sought

12  by the petitioner).

13                                         164.

14         Congress did not grant the BIA an express delegation of authority to prohibit Tribes

15  from re-petitioning under 25 C.F.R. § 83, and the BIA has not been given implicit legislative

16  delegation to do so because such a ban is manifestly contrary to the purpose of the federal

17  acknowledgment process.  *See* 25 C.F.R. §§ 83.2 (purpose) and 83.3 (scope).  Defendants

18  have violated the APA by adopting rules that are not  in accordance with the law by failing

19  to act pursuant to Congressionally-delegated authority in  amending the Part 83 rules,

20  codified at 25 C.F.R § 83.4(d), to prohibit the BIA from considering a new petition for

21  acknowledgment by a previously-denied Tribe under the prior, "broken" and "inconsistent"

22  Part 83 process.

23                                         165.

24         The scope of the BIA's acknowledgment process under Part 83 applies only to

25  indigenous entities (like the Chinook) that are not federally-recognized Indian Tribes.  25

26  C.F.R. § 83.3.  Consequently, Part 83 only applies to a small number of unrecognized Tribes

Page 63 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224.4100 • 503.224.4133 (facsimile

1  in the United States, and yet the BIA chose to restrict that small number of
2  non-federally-recognized Tribes to a single effort to obtain the rights that their members
3  are entitled to – federal acknowledgment and recognition – regardless of the substantive
4  merits of their claim for recognition and regardless of the BIA's admission that the
5  Chinook's Petition was effectively doomed by its own prior "broken" and "inconsistent"
6  process and regardless of that fact that the 1978 regulations under which the Chinook
7  petitioned for federal acknowledgement contained no prohibition on re-application.

8                                          166.

9         A federal agency cannot act unlawfully, or arbitrarily and capriciously or abuse its
10  discretion to prohibit petitions for redress to vindicate a regulated entity's statutory rights
11  based on its own administrative convenience and efficiency concerns and without statutory
12  authority to do so.  Congress did not authorize or intend that the BIA be allowed to delay
13  final action on a petition for more than 20 years, change the rules regarding recognition
14  and acknowledgment during that more than 20-year process to limit evidence and
15  procedural protections and allow third party objections and then grant formal
16  acknowledgment to the Tribe only to have a third-party request reconsideration at the
17  eleventh hour and then have that acknowledgment ripped away after 18 months.
18  Especially when the BIA, applying the same criteria, approved other Tribes' petitions for
19  recognition under similar, indeed virtually identical facts. Compounding its unlawful
20  behavior, the BIA relying upon its own track record of administering a "broken,"
21  "inconsistent," and "unpredictable" process, then adopted new rules that forever foreclose
22  the ability of a Tribe victimized by that process, such as the Chinook, to re-petition for
23  recognition or reaffirmation with more evidence and/or under different criteria.

24                                          167.

25         The 2015 amendments of Part 83 that became effective July 31, 2015, eliminate any
26  possibility that the BIA could consider new information or supplemental facts for

Page 64 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
Attorneys at Law
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 • 503.224-4133 (facsimile

1   reaffirmation as opposed to one for recognition. As a result, it is unlawful because it was

2   done without Congressional authority and is therefore *ultra vires*. It allows the BIA to

3   ignore unrecognized Tribes' petitions for recognition or reaffirmation without any

4   authority to do so from its governing statutes.

5   168.

6   The BIA's refusal to consider new evidence or a new Petition from the Chinook after

7   the Tribe had its initial Petition denied under an admittedly broken and unfair process

8   violates the APA because it is erroneous, arbitrary, capricious, an abuse of discretion, and

9   not in accordance with the law within the meaning of 5 U.S.C. § 706.

10   169.

11   The Chinook Indian Nation and its members have suffered substantial injury as a

12   result of the Defendants' actions, including interference with aboriginal and treaty rights to

13   fish, hunt, and gather in their aboriginal territory, and the right to have lands and monies

14   held in trust by the United States.

15   170.

16   The Chinook Indian Nation and its members are adversely affected and aggrieved by

17   the action of the Defendants in prohibiting them from re-applying for acknowledgement or

18   reaffirmation of their tribal status, in that it deprives them of rights and benefits accorded

19   to federally-recognized Tribes and their members and deprives them of their ability to

20   maintain and support their distinct tribal and cultural identity. Plaintiffs therefore seek a

21   declaration from this court that the regulatory prohibition on re-application for

22   acknowledgement or application for reaffirmation contained in 25 C.F.R. § 83.4(d), as it

23   applies to the Chinook, violates the APA.

24   ///

25   ///

26   ///

Page 65 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

### THIRD CLAIM FOR RELIEF

● **Violation of the Due Process Clause of the Fifth Amendment** ●

171.

Plaintiffs reallege and incorporate herein by reference the allegations contained in ¶¶ 1-170 above.

172.

Defendants' adoption of 25 C.F.R. § 83.4(d) which prohibits the Chinook from re-petitioning for recognition or reaffirmation of their tribal status under Part 83 violates the procedural due process component of the Due Process Clause of the Fifth Amendment.

173.

In 1975, Congress passed the Indian Self-Determination and Education Assistance Act, and again reiterated the federal policy concerning the United States' relationship with Indian Tribes:

> The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes.... In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities.

25 U.S.C. § 5302 (Congressional declaration of policy).

174.

This longstanding Congressional policy of "assisting Indian Tribes" to develop independent communities has been undermined and eroded by the BIA's action in 2015 to ban re-petitioning for tribal recognition or reaffirmation. By prohibiting the Chinook's ability to show that it is entitled to recognition and/or reaffirmation, despite the fact that the Tribe is able to demonstrate that it fairly satisfies the criteria for recognition and/or reaffirmation, Defendants have violated the Plaintiffs' right guaranteed under the U.S. Constitution to due process petition the government for redress of grievances.

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 ● 503.224-4133 (facsimile

175.

Given the federal government's underlying policy of "assisting Tribes," and the government's recognition of the Chinook on multiple occasions beginning in 1851, the Chinook should be given an opportunity to petition, for the first time, under the "reaffirmation" process of 25 C.F.R. § 83.12. The Chinook can demonstrate their ability to satisfy all of the reaffirmation criteria.

176.

Subsequent to the denial of the Chinook's petition for recognition in 2002, it became evident that the Defendants were applying the criteria for approval of petitions for recognition in a biased, arbitrary, capricious, inconsistent, and unlawful manner. The Chinook should be allowed to reapply or have their petition for recognition or reaffirmation considered in a fair and objective manner under the recognition process set forth in 25 C.F.R. § 83.7.

177.

The Chinook have therefore been substantially prejudiced, adversely affected and aggrieved  by the BIA's prohibition on re-petitioning, particularly where the regulatory scheme under which the Chinook first petitioned for federal acknowledgement contained no such prohibition on re-application and where the  BIA has subsequently acknowledged that the process under which the Chinook's petition for recognition was ultimately denied was the product of a "broken," "inconsistent," "non-transparent," and "unpredictable" process

178.

The Chinook therefore seek a declaration from this court that the Defendants' action in adopting such a regulatory prohibition on re-application for acknowledgment or reaffirmation, as it applies to the Chinook, violates the Due Process Clause of the Fifth Amendment.

Page 67 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
Attorneys at Law
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

**FOURTH CLAIM FOR RELIEF**

● **Violation of the Equal Protection Clause of the Fifth Amendment** ●

179.

Plaintiffs reallege and incorporate herein by reference the allegations contained in ¶¶ 1-178 above.

180.

The Chinook are part of a group of Tribes that may deserve federal recognition under the provisions of Part 83, but are foreclosed or prohibited from re-petitioning for recognition or petitioning for reaffirmation as a Tribe simply because the Tribe exercised its statutory right to apply for recognition prior to the 2015 amendments and was initially acknowledged and then, on reconsideration, denied under a flawed process which the Defendants have acknowledged was "broken," "inconsistent," and "unpredictable."

181.

The Chinook are similarly-situated to current tribal petitioners whose applications are being reviewed by the BIA under the 2015 amendments. The Chinook, however, are absolutely prohibited from being considered for recognition under this revision procedure without regard to their rights under the IRA or to the merits of their petition for federal recognition or reaffirmation.

182.

The Chinook also belong to a class of similarly-situated Pacific Northwest Tribes which have historically existed for millennia, and who either entered into treaties that were not formally ratified by the Congress, or who were invited by the federal government to participate in treaty negotiations and then refused to sign, but who nonetheless had their lands seized from them by the federal government. Yet the other members of the class have been subsequently federally recognized by the DOI or by Acts of Congress.

///

Page 68 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 ● 503.224-4133 (facsimile

1                                    183.

2          The Chinook have therefore been denied equal protection of the laws under the

3    Fifth Amendment because the BIA now has imposed a threshold prohibition on the Chinook

4    again seeking federal acknowledgment under the Part 83 process when similarly-situated

5    Pacific Northwest Tribes, such as the Cowlitz, either have been accepted and federally

6    recognized under Part 83, or whose petitions for acknowledgement will be considered

7    under the newly-approved and less stringent criteria.

8                                    184.

9          Furthermore, the BIA's ban on re-petitioning creates a situation where the Chinook

10   would be able to succeed in obtaining federal acknowledgement or reaffirmation under the

11   current Part 83 process because of the required application of a "consistent baseline," *i.e.*,

12   the same standards be applied to all similarly-situated Tribes petitioning the BIA for

13   recognition.  The Chinook therefore are being subjected to an unreasonable, inconsistent,

14   rigid, biased, non-transparent, and subjective analysis that failed to apply the same

15   "consistent baseline" to it as was applied to other tribal petitioners who participated in the

16   same 1855 Treaty negotiations, and/ or who had monies appropriated by Congress for

17   them to compensate them for the values of their seized lands, all of whom have now been

18   successfully recognized, in violation of the Equal Protection component of the Fifth

19   Amendment.

20                                   185.

21         Plaintiffs therefore seek a declaration from this court that the actions of the

22   Defendants as set forth above constitute a violation of the Equal Protection component of

23   the Fifth Amendment.

24   ///

25   ///

26   ///

Page 69 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 ▪ 503.224-4133 (facsimile

1

## FIFTH CLAIM FOR RELIEF

2

### • Petition Clause of the First Amendment Challenge •

3

186.

4  Plaintiffs reallege and incorporate herein by reference the allegations contained in

5  ¶¶ 1-185 above.

6

187.

7  The First Amendment to the Constitution protects "the right of the people ... to

8  petition the Government for a redress of grievances."  *Borough of Duryea, Pa. v. The*

9  *Guarnieri*, 564 U.S. 379, 382 (2011).  The Petition Clause of the Constitution protects a

10  citizen's right of access to mechanisms for their redress of grievances.

11

188.

12  By prohibiting the Plaintiff as a once-denied petitioner for recognition from

13  applying for reaffirmation of its Tribal status for a first time, or seeking to reapply for

14  acknowledgment, Defendants have effectively foreclosed the ability of the Chinook to seek

15  redress or to grieve its federal recognition status.  Defendants have therefore violated the

16  Petition Clause of the First Amendment. Plaintiffs therefore seek a declaration from this

17  court that the actions of the Defendants constitute a violation of the Petition Clause of the

18  First Amendment.

19

## SIXTH CLAIM FOR RELIEF

20

### • Violation of APA •

21

189.

22  Plaintiffs reallege and incorporate herein by reference the allegations contained in

23  ¶¶ 1-188 above.

24

190.

25  The federal government has already concluded that the Chinook had aboriginal or

26  Indian title over the lands taken from them:

Page 70 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 • 503.224-4133 (facsimile

1    Upon the findings of fact this day filed herein and hereby made a part of this
     order, the Commission concludes as a matter of law, that … the Chinook
2    (proper) Indians [Lower Band of Chinook] had Indian title to the lands
     described … and that the defendant [United States of America] assumed
3    definite control over the lands of the Chinook (proper) tribe as of August 9,
     1851, that said Indian tribal groups have the capacity and the right to assert
4    claims for their respective lands….

5

6    6 Ind. C. Comm. 176a (1958).  The federal government has further determined that those

7    lands were and are deserving of compensation:

8    [T]he lands of the Chinook Indians were taken as of the dates of the
     unratified treaties at which time "the defendant assumed definite control
9    over the areas of land… disregarding the aboriginal rights of said Indians."

10   21 Ind. C. Comm. 143, 151 (1969), quoting 6 Ind. C. Comm. 177, 207 (1958).

11                                        191.

12       Defendants' actions in denying the federal acknowledgment of the Chinook Indian

13   Nation are now being used to justify Defendant DOI's refusal of the Chinook to access the

14   money awarded to them by Congress and the Indian Claims Commission for seizure of their

15   land – denying the Chinook Indian Nation proper compensation for land over which the

16   government has already determined the Tribe had "aboriginal or Indian title." See Ch 214,

17   H.R. 2694, 43 Stat. 886.

18                                        192.

19       Despite the fact that partial payment was appropriated for and administered to the

20   Chinook by Congress and the BIA, respectively, in 1912, the Indian Claims Commission in

21   1970 determined that such payment did not constitute just compensation and awarded the

22   Chinook an additional sum of money. Dkt. 234, Ind. Cl. Comm. 56.  Defendant DOI now flatly

23   refuses to pay out that monetary award to the Chinook: "[B]ecause you are not recognized,

24   the funds with our office cannot benefit your tribe." Letter from Catherine E. Ruge, Regional

25   Trust Administrator, U. S. Department of the Interior Office of the Special Trustee for

26   American Indians, to Tony A. Johnson, Chairman of the Chinook Indian Nation (August 25,

Page 71 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
Attorneys at Law
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224-4100 • 503.224-4133 (facsimile

2017). Even though the money awarded to the Chinook by the Indian Claims Commission is now held in trust by the DOI for the Chinook, the fact that the DOI refuses to release the money to the Chinook means that the Chinook, by the terms set forth by the Indian Claims Commission, *have not been justly compensated* for the land taken from them following the signing of the 1851 treaties at Tansey Point.

193.

As DOI Regional Trust Administrator Rugen points out in her letter of August 25, 2015, 25 C.F.R § 83.2 provides that "Acknowledgment of tribal existence by the Department is a prerequisite to the protection, services and benefits of the Federal government available to Indian tribes by virtue of their status as tribes." She argues that because the *BIA* has not acknowledged the Chinook as a tribe, the Chinook Indian Nation is therefore ineligible to receive its award. However, the Indian Claims Commission made a preliminary determination of eligibility before the Chinook were allowed to proceed with their claim against the federal government. Further, when Congress appropriated money in 1912 to compensate the Chinook for land taken as a result of the 1851 Tansey Point treaties, it was the BIA that managed distribution of those funds to the Chinook. The Chinook Indian Nation has not been terminated and, further, has been recognized many times over by other branches and agencies of the federal government – including many within the Department of the Interior. The DOI's refusal to allow the Chinook Indian Nation to access funds awarded to it by the Indian Claims Commission as just compensation for land taken from it by the federal government therefore violates the APA. It is arbitrary and capricious, an abuse of discretion, and not in accordance with the law.

///
///
///
///

Page 72 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224.4100 ▪ 503.224.4133 (facsimile

### SEVENTH CLAIM FOR RELIEF

### ● Procedural Due Process Challenge ●

194.

Plaintiffs reallege and incorporate herein by reference the allegations contained in ¶¶ 1-193 above.

195.

The actions of Defendants in forfeiting the monies previously appropriated by Congress and upheld by the Courts for the Chinook and/or its members, Defendants have deprived the Chinook of a protected property interest to which the Fifth Amendment's Due Process protection applies.

196.

Forfeiture of monies that have been appropriated over 100 years ago for the Chinook and/or its members by Congress as compensation for lands seized by the federal government in the aftermath of treaty negotiations is not, and should not, be dependent upon the results of any regulatory acknowledgment decision made in 2002, especially when the decision by the Defendants to declare the Chinook's property forfeited to them was not, in fact, made until almost two years ago (August 2015) without any prior notification, opportunity to be heard, or opportunity to challenge the decision. Such an action by the Defendants should be declared by this court to constitute a violation of the procedural component of the Due Process Clause of the Fifth Amendment.

### EIGHTH CLAIM FOR RELIEF

### ● Substantive Due Process Challenge ●

197.

Plaintiffs reallege and incorporate herein by reference the allegations contained in ¶¶ 1-196 above.

///

Page 73 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 ▪ 503.224-4133 (facsimile

1

198.

2  In forfeiting monies previously appropriated by Congress and upheld by the courts

3  for the Chinook and/or its members, Defendants have deprived the Chinook of a protected

4  property interest to which the Fifth Amendment's Due Process protection applies and

5  which enjoys protection from the substantive component of the Due Process Clause of the

6  Fifth Amendment.

7

199.

8  Forfeiture of monies that have been appropriated beginning over 100 years ago that

9  were appropriated for the Chinook and/or its members by Congress as compensation for

10  lands seized by the federal government in the aftermath of treaty negotiations is not, and

11  should not, be dependent upon the results of any regulatory acknowledgment decision

12  made in 2002, especially when the decision by the Defendants to declare the Chinook's

13  property forfeited to them was not, in fact, made until almost two years ago (August 2015)

14  without any prior notification, opportunity to be heard, or opportunity to challenge the

15  decision. Such an action by the Defendants "shocks the conscience" and should be declared

16  by this court to constitute a violation of the substantive component of the Due Process

17  Clause of the Fifth Amendment.

18  **WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

19  (1)  On their First Claim for Relief, for a declaration that the Chinook is entitled to

20  be a federally acknowledged Indian tribe, that it and its members are to be

21  accorded the full panoply of services and benefits that accompany federal

22  recognition and an order enjoining the Defendants to place the Chinook on

23  the Federally Recognized Indian Tribe List;

24  (2)  On their Second through Fifth Claims for Relief, without waiving the above,

25  for a declaration that the regulatory prohibition on petitioning for

26  reaffirmation or re-petitioning for recognition for a tribe previously denied

Page 74 - COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 ▪ 503.224-4133 (facsimile

recognition under 25 C.F.R. 83.4(d) is unlawful, unconstitutional, arbitrary and capricious, and unenforceable as it applies to the Chinook;

(3)     On their Sixth through Eighth Claims for Relief, for a declaration that the Chinook are entitled to the entire value of their tribal trust account as of the date of the filing of this Complaint, together with interest accrued during the pending litigation;

(4)     For their reasonable attorney fees and costs and expenses pursuant to the Equal Access to Justice Act; and

(5)     For such other and further relief as the Court deems just and equitable.

DATED:  August 24, 2017.

LANDYE BENNETT BLUMSTEIN LLP

By: _____

Thane W. Tienson, WSBA #13310
ttienson@lbblawyers.com
Attorneys for Plaintiffs

Page 75 - COMPLAINT