1
2
3
4
5

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

**CHINOOK INDIAN NATION**, an Indian Tribe, and as successor-in-interest to The Lower Band of Chinook Indians; **ANTHONY A. JOHNSON**, individually and  in his capacity as Chairman of the Chinook Indian Nation; and **CONFEDERATED LOWER CHINOOK TRIBES AND BANDS**, a Washington nonprofit corporation,

Plaintiffs,

v.

**RYAN K. ZINKE**, in his capacity as Secretary of the U.S. Department of Interior; **U.S. DEPARTMENT OF INTERIOR**; **BUREAU OF INDIAN AFFAIRS, OFFICE OF FEDERAL ACKNOWLEDGMENT**; **UNITED STATES OF AMERICA**; and **JOHN TAHSUDA**, in his capacity as Acting Assistant Secretary – Indian Affairs,

Defendants.

Case No. 3:17-CV-05668-RBL

**FIRST AMENDED COMPLAINT**

Plaintiff alleges:

**INTRODUCTION**

1.

This is an action brought by the Chinook Indian Nation, an Indian Tribe, and as successor-in-interest to The Lower Band of Chinook Indians, its Chairman Anthony

Page 1 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile)

1  Johnson, and the Confederated Lower Chinook Tribes and Bands, a Washington nonprofit

2  corporation (collectively "Chinook" or "Tribe"). This action is brought under the U.S.

3  Constitution, the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 500, *et seq.*, 554,

4  701-706, and Declaratory Judgment Act to address the deprivation of rights, privileges, and

5  immunities secured by the Constitution and laws of the United States, and upon 28 U.S.C.

6  § 2412, the Equal Access to Justice Act, which authorizes the award of attorney fees and

7  costs to the prevailing plaintiffs in such actions.

8                                                    2.

9         This Complaint seeks a Declaratory Judgment from the Court that the Treaty of

10  Tansey Point between the Defendant United States of America and the Lower Band of

11  Chinook Indians was thereafter constructively ratified by Congress through the Acts of

12  Congress of 1911, 1912, and 1925, as set forth in greater detail *infra*, and that the Chinook,

13  as successor-in-interest to the Lower Band of Chinook Indians is therefore entitled to be

14  acknowledged as a federally recognized sovereign Indian nation under federal common

15  law, or under governing federal statutes, or, alternatively, Plaintiffs seek a declaration from

16  this court that the actions of Congress and the over 100-year course of dealing between the

17  Defendants and the Chinook has resulted in *de facto* or constructive federal

18  acknowledgment of the Chinook as an Indian Tribe. In the alternative, without waiving the

19  above, Plaintiffs seek an order and judgment of this Court invalidating the Bureau of Indian

20  Affairs ("BIA") regulation prohibiting the Chinook, as a Tribe once denied formal

21  recognition from re-petitioning for recognition or reaffirmation of their federal tribal

22  status. In addition, the Chinook seek a declaratory judgment from this Court

23  acknowledging their right to monies appropriated to them by Congress and awarded to

24  them by the United States Court of Claims. Finally, because of the BIA's historical and

25  continuing mismanagement and malfeasance, the Chinook Indian Nation further seeks

26  ///

Page 2 - FIRST AMENDED COMPLAINT

1  injunctive relief and requests that a Special Master be appointed by the Court to monitor

2  agency action or inaction in response to this Court's orders.

3  **JURISDICTION AND VENUE**

4  3.

5  Jurisdiction is conferred by this Court by 28 U.S.C. § 1331 (federal question

6  jurisdiction) because this action raises substantial questions of federal law under Plaintiff's

7  Chinook Tribe's Treaties with the United States, the APA (5 U.S.C. §§ 554, 701-706, *et seq.*),

8  federal common law and the Federally Recognized Indian Tribe List Act of 1994.  108 Stat.

9  4791 (1994) (codified at 25 U.S.C. § 5130), and the federal Mandamus Act, 28 U.S.C. § 1361.

10  4.

11  The United States has waived sovereign immunity from suit under 5 U.S.C § 702

12  because Plaintiffs seek review of agency action and to mandate federal acknowledgment of

13  the Chinook as a recognized Indian Tribe.  This Court has personal jurisdiction over the

14  Defendants pursuant to 28 U.S.C. § 1391(e) as they are federal agencies and officers of the

15  United States.

16  5.

17  Venue lies in this district because a substantial part of the events or omissions

18  giving rise to the claims occurred in this district.  28 U.S.C. § 1391(e).

19  **PARTIES**

20  6.

21  Plaintiff Chinook Indian Nation is an Indian Tribe located and long present in the

22  States of Washington and Oregon.  Presently and since 2008, its principal location has been

23  in Bay Center, Washington, at the north end of Willapa Bay.  The Chinook Indian Nation,

24  including its predecessors-in-interest, is comprised as a single community and has existed

25  as a community on a substantially continuous basis from historical times and certainly

26  from 1900 to the present.  The Chinook Indian Nation is the present-day political

Page 3 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224.4100 • 503.224.4133 (facsimile

organization of, and successor-in-interest to The Lower Band of Chinook Indians, Wau-ki-kum ("Wahkiakum") Band of Chinook Tribe of Indians, Wheelappa ("Willapa") Band of Chinook Indians, Cathlamet Band of Chinook Indians, and Clatsop Tribe of Indians, that historically lived on both sides of the lower Columbia River and which were parties to the treaties of Tansey Point signed in August 1851. Further, the Chinook Indian Nation is a successor-in-interest to those Chinook Indians who participated in the Chehalis River Treaty negotiations with Washington Territorial Governor Isaac Stevens in 1855 that resulted in the Treaty of Olympia, ratified by Congress in 1859. The Chinook Indian Nation and/or its members descend from the historic Chinook Tribe, including the Lower Band of Chinook and Clatsop Tribe, that resided in the area of the lower Columbia River since time immemorial and which has combined and functions as a single autonomous political entity and has maintained political influence and authority over its members from historic times to the present.

7.

The Chinook have satisfied all mandatory criteria established for federal recognition, acknowledgment, or reaffirmation as an Indian Tribe by the U.S. Department of Interior ("DOI") pursuant to applicable statutes and their implementing regulations and as set forth in 25 C.F.R. § 83, including the regulations first promulgated in 1978, those adopted in 1994, and the 2015 regulations which are currently in place. The Chinook constitute an "Indian Tribe," as that term is defined and applied in all laws and regulations applying to Indian Tribes administered by the DOI, and its members constitute "Indians" or "members of an Indian Tribe," as those terms are defined and applied in those same laws and regulations.

8.

Plaintiff Confederated Lower Chinook Tribes and Bands is a Washington nonprofit corporation organized, *inter alia*, to promote the educational, cultural, and economic

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

development interests of all Indians who are descendants of the Lower Band of Chinook Tribe/Nation, to protect their rights and enforce claims against the federal government.

9.

The Chinook Indian Nation governs itself pursuant to a duly adopted constitution, which was first drafted in 1925 and has since been amended (*see* **Exhibit A** attached). Its members are descended from the Chinook Indians who signed the 1851 Tansey Point treaties and who participated in the 1855 Chehalis River treaty negotiations and are a distinctive, indigenous Indian Tribe that has resided near the mouth of the Columbia River since time immemorial.

10.

Plaintiff Anthony "Tony" A. Johnson is the elected Chairman of the Chinook Indian Nation, authorized to bring this action on behalf of the Chinook and a direct descendent of Lower Band of Chinook Indians, as well as Clatsop and Wahkiakum Band of Chinooks, were signatories to the 1851 Tansey Point Treaty, referenced herein and who sent representatives to the 1855 Chehalis River treaty negotiations. Plaintiff Johnson and his Chinook ancestors have actively pursued justice for the Chinook for more than a century.

11.

Defendant Ryan K. Zinke ("Zinke") is the Secretary of the U.S. Department of the Interior.

12.

Defendant John Tahsuda ("Tahsuda") is the Acting Assistant Secretary – Indian Affairs and is the highest ranking official in the BIA,[1] which has direct responsibility for administering the acknowledgment procedures for Indian Tribes. John Tahsuda is the current Acting Assistant Secretary – Indian Affairs, and Defendants have substituted him in for Defendant Michael Black who was formerly serving in that role.

Page 5 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

**13.**

Both Zinke and Tahsuda are officers or employees of the DOI and have direct or delegated statutory duties for carrying out relations with the Indian Tribes and the United States' obligations to Indian Tribes under 25 U.S.C. §§ 2 and 9. Both Zinke and Tahsuda are named here in their official capacities. In that official capacity, Secretary Zinke is responsible for the overall administration of the BIA, an agency within the DOI tasked with managing the federal government's relationship through various agreements with Indian Tribes, Nations, and Bands within the United States. 43 U.S.C. § 1457.

**14.**

Among Assistant Secretary Tahsuda's duties and responsibilities is to make a final decision on petitions for acknowledgment and reaffirmation of an Indian Tribe under the authority delegated to him by the Secretary under 25 C.F.R. § 83, and to oversee monies appropriated by Congress and held in trust for Indian Tribes and their members.

**15.**

Defendant Department of the Interior ("DOI") is a cabinet-level agency of the United States and is responsible for managing the relations with Indian Tribes through the BIA and its Assistant Secretary. The DOI is also responsible for promulgating regulations pursuant to statutory authority granted to it by Congress, and insuring compliance with those regulations.

**16.**

Defendant DOI, acting through the BIA and its Office of Federal Acknowledgment ("OFA") (formerly the Branch of Acknowledgment and Research), is the administrative agency that currently receives and processes applications from Indian groups for

---

(continued)

[1] The Office of Indian Affairs was renamed the Bureau of Indian Affairs by the DOI on September 17, 1947.

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

recognition, acknowledgment, or reaffirmation of tribal status in accordance with 25 C.F.R. Part 83 and the U.S. Constitution, statutes, regulations, treaties, and legal requirements.

///

17.

Defendant United States of America includes all government agencies and officers, including the within named Defendants, charged with the administration of Indian affairs and responsible for protection of property and rights of the Chinook, including under the terms of the 1851 and 1855 treaties that are, in part, the subject of this action. Plenary authority over Indian affairs is reserved to the U.S. Congress under Art. I, § 8, of the U.S. Constitution.

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

18.

Federal acknowledgment or recognition of an Indian Tribe is essential for a tribe and its members to be eligible for programs and services provided by the United States. The Defendant Secretary maintains a list of all of those tribes which have been so recognized. See 25 U.S.C. §§ 5130-31.

> Federal recognition affords important rights and protections to Indian tribes, including limited sovereign immunity, powers of self-government, the right to control the lands held in trust for them by the federal government, and the right to apply for a number of federal services. 'Federal recognition may arise from treaty, statute, executive or administrative order, or from a course of dealing with the tribe as a political entity.'

*Kahawaiolaa v. Norton*, 386 F.3d 1271, 1273 (9th Cir. 2004), quoting William C. Canby, Jr., *American Indian Law in a Nutshell* 4 (4th ed. 2004).

19.

The significance of formal recognition or acknowledgment of an Indian Tribe by the DOI is underscored by the Federally Recognized Indian Tribe List Act of 1994, Pub. L. 103-454, 108 Stat. 4791, 25 U.S.C. § 479(a), *et seq.* Under that Act, a Tribe's inclusion on the

Page 7 - FIRST AMENDED COMPLAINT

list of federally-recognized Tribes maintained by the DOI imposes upon the Secretary of the Interior "specific obligations to provide a panoply of benefits and services to the Tribe and its members.... Appearing on the List is a functional precondition to receipt of those services. In addition to the BIA, other federal agencies which provide services to the Tribes use the List to determine eligibility." House Rept. No. 103-781 at 3 (Oct. 3, 1994). These services include, *inter alia*, health, probate, individual money accounts, economic development support, and education.

20.

The Federally Recognized Indian Tribe List Act of 1994 also provides in pertinent part that "Indian tribes presently may be recognized...by a decision of a United States Court." Pub. L. 103-454, § 103(3). The Chinook have sought federal recognition diligently but unsuccessfully through the BIA's "broken" and "inconsistent" acknowledgment process. In fact, the Chinook have exhausted the administrative remedies available through the BIA and OFA. Nonetheless, the Chinook have satisfied and presently are able to satisfy all of the criteria established for recognition or reaffirmation through common law, through treaties, through executive orders and/or Congressional legislation, and through a very lengthy course of dealing with the federal government. The Tribe therefore has resorted to this United States court to seek a Declaration that it is entitled to be recognized as a tribe by the defendants and that defendants should accordingly be enjoined to provide that formal recognition to the plaintiff Chinook Indian Nation.

**FEDERAL RECOGNITION OF THE CHINOOK THROUGH COMMON LAW**

21.

In *Montoya v. United States,* 180 U.S. 261 (1901), the Supreme Court adopted a four-part common law test for whether an Indian group constituted a tribe for the purpose of the Indian Depredation Act of 1891 (26 Stat. 851). *See also U.S. v. Holliday*, 70 U.S.407 and

Page 8 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 ▪ 503.224.4133 (facsimile

*U.S. v. Sandoval*, 231 U. S. 28. The Court in *Montoya* defined "tribe," providing that members must be:

(1)     A body of Indians of the same or similar race;

(2)     United in a community;

(3)     Existing under one leadership or government; and

(4)     Inhabiting a particular though sometimes ill-defined territory.

180 U.S. 266. The Department of the Interior, in its Reconsidered Final Determination Against Federal Acknowledgment of the Chinook, did not dispute that the Chinook are comprised of a body of Indians of substantially the same race (in other words, not made up of members of other tribes). Further, the DOI found that even though the Chinook could demonstrate that it was united in a community and existing under one leadership or government for the extended historical period required, the Chinook certainly had shown that they had been doing so for decades. Finally, the DOI recognized that a large portion of the Chinook still live in their historic territory around the mouth of the Columbia River.

22.

The Chinook clearly satisfy the requirements for common law recognition. It is within the power of this Court to declare that the tribe is accordingly federally recognized, 25 U.S.C. §§ 479a, 479a-1, and to order that the Chinook Indian Nation be added to the Federally Recognized Indian Tribe List, 25 U.S.C. § 5131.

**FEDERAL RECOGNITION OF THE CHINOOK THROUGH TREATIES**

**1851 Tansey Point Treaties**

23.

The 1850s was a decade of rapid settlement in the western United States, and – not coincidentally – a period of frantic treaty negotiations. The federal government wanted Indian lands for white settlers and instructed negotiators to relocate those Indians remaining west of the Cascades in the then-Oregon Territory to less populated, arid land

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

east of the mountains.  By that time, diseases contracted from the early explorers, fur traders, and settlers had diminished Indian populations to a tiny fraction of their former numbers.  The Chinook, because of their historic dominance and location at the mouth of the Columbia River where they began trade with whites in the late 18th century, were particularly devastated by exposure to diseases to which they had no natural resistance.  By 1851, their numbers were estimated to be less than 400.  Oregon Territorial Superintendent of Indian Affairs Anson Dart was dispatched in 1851 to conclude treaties with the Chinook and related bands at Tansey Point, near Astoria, Oregon.

24.

Superintendent Dart thereafter succeeded in securing signatures from the ancestors of present tribal members in the treaties he negotiated with all of the Chinook, including the Lower Band of Chinook Tribe, Wheelappa ("Willapa") Band of Chinook Tribe, Wau-ki-kum ("Wahkiakum") Band of Chinook Tribe, and Clatsop Tribe.  Under the terms of the treaties, the Chinook ceded lands and received certain reserved rights from the federal government. Dart forwarded these treaties to Washington, D.C., in November 1851.  The treaties passed to President Fillmore on July 20, 1852, who, in turn, submitted them to the Senate on July 31 for ratification.  Millions of acres ceded by the Chinook in the Tansey Point treaties were seized by the federal government shortly after the treaties were submitted to Congress for ratification.  None of the treaties secured formal Congressional ratification, but rather remained in limbo.  32nd Congress, 1st Session, Senate Confidential Executive Documents Nos. 46, 50, 52, 53, and 54.  *See also* Bernholz at 125 and Deloria and DeMallie, pp. 218-219, 223-228.

**1855 Stevens Chehalis River Treaty Negotiations**

25.

The Chinook participated in treaty negotiations with the federal government again in 1855 after creation of the Washington Territory, this time led by newly-appointed

Page 10 - FIRST AMENDED COMPLAINT

Washington Territorial Governor Isaac Stevens.  Governor Stevens' goal was to remove the Indians from areas of white settlement.  During negotiations, it became clear that the Chinook would be forced to leave their lower Columbia River homelands and join several other Tribes – including their historic adversaries, the Quinault – on a reservation to the north on the Washington coast.  The Chinook did not want to abandon their traditional food sources and the land of their ancestors' graves for that of their historic enemies, the Quinaults, and refused to sign, as did the Chehalis and Cowlitz Tribes.  *From "Boston Men" to the BIA: The Unacknowledged Chinook Nation*, pp. 268-69 (Robinson, John R.).   The Quinault did sign, however.

26.

Finally, in 1859, the resulting treaty, the Treaty of Olympia, was ratified by Congress and the Chinook were included among the "fish-eating tribes" whom the federal government hoped would take advantage of its provisions.  Later this treaty was favorably cited by the Supreme Court when considering Chinook land and compensation claims and allotments.  *Halbert v. United States*, 283 U.S. 753, 51 S.Ct. 615 (1931):

> [T]here were also provisions in the treaty … consenting that the President might "consolidate" the Quinaielts and Quillehutes and "other friendly tribes," whenever in his opinion the public interest and the welfare of the Indians would be promoted by it…. Our conclusion … is that the Chehalis, Chinook and Cowlitz Tribes are among those whose members are entitled to take allotments within the Quinaielt Reservation, if without allotments elsewhere.

Both the Chehalis and Cowlitz Tribes have since been federally recognized, as have all other tribes ruled eligible for allotments on the Quinault Indian Reservation: Ozette (part of the Makah Indian Tribe), Queets (part of the Quinault Indian Nation), Shoalwater Bay, Quilleute, Quinault, and Hoh.

27.

Page 11 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

In its review of the Cowlitz Indian Tribe's Petition for Acknowledgement, the Branch of Acknowledgment and Research ("BAR")[2] determined that the government's mere willingness to participate in treaty negotiations constituted unambiguous prior federal acknowledgment, dramatically lowering the Cowlitz's burden for demonstrating its case for official acknowledgment (*see* Reconsidered Final Determination for the Cowlitz Indian Tribe at 17). That same consideration was not given to the Chinook, whose acknowledgment petition ultimately failed before the BAR. In fact, of the Tribes that participated in the Chehalis River Treaty negotiations, only the Chinook remain unacknowledged today.

## FEDERAL RECOGNITION OF THE CHINOOK
## THROUGH EXECUTIVE ORDER

28.

Congress abolished the practice of treaty-making after several Tribes aligned themselves with the Confederacy during the Civil War and the military advantage of the treaties declined. *See The Incomplete Loom: Exploring the Checkered Past and Present of American Indian Sovereignty*, 64 Rutgers L. Rev. 471, 476, n. 28 (Jackson, Harry S. III) (2012). Following the cessation of treaty-making, federal recognition of Tribes occurred when the Executive Branch set aside certain federally-owned lands for the use of Indians and Indian Tribes by Executive Order. This method was ended by Congress in 1919.

29.

Following the treaty negotiations with the Chinook in 1851 and 1855, two Presidents were subsequently moved to grant some measure of relief to the Chinook through Executive Orders. In 1866, President Andrew Johnson created the small

---

[2] The Branch of Acknowledgment and Research was nested within the Bureau of Indian Affairs until July 27, 2003, when it was renamed the Office of Federal Acknowledgment, and now reports directly to the Deputy Assistant Secretary – Indian Affairs.

Page 12 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

Shoalwater Bay Reservation, an area where a small number of Chinook and Chehalis had congregated at the extreme north end of the Chinook's ceded territory. Pursuant to that Order, provisions were made for locally-residing Chinook families to be enrolled and reside on that reservation. *Indian Affairs: Laws and Treaties*, Vol. I, Part III, at 924 (Kappler) (1904).

///

30.

Seven years later, in 1873, President Grant greatly expanded the Quinault Reservation (from 10,000 acres to 220,000 acres) to include sufficient land to accommodate the Chinook and other non-Quinault "fish-eating" Indians. *Id.* at 923. While large numbers of Chinook subsequently moved there in order to receive federal benefits, they noted their Chinook identification on tribal documents and continued to participate in Chinook community events in Bay Center on Willapa Bay and along the Columbia River All the while, Executive Branch officials treated the Chinook as a separate tribal entity.

**FEDERAL RECOGNITION OF THE CHINOOK THROUGH**

**CONGRESSIONAL ACTION**

31.

In addition to recognition through treaties and executive orders, Congress has recognized certain Indian Tribes through federal legislation, either implicitly by legislating with respect to a particular Tribe regarding some matter other than recognition, or by expressly extending federal recognition.

32.

Over the past century, Congress has demonstrated its recognition of the Chinook in several ways. First, Congress authorized two separate series of treaty negotiations with the Chinook (first in 1851 and again in 1855), a standard which the BIA found in 2001 to constitute "unambiguous prior federal acknowledgement" for the Cowlitz Indian Tribe

Page 13 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 ▪ 503.224.4133 (facsimile

during its recognition petition – a petition which was considered concurrently with that of the Chinook. Second, Congress appropriated money *twice* for the express purpose of compensating the Chinook for land seized by the federal government following the 1851 treaties negotiated with the Chinook at Tansey Point, a standard which Assistant Secretary of the Interior Gover later found to constitute constructive, statutory ratification of those treaties. Third, Congress authorized lawsuits brought by the Chinook, recognizing the Chinook as a tribal entity with standing to sue the federal government. Fourth, Congress created the American Indian Policy Review Commission ("AIPRC"), a commission which included members of Congress, and which found severe inadequacies in the process by which Tribes could become federally recognized. AIPRC identified the Chinook as having treaty rights and expressly recommended that they be formally recognized. Congress has been clear: The Chinook are a Tribe deserving of federal recognition – an action which would simply formalize their long-existing government-to-government relationship with the United States.

33.

Further, there have been several instances of Congress appropriating funds for the benefit of the Chinook, beginning in 1899. S. 1941, *A Bill for the Relief of The Lower Band of the Chinook Indians of the State of Washington* (Dec. 20, 1899). On December 20, 1899, Senator Turner from Washington introduced a bill, S. 1941, for the relief of The Lower Band of the Chinook Indians of the State of Washington. That bill was initially referred to the Senate Committee on Claims, but was later transferred to the Senate Committee on Indian Affairs. Cong. Rec., Proceedings and Debates of the 56th Congress at 585. The Lower Band of Chinook had filed a land claim against the federal government seeking compensation for the millions of acres of land taken by the federal government following the Tansey Point treaties – treaties which had (and have) remained in congressional limbo, neither ratified nor rejected, since their signing in 1851.

Page 14 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

34.

Congress also sought to make amends with the Chinook, admitting they had been treated "shabbily" by the federal government in failing to ratify their 1851 treaties and the manner in which they had been dealt with thereafter.  In 1900, Congress granted the Chinook authority to petition for annuities and it sent a federal investigator (McChesney) out to Chinook country in 1906 to compile a federal enrollment roster so that federal benefits could be properly distributed to them.  Based in part on those findings, Congress appropriated funds for the Chinook in 1912 in the exact amounts specified in the 1851 treaties.  Those funds were expressly meant to compensate the Chinook for land seized following the 1851 treaties. In 2001, DOI Assistant Secretary – Indian Affairs Gover (a recognized national expert in federal Indian law) appropriately characterized this as evidence of "constructive ratification" by Congress of the 1851 treaty with the Lower Band of Chinook for, in fact and in law, that treaty has been constructively ratified.

35.

The Indian Appropriation Act of 1906 is one of the first examples of Congress' explicit discussion of reimbursing the Chinook for land ceded in the unratified treaties at Tansey Point in 1851.  In a Senate committee hearing on that legislation, an insightful exchange took place:

> Senator Fulton…. Years ago the Government entered into a treaty with the Lower Band of Chinook Indians, whereby the Government agreed to pay to the Indians a certain stipulated sum of money, and all their lands were to be ceded to the Government. The treaty was never ratified, but the Government, nevertheless, took their lands and the Indians were crowded off.
>
> Senator Teller. They were never paid for their lands?
>
> Senator Fulton. They never were paid a dollar for them….

* * *

///

///

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

Senator Clapp. It seems from this bill that the lands were sold and the proceeds covered into the Treasury. Is there anything to show how much was covered in?

Senator Fulton. Yes, sir; the Land Department could ascertain that.

Senator Clapp. Have you any idea what it was?

Senator Fulton. It was a good many millions. I do not know just how much territory the Lower Band of Chinooks gave, but it was several millions.

* * *

Senator Clapp. You claim that we took the land and sold it?

Senator Fulton. Yes, sir; there were several Tribes in the same situation.

Senator Teller. Did we take any more of the Indians' lands than were sold?

Senator Fulton. We sold it all; it is all sold – every foot of it.

Indian Appropriation Bill, 1905, Hearing before the Subcommittee of the Committee on Indian Affairs of the Senate of the United States, 58th Cong. 3rd Sess. (1905) (Statement of Sen. Charles W. Fulton).

36.

In a letter filed December 10, 1906, and transmitted on January 7, 1907, the Assistant Clerk of the Court of Claims provided a copy of the Findings of the Court of Claims in the case of the Lower Band of Chinook Indians of the State of Washington against the U.S. to President of the U.S. Senate, Charles W. Fairbanks.  The Findings were that the Lower Band of Chinook Indians entered into the Treaty of Tansey Point on August 9, 1851; that on July 30, 1852, the then-Secretary of the Interior to whom the treaty had been forwarded, transmitted it to the President with a recommendation for its ratification, and that the President thereafter transmitted the treaty to the Senate Committee on Indian Affairs, but the treaty was not thereafter ratified nor rejected, but was still pending in the Senate; and that as of the date of the letter, approximately 95% of the total number of acres ceded by

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

the Lower Band of Chinook Indians had been disposed of by the federal government, *i.e.*, 217,036 acres of the 232,814 acres encompassed by the treaty; and that none of the consideration specified in the treaty had been paid to the Chinook Indians.

37.

Congress thus clearly recognized – and further, admitted – that the defendant federal government, despite the absence of formal ratification, nonetheless acted as if the treaties had been fully ratified and seized all of the Chinook's land under the terms of the 1851 treaties, sold that land, and never compensated the Chinook. That is still true today. The 1851 Treaty of Tansey Point, at least with respect to the Lower Band of Chinook, was constructively ratified by the Defendants, thereby entitling the Tribe to be formally recognized as such by the Defendants.

38.

Between January and June 1906, Dr. Charles E. McChesney, Supervisor of Indian Schools for the BIA, visited the Pacific Northwest to prepare an enrollment of Indians pursuant to pending distribution of funds in land claims litigation before the Court of Claims (now the Court of Federal Claims). The Indian Appropriation Act of 1906 (33 Stat. 1073), passed in recognition of the 1851 treaties, expressly authorized the Secretary of the Interior to "investigate the number of ... Lower Band of Chinook Indians of Washington, and Kathlamet band of Chinook Indians of the state of Oregon, or their heirs." McChesney's 1906 report documented every member of the Chinook who was alive in 1851 and living in 1906, or those who were heirs of tribal members alive on the date of the 1851 treaties were signed. Of the total of 124 Chinook heirs identified in 1906 by Agent McChesney, 86% lived within or immediately adjacent to the aboriginal Chinook tribal homeland. The McChesney Roll continues to be used by the Chinook to determine eligibility for enrollment.

///

///

Page 17 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

**Allotment Act of March 4, 1911**

39.

Another such Congressional Act is the Allotment Act of March 4, 1911. In that Act, Congress authorized Tribes, including the Chinook, whose lands had been taken from them by the federal government without compensation, to obtain allotments of land.

40.

Shortly thereafter, the Chinook again sought permission from Congress to bring a compensation claim for their land, seeking an award that more accurately reflected the magnitude and fair value of land that had been taken from them by the federal government. *Halbert v. United States*, 283 U.S. 753 (1931), was centered around one primary question: Whether the Chinook Tribe was one of the unspecified "other Tribes of Indians in Washington who are affiliated with the Quinaielt and Quileute Tribes" under the Treaty of Olympia, as provided for in the Allotment Act of March 4, 1911? By answering that question in the affirmative, the Supreme Court in *Halbert* explicitly included the Chinook as a beneficiary under that 1911 Act, and concluded Chinook tribal members were entitled to take allotments of land on the Quinault Reservation. Of the three Tribes held entitled to allotments on the Quinault Reservation through the *Halbert* decision, the Chehalis and Cowlitz have since been federally recognized; again, only the Chinook have not.

41.

Between 1932 and 1934, the BIA issued hundreds of allotments to both adults and minors in the Chinook Indian Nation. Chinook allottees were not Quinaults and were not members of the Quinault Indian Nation, and many did not reside on the Quinault Reservation. Hundreds of these allotments remain in trust today and are administered by the BIA for members of the Chinook Indian Nation.

///

///

Page 18 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

**The Appropriations Act of 1912**

42.

The Act of August 24, 1912 (37 Stat. 518) was adopted by Congress expressly for the purpose of "making appropriations for the current and contingent expenses of the BIA, *for fulfilling treaty stipulations with various Indian tribes*, and for various other purposes, for the fiscal year ending June thirtieth, nineteen hundred and thirteen." *Id.* at 518-550 (emphasis added). The 1912 Act appropriated money – in the exact amounts specified in the 1851 Tansey Point Treaties – for the Kathlamet Band of Chinook Indians of Oregon ($7,000), the Waukikum Band of Chinook Indians of Washington ($7,000), the Wheelappa Band of Chinook Indians of Washington ($5,000), and The Lower Band of Chinook Indians of Washington ($20,000), with the following caveat:

> That said Indians shall accept said sum, or their respective portions thereof, in full satisfaction of all demands or claims against the United States *for the lands described in the agreements or unratified treaties between the United States and said Indians*....

*Id.* at 546 (emphasis added). This money was appropriated by Congress for the Chinook in order to reimburse them for the land seized from them by the federal government following the unratified Tansey Point treaties in 1851. This Act of Congress was highlighted by Assistant Secretary Gover as constituting constructive, statutory ratification of the 1851 treaties because it sought to fulfill the terms of those treaties through compensation for the land which had been seized.

**The Western Washington Claims Act of February 12, 1925**

43.

Pursuant to its reserved power to legislatively recognize or terminate Tribes, the 1925 Western Washington Claim Act expressly acknowledged the Chinook as a Tribe under its jurisdiction requiring:

///

Page 19 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

that all claims of whatsoever nature, both legal and equitable, of all the tribes and bands of Indians [citing the treaties of 1855 and 1859] ... which the ... Chinooks ... may have against the United States shall be submitted to the Court of Claims, with right of appeal by either party to the Supreme Court of the United States for determination and adjudication.

U.S. Statutes at Large, 68th Cong., 2nd Sess., Ch. 214, 886-87.

44.

The Western Washington Claims Act of February 12, 1925 was perhaps the most consequential Congressional action for the Chinook, because, through it, Congress authorized that "all claims of whatever nature, both legal and equitable" could be submitted to the Court of Claims (later the Indian Claims Commission), and the Act expressly acknowledged the Chinook as identified claimants. Ch. 214, H.R. 2694, 43 Stat. 886 (Feb. 12, 1925). The Chinook's authorized claim ultimately became "Docket 234," and resulted in a final determination that the Tribe had "aboriginal or Indian title to certain lands lying in parts of the present states of Washington and Oregon," that had not been properly compensated for by the 1912 Act. Ch 214, H.R. 2694, 43 Stat. 886. Thus, in the 1925 Act, Congress effectively declared that the Chinook were a Tribe with the standing to make both legal and equitable claims against the United States government.

**American Indian Policy Review Commission**

45.

Creation of a special commission to effect a simple and modern codification of law relating to Indians was suggested in the 1928 *Problem of Indian Administration*, widely known as the Meriam Report (Brookings Institution). *The Problem of Indian Administration: Report of a Survey* made at the request of Honorable Hubert Work, Secretary of the Interior, and submitted to him on February 21, 1928 (Baltimore, Md., The Johns Hopkins Press, 1928). The Meriam Report recognized that a large number of Tribes had outstanding claims with the federal government, many dating back to treaties, and recommended

Page 20 - FIRST AMENDED COMPLAINT

settling those claims "at the earliest possible date so that the Indians may know where they stand and settle down to a reasonably well defined economic situation, free from the uncertainties arising from the existence of material unsettled claims." *Id*. at 749. The Meriam Report continued:

> With these claims largely out of the way, it would seem practicable for a specially appointed commission, after considerable arduous labor, to effect a codification of law relating to Indians which will be at once reasonably simple and well adapted to modern conditions.

*Id*. at 749-750.

46.

The American Indian Policy Review Commission ("AIPRC") was established under the 93rd Congress in order to conduct a thorough assessment of the policy and legal history of federal government relations with Indian Tribes, and the ramifications of those relations. United States Cong. Joint resolution to provide for the establishment of the American Indian Policy Review Commission, 93rd Cong., S.J. Res. 133. 88 Stat. 1910 (1975). The Commission was ultimately tasked with defining the federal government's trust responsibility to Indian Tribes and making legislative recommendations in accordance with that freshly defined responsibility. *Id*.

47.

The Commission made several findings and recommendations in its Final Report, which it submitted to Congress May 17, 1977. United States Senate, American Indian Policy Review Commission, Final Report, 95th Cong., 1st Sess., Vol 1. Among the Commission's findings were the recognition that "unrecognized" Tribes are excluded from the protection and privileges of the Federal-Indian relationship and the recommendation that the recognition of all Tribes should be affirmed by a special office. *Id*. at 457, 461. The Chinook are specifically identified on the Commission's list of "unrecognized" Tribes under the states of both Oregon and Washington. The entry for the Chinook in Washington confirms

Page 21 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

1  that the Chinook have both U.S. Treaty Rights and are mentioned in BIA records, reports, or

2  publications.

3                                                    48.

4         Congress also legislates generally with respect to all Indian Tribes and individual

5  Indians, delegating the authority to federal administrative officials and agencies to

6  determine which Indian Tribes or individuals are to be served pursuant to such laws.  In

7  conjunction with such delegated authority from Congress, the Secretary of the Department

8  of the Interior is authorized to determine, acknowledge, or recognize the existence of

9  particular Indian Tribes.  Formal federal acknowledgment qualifies Tribes for many

10  programs designed to fulfill the federal government's trust responsibility to those Tribes.

11  The authority of the DOI over such recognition or acknowledgment, however, derives

12  entirely from statutes enacted by Congress, and is limited by, and to be guided by, that

13  statutory grant or authority.  No statute ever has been enacted by Congress that has given

14  the DOI the power or authority to terminate a federal relationship with an Indian Tribe that

15  has been recognized by Congress, either implicitly or expressly. Similarly, no statute has

16  ever been enacted to give the defendants authority to prohibit a tribe once denied

17  acknowledgment under its admittedly "broken" process from re-petitioning for

18  acknowledgment or seeking reaffirmation of their tribal status based upon new or

19  additional evidence.

20                    **FEDERAL RECOGNITION OF THE CHINOOK THROUGH**

21                          **EXECUTIVE OR ADMINISTRATIVE ACTION**

22                    **Chinook Petition for Federal Acknowledgment**

23                                                    49.

24         In 1978, the DOI promulgated Part 83 of its implementing regulations under the

25  IRA, which set out a uniform procedure known as the "Federal Acknowledgment Process,"

26  through which Indian groups could seek federal recognition or acknowledgment.  Part 83

Page 22 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

"applies only to indigenous entities that are not federally recognized tribes." 25 C.F.R. § 83.3.

50.

There are two primary means of achieving federally acknowledged status under Part 83. A Tribe can be "recognized for the first time," which requires that a Tribe must produce evidence sufficient to satisfy seven criteria set forth in 25 C.F.R. § 83.7(a)-(g). Alternatively, a previously recognized Tribe "can be re-affirmed" pursuant to 25 C.F.R. § 83.12, whereby the petitioner would have to prove past recognition through treaties, acknowledgment of rights by the federal government, past allocation of land by the government, and satisfy two of the same criteria set forth in § 83.7.

51.

In 1979, the Chinook gave formal notice of intent to seek federal recognition under the 1978 regulations. They retained an attorney and a tribal historian to document their case, and over a 19-year period submitted twelve standard file boxes of materials containing 1,307 exhibits – 178 pounds of paper. During the next five years, the DOI's BIA required supplemental information that the Chinook combined in yet another filing in 1998. That additional material was later found unconsulted in a BIA employee's desk drawer.

52.

After Kevin Gover became Assistant Secretary – Indian Affairs in 1997, he determined that he could not rely on the Branch of Acknowledgment and Research, ("BAR"), which was charged with performing the technical review of recognition petitions. He authorized the retention of an outside consultant to independently review the work performed by the BAR to ensure regulatory compliance. The BAR recommended against recognition for the Chinook as it did then for almost all such petitions. Based on the outside consultant's review, however, Gover came to a contrary conclusion and a Final

Page 23 - FIRST AMENDED COMPLAINT

Determination was issued finally granting formal recognition to the Chinook Indian Nation in January 2001 (*see* **Exhibit B** attached).

53.

Specifically, Assistant Secretary Gover found the 1911 and 1912 Congressional Acts to be significant expressions of federal recognition of the Chinook as a Tribe, but singled out the Western Washington Claim Act of 1925 as the most important of the three Congressional Acts, as evidence of "unambiguous prior Federal recognition" in making the case for federal recognition of the Chinook in 2001. It also meant that under the then-extant 1994 regulations, the Chinook need only demonstrate their continued existence since 1925 – the date of last federal acknowledgment of the Tribe – to prove their entitlement to federal recognition. Assistant Secretary Gover articulated that the 1925 Act paired with the 1911 Allotment Act:

> constitute a statement by the United States. There was a tribal organization, as the district court in *Halbert* recognized, and, in fact, the petitioner was faced with a bewildering and confusing response every time the BIA was approached on the question of tribal recognition.

Summary Under the Criteria and Evidence for Final Determination For Federal Acknowledgment of the Chinook Indian Tribe/Chinook Nation at 52, 79.

### Bush Administration Revocation of Chinook Recognition

54.

For 18 months, the federal government acted in accordance with the BIA decision formally acknowledging the Chinook Tribe. Indeed, then-Chinook Tribal Chairman Gary Johnson was invited to the White House to participate with other Indian leaders in an event honoring the beginning of the bicentennial of the Lewis and Clark Expedition, an occasion where he presented an elaborately carved heirloom canoe to President George W. Bush. In that first week of July 2002 while Chairman Johnson was still in Washington, DC representing the Chinook, he received a phone call from a BIA employee informing him that

Page 24 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

their recognition had been rescinded. The Quinault Indian Nation had filed an 11th-hour appeal, concerned about the consequences of their acknowledgment.

55.

Newly-appointed Assistant Secretary – Indian Affairs Neal McCaleb was persuaded that his predecessor was mistaken about the Chinook's tribal history. The BAR conducted no additional investigation or research before Assistant Secretary McCaleb issued a brief opinion claiming the Chinook failed to prove they had continued to exist and be governed as a Tribe during the first decades of the 20th Century – despite voluminous evidence to the contrary, including supplementary materials that were cached by one of his employees, perhaps deliberately to prevent their consideration and despite the fact that other Tribes were found to have shown adequate evidence of continued existence during those same decades with similar or even less evidence.[3]

56.

When the Chinook Petition for Acknowledgment was ultimately denied on reconsideration in 2002 (*see* **Exhibit C** attached), the BIA found that the Chinook satisfied four of the seven criteria set forth in 25 C.F.R. § 83.7:

1. Section 83.7(d), which required that the Chinook Indian Nation provide a copy of its governing document, a constitution ratified by its members;

2. Section 83.7(e), which required that the Chinook provide a list of all known current members and all available former membership lists, membership of individuals having been established using evidence acceptable to the Secretary demonstrating descendancy from a historical Tribe or Tribes;

///

---

[3] Many other Tribes who were granted recognition had no records of consistent government before the Indian Reorganization Act of 1934, whereas the Chinook adopted their first constitution in 1925 and had been actively pursuing land claims and litigation since 1899.

Page 25 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

3. Section 83.7(f), which required that the tribal membership be comprised principally of persons who are not members of any acknowledged North American Indian Tribe; and

4. Section 83.7(g), which required the absence of evidence that the Chinook were the subject of congressional legislation expressly forbidding or terminating the federal relationship.

57.

The BAR under the new presidential administration ultimately found that the Chinook did not meet the following three criteria:

1. Section 83.7(a) – the "Indian Entity" criteria – which required the Chinook Indian Nation to have been identified as an American Indian entity continually since its last acknowledgment;

2. Section 83.7(b) – the "Distinct Community" criteria - which required that a "predominant portion" of the group must exist as a distinct community; and

3. Section 83.7(c) – the "Political Authority" criteria - which required that a petitioner must maintain political influence and authority over its members. The BIA found that the Chinook failed to meet this criterion because there was insufficient evidence of the governing body on a continual basis since 1851. The BIA initially found that the Chinook satisfied this criterion, but later concluded that it did not – a determination which was based on subjective rather than objective criteria. By comparison, the Cowlitz Indian Tribe also petitioned for recognition under Part 83, and the BIA granted its petition and recognized it an Indian Tribe despite the fact that the evidence submitted by the Chinook was at least as strong, if not stronger, than that submitted by the Cowlitz.

///
///

Page 26 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

58.

The Reconsidered Final Determination by new Assistant Secretary McCaleb omitted significant evidentiary and documentary material and analysis included in the Final Determination made by Assistant Secretary Gover, and also applied a much more stringent and demanding standard to establish the Chinook Indian Nation's continuity with the historic Chinook Tribe than had been used with respect to other Tribes who were successful in seeking federal recognition.

59.

No evidentiary hearing was held at any time in the Chinook's recognition determination process, although the result of the process controls access by tribal members to fundamental services. The Tribe was not provided an opportunity to cross-examine witnesses, and decision-makers did not allow live testimony, and therefore were not able to determine the credibility of the anthropologists, historians, or other professionals, many of whom held differing opinions concerning whether the Tribe did, or did not, meet the established criteria. No impartial decision-maker had the opportunity to evaluate Assistant Secretary McCaleb's Reconsidered Final Determination.

60.

Further complicating their effort to obtain federal acknowledgment, on February 11, 2000, the Assistant Secretary of the Interior – Indian Affairs ("AS-IA") issued a directive, 65 Fed. Reg. 7052 (Feb. 11, 2000), that significantly changed the acknowledgment process, including greatly reducing the Branch of Acknowledgment and Research's ("BAR") active research and analysis in connection with its evaluation of tribal petitions.

61.

Because the period for supplementing the record had passed, the Chinook were not allowed to supplement their petition to respond to the changed role of the BAR staff.

///

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

62.

Prior to the issuance of this new directive, and for other cases, the BAR staff made field visits, conducted interviews, and engaged in independent research and analysis to evaluate and provide technical assistance "to ensure that the petitioner presents the strongest case possible and is not turned down for technical reasons."  Bureau of Indian Affairs, Branch of Acknowledgment and Research, Official Guidelines of the Federal Acknowledgment Regulations, 12-13 (1997).

63.

The staff used those visits to gain greater understanding of the petition and community than might be readily available from the documents submitted.

64.

Until the February 11, 2000 directive, the Chinook had every reason to believe the BAR would continue its existing practice and that BAR was interested in seeking all information and developing all possible analyses relevant to the proper determination of its Tribal status.

65.

Changing the evaluation greatly increased the burden on the Chinook Indian Nation, which could no longer expect researchers to apply the broadest range of their expertise to assist the Tribe to receive the most favorable possible consideration.  Had the Tribe known that the BAR would not function as research professionals, it would have made efforts to introduce increased evidence.  This dramatic change in BAR practice was made without notice and comment under the APA, and it violated the APA, 5 U.S.C. § 553.

66.

This directive was partially revoked on March 31, 2005, 70 Fed. Reg. 16,513 (Mar. 31, 2005).  By that time, however, it was too late to benefit the Chinook, whose petition had already been ultimately denied.

Page 28 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

67.

During its final consideration of the Tribe's petition, BAR made no field visits and conducted no interviews of tribal members, unlike the assistance extended to other Tribes. Further, in accordance with the Assistant Secretary's directive, BAR did not conduct any independent research and analysis to support the Tribe's petition in the course of considering the Chinook Petition for Acknowledgment and ultimately issuing its Reconsidered Final Determination denying recognition to the Tribe.

68.

Reeling from McCaleb's arbitrary reversal, and with limited funds to further appeal, the Chinook Indian Nation ultimately abandoned its recognition efforts with the DOI. Former Congresswoman Elizabeth Furse, a champion of tribal recognition efforts, and a respected tribal attorney told them that they could expect Congressional restoration of their federal status within four to six months. The Tribe relied upon that advice and opted to forego further appeals and instead pursue legislative action. Such legislation was not introduced, however, until the introduction of bills in 2008 and again in 2009 by Congressman Brian Baird. Those bills would have extended federal acknowledgement to the Chinook, including eligibility for all benefits and services provided by the federal government to federally recognized tribes, allowing for ceremonial fishing and hunting in designated areas, and the ability to have land taken into trust for the Tribe. Congressional efforts to restore Chinook tribal sovereignty, however, went for naught, as Rep. Baird's bills never made it to a vote. As of July 31, 2015, the BIA's new regulations now prohibit a tribe that has been denied recognition from reapplying (25 C.F.R. 83.4(d)).

69.

In 2004, former Assistant Secretary Gover testified before the Senate Committee on Indian Affairs regarding S. 297, a bill which would provide reforms and resources to the

///

Page 29 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
Attorneys at Law
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

BIA in order to improve the federal recognition process for Tribes. Sen. Hrg. 108-534. In his prepared statement, Assistant Secretary Gover testified:

> I remain convinced that the Chinook Tribe is deserving of Federal recognition, and I believe that, if Assistant Secretary McCaleb had the resources provided in this bill available to him when he addressed the Chinook petition, the outcome well may have been different.

Sen. Hrg. 108-534 at 72.

70.

Scholars analyzing the BIA tribal acknowledgment process during this era have concluded:

> Prior to the George W. Bush administration, Indian nations petitioning for acknowledgment could expect about a 50 percent chance of success. Between 2001 and 2009, however, the process ended favorably for only two of fifteen petitioners. Federal acknowledgment policy has become an entrenched bureaucratic tool for denying legitimate Indian nations sovereignty that is rightfully theirs.

*Recognition, Sovereignty Struggles, & Indigenous Rights in the United States*, p. 280, Den Ouden and O'Brien (U. N. Carolina Press, 2013).

## FEDERAL RECOGNITION OF THE CHINOOK THROUGH

## COURSE OF DEALING

### Bureau of Indian Affairs

71.

> We are fully aware that the Chinooks are an Indian Tribe, and it is unfortunate that no treaties were ever executed with them. However, you are familiar with the circumstances, undoubtedly, surrounding the [1855 Chehalis River] treaty negotiations, and it was not at that time assumed that any serious consequences could arise in the future years because of the failure to enter into this treaty.

Letter from Melvin L. Robertson, Superintendent of the Bureau of Indian Affairs Western Washington Agency, Everett, Washington (October 13, 1954).

///

Page 30 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

72.

The BIA, created in 1824 as the Office of Indian Affairs under the then-Department of War, has a more prolific history of governmental interaction with the Chinook Indian Nation than any other branch or bureau of the federal government. That relationship began in 1851, when Superintendent of Indian Affairs for the Oregon Territory Anson Dart was sent by Congress to negotiate treaties with Tribes of the Oregon Territory, including the Chinook, and that relationship continues to this day.  Throughout that more than 150 years of history, the BIA has taken and held land in trust for Chinook Indian Nation members, managed and distributed judgment funds, authorized fishing and negotiated fishing contracts, supervised loans and attorney contracts, administered allotments, enrolled Chinook Tribal members in BIA schools, and admitted Chinook Tribal members to BIA hospitals.  That lengthy course of dealing between the BIA and the Chinook establishes that the BIA has long-recognized the federal status of the Chinook Indian Nation.

73.

Typical actions of the BIA fulfilling fiduciary duties associated with its trust responsibility include holding land in trust, supervision of attorney contracts, supervision of loans, management and distribution of judgment funds, and issuing, administering, and maintaining allotments.  These are all actions the BIA has performed for the Chinook Indian Nation, demonstrating the BIA's fiduciary responsibility to Chinook Indian Nation.

74.

The General Allotment Act (24 Stat. 388) limited public domain allotments to Indians maintaining tribal relations with a recognized Tribe.  Yet, two public domain allotments secured by members of the Chinook Indian Nation in 1890 were subsequently taken into trust by the BIA.  A third public domain allotment was secured by an unnamed member of the Chinook Indian Nation in 1895. Numerous parcels of land in historically ///

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

Chinook territory were, and in some cases still are, held in trust for Chinook tribal members.

## BIA-Distributed 1912 Judgment Funds

### 75.

The BIA maintained detailed records of the per capita payments made in the first land claims case of the Chinook Indian Nation. These funds were appropriated by Congress on August 24, 1912 (37 Stat. 518-35) and were paid out by the BIA the beginning in November 1914. The BIA maintained notes on each entitled tribal member and recorded the number of the check, date of payment, and other information relevant to heirship of deceased beneficiaries. The associated Annuity Payment Roll of 1914, in which Congress commissioned the BIA to identify and list all Chinook tribal members who were eligible for payment under the 1912 judgment, is still used as tribal enrollment criteria under the Chinook Constitution (*see* **Exhibit A** attached). The BIA again conducted a census among tribes in Washington from 1916 to 1919, this time dispatching special allotting agent Charles E. Roeblin to document tribal members in Washington state not recorded on the 1906 McChesney Roll. The Roeblin Roll, which was reported to the Commissioner of Indian Affairs on January 31, 1919, includes many Chinook tribal members and is also still used as criteria for establishing enrollment eligibility by the Chinook Indian Nation (*see* **Exhibit A** attached).

## BIA-Supervised Attorney Contracts

### 76.

For many decades, Congress required approval of the Secretary of Interior for all attorney contracts of Tribes to pursue federal claims. 25 U.S.C. § 70(n). The Chinook hired their first attorney for a claim against the federal government in 1899. In 1925, W.B. Sams, Superintendent of the Taholah Indian School, approved the Chinook attorney contract with Arthur E. Griffin. This contract was entered into to pursue the Tribe's Docket 234 lawsuit

Page 32 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

in the Court of Claims through the jurisdictional act P.L. 402.  From 1951 to 1954 attorney contracts for the Chinook were approved and signed by the Commissioner of Indian Affairs and BIA Superintendent, pursuant to a statute that required contracts between Indian Tribes and attorneys be approved by the Commissioner of Indian Affairs and BIA, and an additional attorney contract was declined.  In the 1960s, the BIA supervised the Chinook's attorney hired to handle its Docket 234 case.

### Indian Reorganization Act Consultation

77.

The Indian Reorganization Act of 1934 ("IRA") was passed as part of a larger attempt by the federal government to codify its treatment of Indian Tribes and to encourage in part tribal economic development and self-determination.  *Cohen's Handbook of Federal Indian Law,* § 1.05, at 81 (2012 ed.).  The IRA ended allotment of Indian land and encouraged Tribes to develop tribal governments, including the adoption of formal constitutions.  *Id.* at 82.  Under the Indian Reorganization Act, the term "Indian Tribe" means "any Indian or Alaska Native Tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian Tribe."  25 U.S.C. § 5130(2).

78.

To qualify for benefits under the IRA, Tribes must meet certain conditions set by federal law.  The most important condition is federal recognition which is a "formal political act confirming the Tribe's existence as a distinct political society, and institutionalizing the government-to-government relationship between the Tribe and the federal government."  *California Valley Miwok Tribe v. U.S.*, 515 F.3d 1262, 1263 (D.C. Cir. 2008) (*quoting Cohen's Handbook of Federal Indian Law*, § 3.02(3) at 138 (2005 ed.)).  The IRA "sought to strengthen tribal governments and restore the Indian land base."  S. Rep. NL. 111-247 at 2 (2010) (internal quotations omitted).

///

Page 33 - FIRST AMENDED COMPLAINT

79.

Section 19 of the IRA broadly defines "Indians" to describe those who are eligible to reorganize under the Act:

(1)     All persons of Indian descent who are members of any recognized Indian Tribe now under federal jurisdiction;

(2)     All descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation; and

(3)     Shall further include all other persons of ½ or more Indian blood.

25 U.S.C. § 479.

80.

Members of the Chinook were "Indians" who satisfied one or more of those criteria at all times material to this lawsuit and the Chinook was a recognized Indian Tribe "under federal jurisdiction" at the time of the passage of the IRA in 1934. This is particularly so, since the BIA's own interpretation of § 19 of the IRA defined a "recognized tribe" so as to include criteria which the Chinook satisfied:

Section 19 of the Act provides that ... a recognized tribe is one with which the government at one time or another has had a treaty or agreement or those for whom reservations or lands had been provided and over whom the government exercises supervision through an official representative.

BIA Branch of Acknowledgment and Research ("BAR") John Collier to Ben Shawanessee (Apr. 24, 1935).

81.

In October 1934, the BIA cited the binding solicitor's opinion that non-resident Indian voters could cast ballots under elections held pursuant to the IRA. The Chinook, possessing a post-treaty affiliation on the Quinault Reservation as determined in the *Halbert* decision, were accordingly determined by the BIA to also possess the right to vote in the Quinault referendum under the IRA. The BIA subsequently enrolled members of the Chinook Indian Nation as voters to cast ballots on the question of organization of the

Page 34 - FIRST AMENDED COMPLAINT

Quinault Reservation pursuant to the IRA. The Chinook voted overwhelmingly in favor of confederating with the Quinault and other Tribes, but that confederation was never carried out. Further, in 1953, the BIA received and held the governing documents of the Chinook, including their constitution and bylaws, as provided for under the Indian Reorganization Act.

## Termination Act Consultation

### 82.

As the Termination program grew in the 1950s, the BIA sought to involve the Chinook Indian Nation in that process. BIA Superintendent wrote the Chinook Chairman Grant Elliott in March 1952, inviting him to attend a meeting with the Quinault Tribe and Quinault allottees in order to set up a Planning Committee to work out a program for the disposition of the Quinault Tribe and Tribal Reservation. In June of that year, BIA officials visited western Washington to assess prospects of termination, during which time they met with the Chinook and other Tribes. The Chinook were invited to and participated in additional meetings and consultations held in September 1953, October 1953, November 1953, and November 1954 regarding the proposed termination. Most significantly, two of those meetings, on October 3 and October 25, were held in the historical Chinook village of Bay Center, Washington, where the Chinook are headquartered today.

## BIA-Supervised Loans

### 83.

In 1965, the BIA Portland Area Office supervised Contract No. 14-20-0500-2430 between the United States and Chinook Indian Nation. The Chinook sought the loan pursuant to the Act of November 4, 1963 (77 Stat. 301), which established a revolving fund from which the Secretary of the Interior could make loans to finance assistance for Tribes in cases before the Indian Claims Commission. The purpose of the BIA-supervised loan to

Page 35 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

the Chinook was to facilitate the study of timber values and fisheries on the lands found in tribal ownership by the Indian Claims Commission in Docket 234.

**Boarding Schools**

84.

The federal policy of removing Indian children from their home and Tribe and relocating them to government-run boarding schools was a hallmark of the Assimilation Era of United States Indian policy. Captain Richard H. Pratt's infamous mantra of "Kill the Indian, save the man," was applied to children taken from Tribes from across the United States, and the Chinook were no exception. Participation in the boarding schools – most prominently for the Chinook, at the Chemawa Indian School near Salem, Oregon – continued in many instances well into the 20th century.

85.

The BIA over many decades enrolled Chinook children (often forcibly) in BIA boarding schools, including the Cushman Trades School, Tulalip Indian School, Haskell Institute in Kansas, and the Chemawa Indian School. Children voluntarily applying to BIA schools later in the 20th century had to submit a required "Application for Admission to Non-Reservation School and Test of Eligibility." Chinook children were admitted as eligible based on citizenship in the Chinook Indian Nation. Further, upon acceptance to a BIA school in several instances BIA arranged for transportation of Chinook children to those schools. Today, at least one Chinook youth is currently enrolled at the Chemawa Indian School.

**Healthcare**

86.

In establishing the Indian Health Service ("IHS"), Congress found that "[f]ederal health services to maintain and improve the health of the Indians are consonant with and required by the Federal Government's historical and unique relationship with, and

Page 36 - FIRST AMENDED COMPLAINT

resulting responsibility to, the American Indian people." 25 U.S.C. § 1601(1). Congress further declared "that it is the policy of this Nation, in fulfillment of its special trust responsibilities and legal obligations to Indians ... to ensure the highest possible health status for Indians and urban Indians and to provide all resources necessary to effect that policy." 25 U.S.C. § 1602(1). IHS provides care directly to members of federally recognized Indian Tribes and Alaska Native villages. 25 U.S.C. § 1603(13). IHS defines eligible individuals as persons who are of Indian descent and are members of their Indian community. 42 C.F.R. § 136.12(a)(1).

87.

The Chinook have historically and continuously been admitted to and treated at BIA hospitals. In its Petition for Acknowledgement, the Chinook Indian Nation documents several of its tribal members who were treated at the Cushman Indian Hospital in Tacoma, Washington beginning in 1938 and who were admitted because of their status as members of the Chinook Indian Nation. More recently, Chinook births have been documented at the Cushman Indian Hospital, and Chinook tribal members have been born as late as the 1990s while receiving IHS funding as Chinook residents of Pacific County, Washington.

**Probate**

88.

The Secretary of the Interior has original probate jurisdiction over trust and restricted Indian property, including exclusive authority to determine heirs and to approve wills for such property. 25 U.S.C. §§ 372, 373; 25 C.F.R. § 15.10. The BIA continues to not only correspond with the Chinook about pending Indian probate matters but consults with the Chinook Indian Nation governmental office to verify enrollment eligibility and request Birth Certificates and Certificates of Indian Blood (CIB) for individuals involved in Indian probate matters Further, the DOI Office of Hearings and Appeals has held Indian probate hearings in the Chinook tribal office.

Page 37 - FIRST AMENDED COMPLAINT

## Financial Management and Administration

### 89.

The American Indian Trust Fund Management Reform Act of 1994 ("AITFMRA") was passed in recognition of the trust responsibility existing between the federal government and Indian Tribes as explicitly including the Secretary of the Interior's responsibility to account for the daily and annual balance of all funds held in trust for Indian Tribes and individual Indians. 25 U.S.C. § 4011(a). The AITFMRA defines "Indian Tribe" as "any Indian Tribe, band, nation, or other organized group or community ... which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 4401(2). The AITFMRA further created an Office of Special Trustee for American Indians to prepare and administer the trust reform plan. 25 U.S.C. §§ 4042, 4043. That Office of Special Trustee for American Indians has, under the current presidential administration, corresponded directly with the Chinook Indian Nation In addition, many Chinook tribal members have Individual Indian Money (IIM) accounts that are administered by the DOI.

## Economic Development Support

### 90.

The BIA standard for assisting Tribes with economic development provides that a Tribe is eligible if it has been "recognized by the Federal Government as eligible for services from the Bureau of Indian Affairs." 25 U.S.C. § 1452. The BIA funded an economic development report for the Chinook Indian Nation by Professor Brown from the University of Washington, entitled "Feasibility of a Charter Boat Operation for the Chinook Indian Tribe of Washington in Ilwaco, Washington." The Chinook then applied in 1978 for funds for a Records Clerk, Tribal Planner, Researcher, and Housing Foreman under the Comprehensive Employment and Training Act. They received $27,490.46 for the period from January through September 1979. In January 1982, the Chinook received a grant for

Page 38 - FIRST AMENDED COMPLAINT

$15,600 from the Small Tribes Organization of Western Washington for maintenance of tribal offices and improvement of tribal operations.

### National Park Service

91.

The National Park Service has a history of consulting with the Chinook Indian Nation on issues ranging from establishment of national monuments and parks, including the establishment of Fort Clatsop, a project which brought the Chinook back to the fort in which they aided Corps of Discovery through the harsh winter of 1805, to environmental recovery projects such as the Colewort Creek Salmon Recovery Project, which the Superintendent of the National Parks Service request initiation of government-to-government consultation for habitat restoration along the Netul River in Oregon.

92.

Fort Clatsop was established by Meriwether Lewis and William Clark as part of the Corps of Discovery during December 1805. The Corps of Discovery wintered at Fort Clatsop from December 7, 1805 until March 23, 1806, visiting and trading with the Chinook almost daily. In his journal, Meriwether Lewis chronicled several interactions with the Chinook, including the following on February 20, 1806:

> This forenoon we were visited by "Ta-cum," a principal chief of the Chinnoks [sic] and 25 men of his nation ... he came on a friendly visit. We gave himself and party something to eat and supplied them plentifully with smoke. We gave this chief a small medal with which he seemed much gratified. In the evening at sunset we desired them to depart as is our custom and closed our gates.

*The Journals of Lewis and Clark* (Lewis, Meriwether and Clark, William).

93.

The National Park Service also consults with the Tribe on projects including repatriation of remains under the Native American Graves Protection and Repatriation Act.

///

Page 39 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

## Native American Graves Protection and Repatriation Act

### 94.

For the purpose of establishing eligibility under the Native American Graves Protection and Repatriation Act ("NAGPRA"), the term "Indian Tribe" "means any Tribe, band, nation, or other organized group or community of Indians ... which is recognized as eligible for the special programs provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 3001(7). Rather than strictly providing for consultation with Tribes appearing on the BIA's list of federally recognized Tribes, the regulations broaden somewhat the standard definition of federal recognition for purposes of NAGPRA by accepting recognition by a federal agency, not just by the BIA. 43 C.F.R. § 10.2; *see* 60 Fed. Reg. 62,13462,136 (1995).

### 95.

This operating definition includes the Chinook, who are regularly consulted with under NAGPRA by the National Park Service and other federal agencies. The Chinook, in fact, appear *on the cover* of the National Park Service's booklet regarding *Consultation with Native Americans: A Historic Preservation Responsibility*, where they are shown performing a traditional post-raising ceremony at Cathlapotle in the Ridgefield National Wildlife Refuge in 2003. NAGPRA consultations regularly include other federal agencies, including the U.S. Fish and Wildlife Service, the Army Corps of Engineers, the Environmental Protection Agency, the Department of Energy, and the list goes on. The Chinook are the only unrecognized Tribe regularly consulted on particular projects, appearing alongside formally recognized Northwest Tribes such as the Confederated Tribes of the Grand Ronde, the Chehalis Confederated Tribes, the Cowlitz Indian Tribe, the Quinault Indian Nation, and the Shoalwater Bay Indian Tribe, to name a few.

///

///

Page 40 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

96.

Other recent consultations between the National Park Service and Chinook Indian Nation include Station Camp – Middle Village Park in Washington, where other, federally recognized Tribes such as the Confederated Tribes of the Grand Ronde and the Shoalwater Bay Indian Tribe deferred to the Chinook for interpretation of an uncovered Chinookan town site The Chinook worked directly with the National Park Service to provide that interpretation, and Chinook tribal members were paid by the National Park Service to stay with uncovered remains around the clock until they could be repatriated.

97.

Other executive agencies, including the U.S. Fish and Wildlife Service and the U.S. Forest Service, are also documented as consulting on an ongoing basis with the Chinook Indian Nation regarding the repatriation of cultural and human remains found in their traditional territories.

**United States Fish and Wildlife Service**

98.

Located within the current boundaries of the Ridgefield National Wildlife Refuge is the Cathlapotle Plankhouse, which the U.S. Fish and Wildlife Service ("FWS") partnered with the Chinook Indian Nation to construct. FWS continues to partner with the Chinook to offer an accurate representation of Chinook culture at the site. Also within the Refuge boundaries is the site of the former Chinookan town of Cathlapotle, which was encountered by Lewis and Clark on their expedition and later excavated and written about by Professor Kenneth Ames.

99.

In February 2017, FWS wrote to the Chinook Indian Nation regarding a proposed visitor access infrastructure at Ridgefield National Wildlife Refuge. FWS cited its responsibilities under § 106 of the National Historic Preservation Act and 36 C.F.R. § 800 as

Page 41 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

initiating consultation with the Chinook pursuant to 36 C.F.R §§ 800.2, 800.4(a)(3), and 800.4(a)(4).  Since 2005, a Memorandum of Understanding has been in place between the USFWS and Chinook Tribe assuring special access to and use of the refuge and the Chinook Plankhouse constructed on the grounds of the refuge for education, subsistence, basketry, etc.  The Chinook have been consulted on other ground disturbing activities and shoreline management plans in the area as well, and have been included in decision making processes.

## United States Navy

### 100.

In addition to agencies under the DOI, the United States Navy consults with the Chinook on an ongoing basis.  In April 2017, *e.g.,* the Department of the Navy wrote to the Chinook Indian Nation to "initiate Section 106 consultation" in accordance with 36 C.F.R. § 800, on a proposed undertaking involving small-unit land and maritime training activities for naval special operations personnel along the southwest Washington coast.  36 CFR § 800 regulates the protection of historic properties, and defines "Indian Tribe," in accordance with § 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. § 5304(e)), elaborating that "for purposes of this rule, *Indian tribe includes federally recognized Indian tribes* and Alaska Native Corporations." 36 C.F.R. § 230.2 (emphasis added).  By initiating § 106 consultation with the Chinook, the Department of the Navy has demonstrated its explicit recognition of the Chinook Indian Nation as a Tribe.

## Inconsistency and Unreliability in BIA Actions

### 101.

A "Tribe" for the purpose of establishing eligibility for BIA programs "means any Indian Tribe, band, nation, or other organized group or community ... which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."  25 U.S.C. § 1903(8).  It would seem that the Chinook

Page 42 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

1  Indian Nation, if it is an "unrecognized Tribe," should not then qualify for the assistance of

2  the United States through programs like the Indian Health Service (25 U.S.C. § 1603(14)),

3  probate jurisdiction (25 C.F.R. § 15.2), and economic development assistance (25 U.S.C.

4  § 1452(c)).  And yet, the Chinook have received all of those benefits, albeit inconsistently at

5  times, and in fact continue to receive many such benefits, all despite the fact the Chinook do

6  not appear on the BIA's list of federally recognized Tribes pursuant to 25 U.S.C. § 5129.

7  **BIA Recognition Standards Interpreted and Applied Unequally**

8  **Jamestown Clallam**

9  102.

10  As set forth above, the BIA was long charged with maintaining a list of federally

11  recognized Tribes, but until 1994 when Congress mandated standards, it was never clear

12  how Tribes were added or subtracted from the roster.  A BIA clerk testified in 1995 that

13  records of the Agency comments had been lost, so her "revised list was generally consulted

14  to determine groups' legal status, although paradoxically she conceded that she had no

15  authority to make such decisions."  Administrative Law Judge Findings in Samish

16  recognition petition, August 31, 1995.  ALJ David L. Torbett heard testimony for eight days

17  and then issued a 44-page opinion in which he found that the BIA could not adequately

18  explain why the Samish Tribe in Washington's Puget Sound had been excluded from a list

19  of federally recognized Tribes (ALJ Findings 1-3; Final Determination at 16, 38-9).  He

20  noted that upon "further questioning Ms. Simmons [BIA clerk] conceded that she had no

21  personal knowledge of the legal status of the groups she had listed under the Portland

22  Area…."

23  103.

24  The inconsistent and unequal standards for obtaining federal acknowledgment set

25  by the BAR have been similarly problematic. What constitutes unambiguous prior federal

26  acknowledgment for one tribe is found not do so for another, based on largely similar – if

Page 43 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

not identical – facts. In the 1980 Jamestown Clallam Proposed Finding for Federal Acknowledgment, the BAR cited a "solicitor's opinion" concluding that the Jamestown Clallam tribe was a federally recognized tribe, based in part on its inclusion in "1925 claims litigation," in order to establish unambiguous prior federal acknowledgment of the tribe. Recommendation and summary of evidence for proposed finding for Federal acknowledgment of the Jamestown Band of Clallam Indians of Washington, Anthropological Report at 3. The BAR's Proposed Finding then suggested that the Jamestown Clallam's inclusion in 1925 claims legislation amounted to "denomination as a tribe by Act of Congress." *Id.* The Chinook were given no such consideration, despite being identified by name in the Western Washington Claims Act of 1925. Such inclusion, under the standards applied by the BAR to the Jamestown Clallam, should have been considered as unambiguous prior federal acknowledgment of the Chinook.

**Cowlitz**

104.

The respective histories of the Chinook and the neighboring Cowlitz Indian Tribe have also followed nearly identical trajectories, so it is no surprise that their acknowledgment petitions were submitted and evaluated almost simultaneously. Their histories are so intertwined that they even hired the same expert, Stephen Dow Beckham, and lawyer, Dennis J. Whittlesey, to assist in documenting their histories and preparing their petitions, the revised versions of which were each filed with the Office of Federal Acknowledgment in 1987. Unfortunately for the Chinook, that is largely where their histories diverge.

105.

On February 12, 1997, the BAR, under Assistant Secretary Ada Deer, released the Summary under the Criteria and Evidence for Proposed Finding Cowlitz Tribe of Indians. As a preliminary matter, the BAR determined that:

Page 44 - FIRST AMENDED COMPLAINT

> The Cowlitz present at the (1855 Chehalis River Treaty) negotiations, specifically the Lower Cowlitz band, had refused to sign the proposed treaty, but the Federal Government's willingness to negotiate with them constituted previous recognition....

Reconsidered Final Determination to Acknowledge that the Cowlitz Indian Tribe Exists as an Indian Tribe, at 17 (summarizing the findings of the Proposed Finding).

106.

Such a determination substantially reduces the burden required of a petitioning Tribe by eliminating several acknowledgment criteria altogether. BAR then evaluated the Cowlitz petition according to its determination of this unambiguous prior federal acknowledgment, ultimately finding in favor of federal acknowledgment.

107.

On August 11, 1997, the BAR under Assistant Secretary Deer released the Summary under the Criteria and Evidence for Proposed Finding ***Against*** Federal Acknowledgment of the Chinook Indian Tribe, Inc. (emphasis added). *Despite the fact that the Chinook were party to the same 1855 Chehalis River Treaty negotiations that were used to establish unambiguous prior federal acknowledgment of the Cowlitz, the Chinook were found not to have been subject to such prior acknowledgement.* There is no explanation in the Proposed Finding for why the Chinook were not unambiguously acknowledged by virtue of their participation in the Chehalis River Treaty negotiation with the Cowlitz in 1855, or further, why the signed treaties which the Chinook had negotiated with the federal government through Anson Dart in 1851 did not establish unambiguous federal acknowledgment twice over:

> Because the 1851 treaties were not ratified by the United States Senate, the Federal Government again engaged in treaty negotiations with representatives of the "Lower Chinook" in 1855.... Although these negotiations did not result in a signed treaty, Federal negotiators once again had accepted that a sovereign Chinook political entity existed with which it could negotiate a treaty.

Page 45 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

Summary under the Criteria and Evidence for Proposed Finding Against Federal Acknowledgement of the Chinook Indian Tribe, Inc. at 26.

108.

Under the standard set forth by the BAR in reviewing the Cowlitz Petition for Acknowledgment, this should have been sufficient for a finding of unambiguous prior federal acknowledgement. Of course, it was not, and ultimately the Chinook were determined by the BAR as having failed to establish federal acknowledgment.

109.

This inconsistent approach by the BAR violates the Equal Protection component within the Due Process Clause of the 5th Amendment to the U.S. Constitution, as well as the Administrative Procedures Act (5 U.S.C. § 500, *et. seq.*), because it constitutes actions by an agency that are arbitrary, capricious, an abuse of discretion, and not in accordance with the law. Both prohibit agencies from treating similarly-situated petitioners differently without providing sufficiently reasoned justification for that disparate treatment. In fact, irrational and unjustified disparate treatment perfectly describes the BAR's approach to evaluating the Cowlitz and Chinook's respective petitions for federal acknowledgment. For example, where the BAR found Chinook evidence insufficient to meet the criteria, when evaluating the Cowlitz, the BAR explained:

> The paucity of descriptions of the full entity is considered to be a consequence of the historically dispersed residential pattern of the groups in the Cowlitz River valley.

Summary Under the Criteria and Evidence for Proposed Finding Cowlitz Tribe of Indians at 19.

110.

As demonstrated in their petition, the Chinook historically exhibited the same residential patterns, yet the BAR found it to be insufficient information for finding in favor of federal acknowledgement.

Page 46 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

1          111.

2          Additionally, participation in BIA schools and other programs was used by the BAR

3    to demonstrate Cowlitz's historical and continuing existence:

4          Chemawa Indian school and Puyallup Agency land records referred to the
           Cowlitz Indians, as did Yakima allotment records between 1898 and 1914.
5          Cushman Indian school correspondence in 1911 referred to...members of the
           Cowlitz Tribe eligible for allotment at Quinault, and recommended that they
6          be enrolled and allotted there.

7

8    Summary Under the Criteria and Evidence for Proposed Finding Cowlitz Tribe of Indians at

9    17.

10         112.

11         Yet, that same criterion was insufficient for the Chinook to demonstrate their

12   historical and continuing existence:

13         Some Chinook descendants attended the Government's Indian schools, but
           they did so because of their degree of Indian ancestry, not because the Indian
14         Office recognized a Chinook tribe.

15   Summary under the Criteria and Evidence for Proposed Finding Against Federal

16   Acknowledgment of the Chinook Indian Tribe, Inc. at 6. In fact, the Chinook comprise the

17   majority of allotments at Quinault.

18         113.

19         The BAR under Assistant Secretary Deer essentially made the determination that

20   the Chinook were unable to show external identification of their Tribe from 1855, the time

21   of the Stevens treaty negotiations, as well as show that the Tribe was a political entity in

22   the early part of the twentieth century. Again, despite nearly identical histories, the BAR

23   made an entirely contrary assessment of the Cowlitz, the Snoqualmie and other Tribes.

24         114.

25         Assistant Secretary McCaleb, Assistant Secretary Gover's successor under the

26   George W. Bush Administration, reversed the Final Determination for Federal

Page 47 - FIRST AMENDED COMPLAINT

Acknowledgment of the Chinook Indian Tribe/Chinook Nation on July 5, 2002, by ruling that Assistant Secretary Gover's determination had been inconsistent with the acknowledgment regulations' standard for demonstrating unambiguous previous federal acknowledgment.    In contrast, Assistant Secretary McCaleb's Reconsidered Final Determination for the Cowlitz Indian Tribe, released six months earlier on December 31, 2001, affirmed the proposed finding of unambiguous prior federal acknowledgment under largely similar facts.

115.

The government's mere willingness to negotiate a treaty with the Cowlitz was determined by the Office of Federal Acknowledgment to constitute unambiguous prior acknowledgment, a finding which ultimately led to a successful conclusion of the Cowlitz's Petition for Acknowledgment.    The Chinook – who participated in that same treaty negotiation as well as another that resulted in multiple, signed treaties – were determined not to have been subject to unambiguous prior federal acknowledgment.    The cruel irony, of course, is that the Cowlitz and the Chinook, neighboring tribes with nearly identical histories, walked out of the same treaty negotiation with Governor Stevens in 1855.    Today, after concurrently participating in the same administrative recognition process utilizing the same expert historian, one Tribe is federally recognized because of that history and the other is not.

**Samish Tribe Recognition Litigation**
***Greene v. Babbitt*, 943 F. Supp. 1278 (W.D. Wash 1996)**

116.

The federal judge presiding over the Samish tribe's litigation noted in a published opinion that the Samish people's "long journey for recognition has been made more difficult by excessive delays and governmental misconduct."  *Id.* at 1281.  In 1996, the Samish Indian Nation sued the DOI, seeking reinstatement of findings that were made in its

Page 48 - FIRST AMENDED COMPLAINT

favor by an Administrative Law Judge considering recognition matters.  In the course of those proceedings, it was discovered that a longstanding opponent of Samish recognition, DOI attorney, Scott Keep, obstructed the processing of the Samish application and deliberately wrote his own counter-findings which he then presented *ex parte* to the decision-maker.  United States District Judge Thomas S. Zilly (appointed by President Reagan in 1988 and now a senior judge) publicly reprimanded Keep, citing him for contempt.

> Mr. Keep, obviously unfazed by statements of disapproval from this Court and the Ninth Circuit, and with apparent disregard for both statutory and traditional standards of fair play, met directly with the ultimate decision-maker and urged her to deny federal recognition to the Samish.[4]

*Id*. at 1286.  The Court ruled that a remand to the BIA would "cause further delay and expense while subjecting the [Tribe] to a substantial risk of suffering the same procedural violations that they have now endured twice over the past ten years."  *Id*. at 1288.  Judge Zilly further found:

> ...when agency delays or violations of procedural requirements are so extreme that the court has no confidence in the agency's ability to decide the matter expeditiously and fairly, it is not obligated to remand. Rather than subjecting the party challenging the agency action to further abuse, it may put an end to the matter by using its equitable powers to fashion an appropriate remedy.

*Id*.

### 117.

The Chinook find themselves in a similar situation to that of the Samish.  A remand to the BIA would be futile.  The agency has amply demonstrated its bias against the Chinook's bid for formal recognition and effectively pre-determined to deny them recognition.  Moreover, as set forth, *infra*, in ¶¶ 123-137, the Chinook are now prohibited

---

[4] As of the date of filing of this Complaint, Mr. Keep remains a Senior Solicitor for the Department of the Interior.

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

from applying for recognition or reaffirmation of their tribal status under the new 2015 regulations governing recognition. Under such circumstances, the Chinook have exhausted their administrative remedies. Further, the Defendants' continuing failure to recognize the Chinook is not the result of a considered application of independent standards, but a manifestly unauthorized exercise of power.

118.

The Samish had to return to Court in 2011 to recover compensation for the time during which the Tribe should have been recognized and receiving federal benefits, but was not. *Samish Indian Nation v. United States*, 657 F.3d 1330 (Fed. Cir. 2011).

**Delaware Tribe**

119.

It is an established fact that the BIA has acted inconsistently and unpredictably in a non-transparent way since the adoption of its regulatory Tribal recognition process. *See, e.g., Cherokee Nation of Oklahoma v. Norton*, 241 F. Supp. 2d 1368 (N.D. Okla. 2002), *rev'd on other grounds*, 389 F.3d 1074 (10th Cir. 2004). In that case, the Delaware Tribe (an East Coast Tribe), was forced to combine with Cherokees in Kansas after the so-called "Trail of Tears." The Delaware had signed a treaty with the United States in 1867 (just as the Chinook did in 1851), but it was granted a final decision by the BIA under which the BIA agreed to "reconsider and retract" its Part 83 denial of acknowledgment and grant federal recognition to the Delaware without forcing the tribe to go through another Part 83 process on the grounds that its treaty was conclusive evidence of its federal acknowledgment. *Id.* at 1370.

120.

While the Tenth Circuit ultimately reversed the grant of recognition on an unrelated ground (the Supreme Court had previously ruled that the text of the Delaware Tribe Treaty actually made their group a part of the Cherokee Tribe and it was not sovereign), the

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 ● 503.224.4133 (facsimile

decision left undisturbed the BIA's conclusion that barring other disqualifiers like the explicit text of the Delaware Treaty, the existence of a federal treaty alone satisfied the criteria established by Part 83 and was unambiguous, conclusive evidence of federal recognition of a Tribe. There is no comparable disqualifying language in the Tansey Point Treaties of 1851 or in the 1855 Treaty of Olympia. They should be considered conclusive evidence of their federal recognition as a tribe.

### Little Shell Tribe of Chippewa Indians

121.

In Montana, the Little Shell Tribe of Chippewa Indians was buffeted by virtually identical bias from the BIA concerning its quest for recognition. The Tribe's bid for recognition was thwarted initially by the same BIA bureaucracy, but their denial was overturned by BIA head Kevin Gover. The Little Shell was officially recognized in the waning days of the Clinton Administration, but, just as with the recognition of the Chinook, Gover's decision was then reversed by his successor. The Little Shell, too, turned unsuccessfully to Congress after losing confidence in the BIA's ability to fulfill its trust responsibility. Then-Congressman Ryan Zinke of Montana (now Secretary of Interior and a named Defendant in the instant case) sponsored the Little Shell's recognition bills.

122.

During the almost 40 years since the time that the Chinook first petitioned the BIA for recognition, virtually all other Pacific Northwest Tribes have been recognized or restored in a variety of ways to the point that presently, the Chinook are among the very few historic Tribes in the Northwest that have not had their tribal status acknowledged, despite the fact that they, historically, were "the most powerful nation on the entire Pacific Coast." Anson Dart, 1851, quoted in Clifford E. Trafzer, *The Chinook* (New York: Chelsea House, 1990), 87.

///

Page 51 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

## 2015 AMENDMENTS TO PART 83

123.

Just two years ago, the BIA itself admitted that the acknowledgment process it applied in the years leading up to the denial of the Chinook's Part 83 petition in 2002 was "broken," "non-transparent," "inconsistent," and "unpredictable." 80 Fed. Reg. 37,862-863 (July 1, 2015):

> To summarize ... the [Part 83 federal acknowledgment] process is slow, expensive, inefficient, burdensome, intrusive, non-transparent, inconsistent, and unpredictable.

Hearing on the federal acknowledgment process before the H.S. Comm'n. on Indian, Insular, and Alaskan Native Affairs, 114th Cong. 2 (Apr. 22, 2015) (testimony of Asst. Secretary – Indian Affairs Kevin Washburn).

124.

The preamble to the proposed 2015 rule changes stated that the purpose for the changes to the recognition process was to promote "fairness and consistent implementation, and increasing timeliness and efficiency, while maintaining the integrity and substantive rigor of the process." *Id.* at 37,862.

125.

The 2015 amendments had been under consideration within the BIA since 2009 in an attempt to improve the process that had recognized only 17 petitions and denied 34 other petitions since 1978. *Id.* Assistant Secretary Washburn's testimony set forth four guiding principles for amending the Part 83 process:

1.  Transparency;

2.  Timeliness;

3.  Efficiency; and

4.  Flexibility.

///

Page 52 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

126.

The need for flexibility emphasized that the amended Part 83 process should understand the "unique history of each tribal community and avoid the rigid application of standards that do not account for the unique histories of tribal communities." *Id.* at 4.

127.

Under the Part 83 procedure that the Chinook underwent, as other courts have recognized:

> a federal acknowledgment petition can be over 100,000 pages long and cost over $5,000,000 to assemble; the BIA estimated time for completion of review is 30 years.

*See Mackinac Tribe v. Jewell*, 829 F.3d 754, 758 (D.C. Cir. 2016) (*citing The Incomplete Loom: Exploring the Checkered Past and Present of American Indian Sovereignty, supra* at 497).

128.

In fact, the BIA itself admitted that "72% of ... currently recognized federal Tribes could not successfully go through the [federal acknowledgment] process as it is being administered today." *Id.* at 507 (*quoting* Rev. John Norwood, Delegates Report, the National Congress of American Indians Annual Conference 1 (2010)).

129.

The 2015 amendments differ from the process in place when the Chinook's petition was considered in several important ways. First, based on "inconsistent and unpredictable criteria, the amended process promotes a consistent baseline," meaning "if a particular amount of evidence or a particular methodology was sufficient to satisfy a criterion in a decision made in 1980, 1990, or 2000, that baseline threshold remains the same for petitioners today." *Information Fact Sheet: Highlights of the Final Federal Acknowledgment Rule* (25 C.F.R. § 83, BIA, June 29, 2015[5]. This would mean that if the Chinook were to

---

[5] Available at https://www.bia.gov/es/groups/public/documents/text/idc1-030769.pdf.

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

petition for acknowledgment or reaffirmation today, the BIA would be required to consider that the Cowlitz Indian Nation in 2002, the Snoqualmie Tribe, and the Jamestown S'Klallam Tribe, satisfied the federal recognition process because of their treaty relationships with the United States, and to accord the same significance to the Chinook for their treaty relationships and grant them recognition, as it did for the aforementioned tribes.  This failure by the Defendants to utilize a consistent baseline and to prohibit reapplication by the Chinook to seek application of a consistent baseline under the 2015 amendments.

130.

Second, but critically for the Chinook, the amended Part 83 prohibits any Tribe from re-petitioning for federal acknowledgment under Part 83 if it previously had applied for that process and its petition was denied.  25 C.F.R. § 83.4(d).  As amended, that section provides:

The Department will not acknowledge ...

* * * *

(d)     An entity that previously petitioned and was denied Federal acknowledgment under these regulations or under previous regulations in part 83 of this title....

131.

During consideration of the amended Part 83 process, the DOI considered a proposal that would allow "limited re-petitioning."  Opponents of "limited re-petitioning," including the Quinault, argued that re-petitioning was "unnecessary, inefficient, and unfair to other tribes," and contended that re-petitioning "could result in acknowledgment of previously denied petitioners."  80 Fed. Reg. 37,874.  Exactly so.

132.

Those in the DOI who strongly objected to the ban on re-petitioning did so on the ground that such a prohibition would treat petitioners, like the Chinook, unequally; that it would violate Equal Protection and Due Process components of the Fifth Amendment; that

Page 54 - FIRST AMENDED COMPLAINT

it would "prevent getting to the truth of whether a Tribe should be acknowledged;" that it exceeds the BIA's authority; is "politically motivated;" is "based on an invalid justification" (established equities); and fails to consider the petitioners' interest. *Id.* at 37,874-75. Their valid and legitimate objections to the ban were nonetheless ignored, because of a claimed need for greater administrative efficiency and less of a workload.

133.

The Chinook submitted comments on the proposed changes and provided those comments to the BIA's Office of Regulatory Affairs & Collaborative Action. The Chinook saw the opportunity to have its status reaffirmed as a Tribe under the new rules.

134.

Nonetheless, instead of allowing Tribes that had devoted decades of their lives and enormous sums of money seeking recognition only to find themselves victimized by that broken, inconsistent, and unpredictable process, to have an avenue for eventual recognition, the BIA did just the opposite in the 2015 regulations by forever barring those victims (such as the Chinook) from reapplying, shirking all responsibility for their plight and leaving any remedy for redress to the political process: "Congress may take legislative action of recognized groups it finds have merit even though they do not meet the specific requirements of the acknowledgment regulations." *Id.*[6]

135.

The BIA's decision adopting the Final Rule prohibiting re-petitioning adversely affected the Chinook by depriving it of the right to supplement or revise a petition for recognition or to file a new petition pursuant to the reaffirmation process.

///

///

---

[6] Interestingly, Assistant Secretary Washburn informed the Chinook in a telephone conference in July 2015 that the Tribe could still reapply, but would have to go to "the back of the line."

Page 55 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

That regulatory prohibition of re-petitioning is arbitrary, capricious, an abuse of discretion, and contrary to law because there was no statutory authority to do so. Further, it is completely inconsistent with the entire purpose behind the new rules, which was to address the unfairness, inconsistency, and unpredictability of the previous system that resulted in recognition of the Cowlitz, and Jamestown S'Klallam, for example, on factual grounds virtually identical to those of the Chinook and which resulted in a contrary decision.

137.

This is especially damaging to the Chinook because the Tribe can demonstrate satisfaction of the BIA's reaffirmation criteria if allowed to re-petition. Indeed, the Chinook can satisfy the recognition criteria as well, if they are to be considered, interpreted, and applied in the same manner as they were applied to those Tribes who were approved, such as the Cowlitz.

**DOCKET 234**

138.

The Indian Claims Commission Act of 1946 required federal officials to make threshold determinations of tribal status before a group could assert a claim against the United States under the Act. According to the Solicitor's Opinion from 1948, claimants under the Act must be:

> a group whose political existence has been recognized by Congress or the Executive Branch of the Government, or one which in the absence of such recognition has a de facto collective existence and carries on a type of group life characteristic of ... Indians.

Op. Sol. Interior, M-35029 (Mar. 17, 1948). Following the service of many of its members in World War II and the creation of the Indian Claims Commission ("ICC"), the Chinook Tribal Council dedicated itself to amending its constitution, first created in 1925.

Page 56 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

139.

In 1951, the Chinook gained congressional approval to file a case before the Indian Claims Commission for fairer federal compensation assessing the misappropriation of its lands by the federal government following the Chinook's entry into the 1851 Tansey Point Treaty. (Dkt. 234, Ind. Cl. Comm. 56). The Chinook ultimately prevailed in that litigation almost 20 years later in 1970 and were awarded $48,692.02, in addition to the $26,307.95 that had been awarded by Act of Congress in 1912. That amount was determined based on 76,630 acres of ceded territory, plus timber rights (fisheries were not considered). Those funds were put into trust for the Chinook to be administered by the BIA.

140.

There is no indication that Congress intended for payment of those funds, or for any claims for uncompensated land, to be made to individual tribal members. Rather, in *Duwamish Tribe of Indians v. United States,* 79 Ct. Cl. 530, the Court of Claims found it hard to believe that money was intended to be paid to individuals:

> The Government was securing a cession of lands improved by the individual efforts and industry of the Indians, and, in addition to the value thereof free from improvements, the clear intention of the parties was to fix a value upon all substantial ones and increase the compensation to the tribe accordingly…. The dwellings housed the members of the tribe and the treaty dealt with the tribe as such, and in the absence of more positive provisions to the contrary, we think the claims are tribal.

79 Ct. Cl. 530 at 575-576. Further, the Indian or aboriginal title held by the Chinook over their lands was held collectively, not individually. The simple existence of a favorable judgment before the Indian Claims Commission therefore demonstrates federal recognition of the Chinook for the simple facts that a threshold determination of recognized political existence was made by Congress when it allowed the Chinook to move forward with their claim, and subsequently when the Chinook were treated as having collective rights in the resulting judgment.

Page 57 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

141.

As its trustee, the BIA has a fiduciary responsibility to the Chinook. The BIA is further charged by Congress with safekeeping and appropriate investment of these funds that were awarded to the Chinook without strings attached. As a fiduciary, its conduct is "judged by the most exacting fiduciary standards," which dictates that it must act with good faith in the best interests of the beneficiary at all times. *United States v.* Mason, 412 U.S. 391 (1978); *see also Seminole Nation v. United* States, 316 U.S. 286, 296 (1942). This money is **not** part of "protections, services and benefits" that the BIA provides to recognized Tribes. It is money that the ICC concluded the Chinook were entitled to **recover** in return for the "lands aboriginally used and occupied by the Clatsop Tribe and The Lower Band of Chinook Indians" and "taken from them without their consent as of 1851." ICC Findings 31 (Apr. 16, 1958). Those funds are held **in trust** pursuant to 25 U.S.C. § 1401(b).

142.

Of necessity, the ICC Decision entailed *de facto* acknowledgment of the Chinook as a federally-recognized Tribe. As a matter of fact, the Commission found that the Chinook Indian Nation's Lower Columbia Band and Clatsop Tribe were the legal successors to the 1851 treaty signatories. In no uncertain terms, it stated: "[T]he defendant assumed definite control over the areas of land exclusively used and occupied by said [Tribes] ... disregarding the aboriginal rights of said Indians."

**BIA-Managed Indian Claims Commission Judgment Funds and Docket 234**

143.

When the Indian Claims Commission rendered its ruling in the matter of Docket 234 on November 4, 1970, it awarded $48,692.02 to the Chinook for the confiscation of 76,630 acres of land in Oregon and Washington that was historically occupied by the various bands of the Chinook and that the Chinook agreed to cede to the federal government in signing the 1851 treaties. Following an appeal of the decision, the court

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 ▪ 503.224.4133 (facsimile

entered its final order for the award on December 3, 1971.  Within four days, the Chief of the Tribal Claims Section of the Division of Tribal Operations at the BIA notified the Area Director about the resolution of Docket 234.  The BIA then worked until 1984 to determine the method by which the judgment funds would be disposed, ultimately proposing a draft bill that would direct the judgment funds to be placed in trust by the BIA for the Chinook and utilized for tribal education purposes developed and implemented by the Secretary of the Interior.  Those funds now sit untouched by and held in trust for the Chinook Indian Nation by the BIA.

144.

For almost 50 years, since entry of the U.S. Court of Claims judgment, the BIA dutifully sent monthly statements regarding the Tribe's Docket 234 funds to its current mailing address. The Tribal Secretary filed these away, first at the tribal office in Chinook, WA until 2008, then at their tribal offices in Bay Center, Washington, after they relocated there.  The monthly statements included the accrual of investment gains.  When last available (Feb. 29, 2012), the Chinook account showed a balance of $497,374.02.  Even given modest returns, the total is easily now over $500,000.

145.

Abruptly in 2015, without explanation, those statements stopped being received by the Chinook Indian Nation from the BIA.  When newly-elected Chinook Tribal Chair Tony Johnson investigated the BIA's actions, he did not learn why until late August 2015 when he received the following response from a senior official in the Office of the Special Trustee, in a letter dated August 25, 2015:

> As you are aware, the Chinook Tribe is not Federally recognized. Section 25.83.2 of the Code of Federal Regulations, provides that "Acknowledgement of tribal existence by the Department [BIA] is a pre-requisite to the protection, services and benefits of the federal government available to Indian tribes by virtue of their status as tribes." Thus, because you are not recognized, the funds held with our office cannot benefit your

Page 59 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon  97201
503.224.4100 • 503.224.4133 (facsimile

tribe. The only suggestion that I can make to you is that you continue to pursue recognition in accordance with the regulations set forth under CFR Section 25, Part 25.

*See* **Exhibit D** attached.  The Office of the Special Trustee has since corresponded directly with the Chinook Indian Nation on other matters.

146.

In sum, because the DOI no longer deemed the Chinook to be a recognized Tribe, they were not entitled to an accounting or possession of their own money – money which was awarded to the Chinook (first by Congress in 1912 and then additional compensation by the ICC in 1970) after extensive proceedings and upon 66 detailed findings recounted in a valid court order. Moreover, the BIA's "suggestion" that the Chinook pursue recognition under its regulations is completely hollow, since the tribe is prohibited from doing so by those same regulations. In any other context, this would be an indictable defalcation.  In the current situation, it is what the AIPRC earlier labeled a "Catch 22" where the BIA absolves itself of its fiduciary responsibility by refusing to acknowledge tribal status – many years after the fact.

147.

In desperation, but still hopeful, the Tribe turned to the newly-elected President Obama.  The Chinook began an intensive, but unsuccessful, letter-writing campaign seeking an Executive Order restoring the Tribe.

148.

The Tribe then decided to appeal to the court of public opinion, and, together with the Duwamish Tribe, their plight was featured in an award-winning documentary, *Promised Land*, depicting both Tribes' protracted fight against federal indifference.

149.

The Chinook have thus pursued their right to recognition diligently and have failed only because of the extraordinary circumstances the Defendants have placed in their way.

Page 60 - FIRST AMENDED COMPLAINT

150.

Almost 40 years after they began the recognition process, over 200 years after Lewis and Clark landed on their shores (and almost 120 years after hiring their first lawyer), and surviving strategies designed to eliminate their very existence, the Chinook have come full circle.  They seek simple justice by petitioning this court to affirm what was internationally recognized at the time of first contact:  The Chinook are a respected and legitimate Indian Tribe with a long and proud history, entitled to formal acknowledgment as such by our federal government.

### FIRST CLAIM FOR RELIEF

**• Declaration of Federal Recognition and Issuance of Mandatory Injunction •**

151.

Plaintiffs reallege and incorporate herein by reference the allegations contained in ¶¶ 1-150 above.

152.

The Constitution vests Congress with plenary authority over Indian affairs.  *See, e.g.,* the Federally Recognized Indian Tribe List Act of 1994, Pub. L. 103-454, § 103(1), 108 Stat. 4791 (1994) (codified at 25 U.S.C. § 5130, *et seq.* – Congressional Findings).

153.

Federal acknowledgment requires that the Secretary of Interior place a Tribe on a regularly updated list of recognized Tribes which are eligible for programs and services provided by the United States.  *See* 25 U.S.C. § 5131.

154.

Congress set forth three separate means for a Tribe to achieve federal recognition in the 1994 Act:

Indian Tribes presently may be recognized by Act of Congress; by the administrative procedures set forth at Part 83 of the Code of Federal Regulations denominated "Procedures for Establishing that an American

Page 61 - FIRST AMENDED COMPLAINT

1 Indian Group Exists as an Indian Tribe;" or by the decision of a United States
2 court.

3 Pub. L. 103-454, § 103(3).

4                                      155.

5      The Chinook have diligently fought for their rights through Congress and through
6 the Part 83 procedure.  However, the failure of the Congress to adopt legislation, and the
7 unlawful and arbitrary and capricious decisions of the BIA, have served to foreclose the
8 Chinook's opportunities for recognition and/or reaffirmation by non-judicial means.

9                                      156.

10      The Chinook have not been congressionally terminated.  The Secretary of the
11 Interior's failure to acknowledge the Chinook and include the Chinook on the list of
12 federally–recognized Tribes pursuant to 25 U.S.C. § 5131 violates the Fifth Amendment to
13 the Constitution and the APA as set forth herein, it violates Congressional policy to assist
14 Indian tribes and it perpetuates more than a century of historical injustice to the Chinook.

15                                      157.

16      A principle that "has long dominated the government's dealings with Indians … [is]
17 the undisputed existence of a general trust relationship between the United States and the
18 Indian people."  *United States v. Mitchell*, 463 U.S. 206, 255 (1983).  The historic and
19 ongoing relationship between the federal government and the Chinook Indian Nation, as
20 set forth above, demonstrates the full trust relationship that exists between the federal
21 government and Chinook Indian Nation. Actions on the part of the Defendants, the
22 Executive Branch and Congress, as alleged herein, demonstrate that the Defendant United
23 States federal government has recognized the Chinook as an Indian Tribe; it has *de facto*
24 acknowledged the Chinook Indian Nation as a Tribe.  It has constructively ratified the 1851
25 Tansy Point Treaty with The Lower Band of Chinook, to which the Plaintiff is a
26 successor-in-interest, and the 1855 Chehalis River Treaty (Treaty of Olympia), the

Page 62 - FIRST AMENDED COMPLAINT

negotiation of which the Chinook participated in. Recognition of the Chinook has also been demonstrated by Congress, by Executive Orders, by a long course of dealing, and by satisfaction of all the elements necessary for common law recognition as set forth herein. Defendants have therefore violated the Federally Recognized Indian Tribe List Act of 1994 by failing to include the Chinook Indian Nation on the BIA federal register of recognized tribal entities pursuant to 25 C.F.R. § 83.6(b).

158.

Plaintiffs therefore seek a declaration from this court that because of the course of dealing set forth herein, the Chinook are, and have been, in fact and in law, a federally recognized and acknowledged as an Indian tribe. Further, this Court has the power and authority to order that the Chinook be placed on the Federally Recognized Indian Tribe List based upon their recognition by the Defendants as alleged herein through treaties, Executive Order, Congressional action, federal common law and based upon the lengthy, detailed history of dealings with the federal government since at least 1851, as set forth above, and Plaintiffs respectfully request that this Court enjoin the Defendants to do so.

159.

The Chinook Indian Nation further seeks an injunction ordering the BIA to provide benefits accorded to federally recognized Tribes in all areas, specifically including, but not limited to: (1) administration of trust accounts; (2) land allotments and the ability to take land into trust for community benefit, including drug and alcohol treatment; (3) probate under the terms of reform legislation; (4) access to health care through IHS; (5) educational benefits available to eligible tribal members through federal scholarship programs; (6) rights to inventories and consultations mandated by the Native American Graves Protection and Repatriation Act and other federal legislation and regulations protecting cultural resources; (7) standing in Indian Child Welfare Act determinations and placements; (8) recognition of fishing, hunting and gathering rights afforded by treaty and

Page 63 - FIRST AMENDED COMPLAINT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

subsequent adjudication since 1851; (9) access to federally managed lands under the provisions of the American Indian Religious Freedom Act; (10) opportunities to qualify for federal grants programs for economic development and other purposes; (11) access to federal housing assistance and housing funds available from HUD and other Departments; and (12) maintenance of Individual Indian Money accounts.

160.

The Chinook Indian Nation also respectfully requests, pursuant to Fed.R.Civ.P. 53(a)(1)(c), that the Court appoint a Special Master versed in federal Indian law to expedite this process, oversee it, and facilitate negotiations with the BIA over specific items listed above. After decades of struggle and maintaining their identity against all odds, the Chinook deserve an able, impartial enforcer to oversee implementation of the Court's decisions in this matter.

## SECOND CLAIM FOR RELIEF

### ● Violation of the Administrative Procedures Act ●

161.

Plaintiffs reallege and incorporate herein by reference the allegations contained in ¶¶ 1-160 above.

162.

The APA grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action...." 5 U.S.C. § 702. "Final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." *Id.* at § 704.

163.

Under the APA, a court must "hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." *Id.* at § 706(2)(A).

Page 64 - FIRST AMENDED COMPLAINT

164.

25 C.F.R. § 83, amended in 2015 and effective July 31, 2015, unlawfully prohibits the Chinook from obtaining a fair review of its status as a sovereign Indian Tribe under the revised criteria where it was previously denied such status after acknowledgment and under a procedure that the BIA has admitted was "broken," "inconsistent," "non-transparent," and "unpredictable," a system effectively designed to deny federal recognition. The Tribe has a legal right to bring this challenge under the revised Part 83 regulation, even though it has not filed a new petition with the BIA since doing so, in light of the ban on re-petitioning, would have been futile and resulted in certain denial.

165.

In fact, the Chinook have exhausted their administrative remedies. *See Safari Club Int'l. v. Jewell*, 832 F.3d 1280 (D.C. Cir. 2016) (futility is an exception to the requirement of exhausting administrative remedies); *accord*, *Honig v. Doe*, 484 U.S. 305, 327 (1988) (futility may occur when agency administrative processes cannot provide the relief sought by the petitioner).

166.

Congress did not grant the BIA an express delegation of authority to prohibit Tribes from re-petitioning under 25 C.F.R. § 83, and the BIA has not been given implicit legislative delegation to do so because such a ban is manifestly contrary to the purpose of the federal acknowledgment process. *See* 25 C.F.R. §§ 83.2 (purpose) and 83.3 (scope). Defendants have violated the APA by adopting rules that are not in accordance with the law by failing to act pursuant to Congressionally-delegated authority in amending the Part 83 rules, codified at 25 C.F.R § 83.4(d), to prohibit the BIA from considering a new petition for acknowledgment by a previously-denied Tribe under the prior, "broken" and "inconsistent" Part 83 process.

///

Page 65 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

167.

The scope of the BIA's acknowledgment process under Part 83 applies only to indigenous entities (like the Chinook) that are not federally-recognized Indian Tribes. 25 C.F.R. § 83.3. Consequently, Part 83 only applies to a small number of unrecognized Tribes in the United States, and yet the BIA chose to restrict that small number of non-federally-recognized Tribes to a single effort to obtain the rights that their members are entitled to – federal acknowledgment and recognition – regardless of the substantive merits of their claim for recognition and regardless of the BIA's admission that the Chinook's Petition was effectively doomed by its own prior "broken" and "inconsistent" process and regardless of that fact that the 1978 regulations under which the Chinook petitioned for federal acknowledgement contained no prohibition on re-application.

168.

A federal agency cannot act unlawfully, or arbitrarily and capriciously or abuse its discretion to prohibit petitions for redress to vindicate a regulated entity's statutory rights based on its own administrative convenience and efficiency concerns and without statutory authority to do so. Congress did not authorize or intend that the BIA be allowed to delay final action on a petition for more than 20 years, change the rules regarding recognition and acknowledgment during that more than 20-year process to limit evidence and procedural protections and allow third party objections and then grant formal acknowledgment to the Tribe only to have a third-party request reconsideration at the eleventh hour and then have that acknowledgment ripped away after 18 months. Especially when the BIA, applying the same criteria, approved other Tribes' petitions for recognition under similar, indeed virtually identical facts. Compounding its unlawful behavior, the BIA relying upon its own track record of administering a "broken," "inconsistent," and "unpredictable" process, then adopted new rules that forever foreclose

///

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile

the ability of a Tribe victimized by that process, such as the Chinook, to re-petition for recognition or reaffirmation with more evidence and/or under different criteria.

169.

The 2015 amendments of Part 83 that became effective July 31, 2015, eliminate any possibility that the BIA could consider new information or supplemental facts for reaffirmation as opposed to one for recognition. As a result, it is unlawful because it was done without Congressional authority and is therefore *ultra vires*. It allows the BIA to ignore unrecognized Tribes' petitions for recognition or reaffirmation without any authority to do so from its governing statutes.

170.

The BIA's refusal to consider new evidence or a new Petition from the Chinook after the Tribe had its initial Petition denied under an admittedly broken and unfair process violates the APA because it is erroneous, arbitrary, capricious, an abuse of discretion, and not in accordance with the law within the meaning of 5 U.S.C. § 706.

171.

The Chinook Indian Nation and its members have suffered substantial injury as a result of the Defendants' actions, including, but not limited to, lack of access to housing , health and medical care, interference with aboriginal and treaty rights to fish, hunt, and gather in their aboriginal territory, and the right to have lands and monies held in trust by the United States, and the loss of protections under the Indian Child Welfare Act, the Native American Graves Protection and Repatriation Act, and the American Indian Religious Freedom Act.

172.

The Chinook Indian Nation and its members are adversely affected and aggrieved by the action of the Defendants in prohibiting them from re-applying for acknowledgement or reaffirmation of their tribal status, in that it deprives them of rights and benefits accorded

Page 67 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

to federally-recognized Tribes and their members and deprives them of their ability to maintain and support their distinct tribal and cultural identity. Plaintiffs therefore seek a declaration from this court that the regulatory prohibition on re-application for acknowledgement or application for reaffirmation contained in 25 C.F.R. § 83.4(d), as it applies to the Chinook, violates the APA.

### THIRD CLAIM FOR RELIEF

**● Violation of the Due Process Clause of the Fifth Amendment ●**

173.

Plaintiffs reallege and incorporate herein by reference the allegations contained in ¶¶ 1-172 above.

174.

Defendants' adoption of 25 C.F.R. § 83.4(d) which prohibits the Chinook from re-petitioning for recognition or reaffirmation of their tribal status under Part 83 violates the procedural due process component of the Due Process Clause of the Fifth Amendment.

175.

In 1975, Congress passed the Indian Self-Determination and Education Assistance Act, and again reiterated the federal policy concerning the United States' relationship with Indian Tribes:

> The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes…. In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities.

25 U.S.C. § 5302 (Congressional declaration of policy).

176.

This longstanding Congressional policy of "assisting Indian Tribes" to develop independent communities has been undermined and eroded by the BIA's action in 2015 to

Page 68 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 ● 503.224.4133 (facsimile

ban re-petitioning for tribal recognition or reaffirmation. By prohibiting the Chinook's ability to show that it is entitled to recognition and/or reaffirmation, despite the fact that the Tribe is able to demonstrate that it fairly satisfies the criteria for recognition and/or reaffirmation, Defendants have violated the Plaintiffs' right guaranteed under the U.S. Constitution to due process petition the government for redress of grievances.

177.

Given the federal government's underlying policy of "assisting Tribes," and the government's recognition of the Chinook on multiple occasions beginning in 1851, the Chinook should be given an opportunity to petition, for the first time, under the "reaffirmation" process of 25 C.F.R. § 83.12. The Chinook can demonstrate their ability to satisfy all of the reaffirmation criteria.

178.

Subsequent to the denial of the Chinook's petition for recognition in 2002, it became evident that the Defendants were applying the criteria for approval of petitions for recognition in a biased, arbitrary, capricious, inconsistent, and unlawful manner. The Chinook should be allowed to reapply or have their petition for recognition or reaffirmation considered and allowed to have considered new evidence, facts, and data in a fair and objective manner, utilizing a "consistent baseline" under the new 2015 amendments, and the recognition process set forth in 25 C.F.R. § 83.7. If the Chinook were allowed to do so, they could demonstrate their ability to satisfy all applicable criteria under the new 2015 rules.

179.

The Chinook have therefore been substantially prejudiced, adversely affected and aggrieved by the BIA's prohibition on re-petitioning, particularly where the regulatory scheme under which the Chinook first petitioned for federal acknowledgement contained no such prohibition on re-application and where the BIA has subsequently acknowledged

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

that the process under which the Chinook's petition for recognition was ultimately denied was the product of a "broken," "inconsistent," "non-transparent," and "unpredictable" process.

180.

The Chinook therefore seek a declaration from this court that the Defendants' action in adopting such a regulatory prohibition on re-application for acknowledgment or reaffirmation, as it applies to the Chinook, violates the Due Process Clause of the Fifth Amendment.

**FOURTH CLAIM FOR RELIEF**

**● Violation of the Equal Protection Clause of the Fifth Amendment ●**

181.

Plaintiffs reallege and incorporate herein by reference the allegations contained in ¶¶ 1-180 above.

182.

The Chinook are part of a group of Tribes that may deserve federal recognition under the provisions of Part 83, but are foreclosed or prohibited from re-petitioning for recognition or petitioning for reaffirmation as a Tribe simply because the Tribe exercised its statutory right to apply for recognition prior to the 2015 amendments and was initially acknowledged and then, on reconsideration, denied under a flawed process which the Defendants have acknowledged was "broken," "inconsistent," and "unpredictable."

183.

The Chinook are similarly-situated to current tribal petitioners whose applications are being reviewed by the BIA under the 2015 amendments. The Chinook, however, are absolutely prohibited from being considered for recognition under this revision procedure without regard to their rights under the IRA or to the merits of their petition for federal recognition or reaffirmation.

Page 70 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 ● 503.224.4133 (facsimile

184.

The Chinook also belong to a class of similarly-situated Pacific Northwest Tribes which have historically existed for millennia, and who either entered into treaties that were not formally ratified by the Congress, or who were invited by the federal government to participate in treaty negotiations and then refused to sign, but who nonetheless had their lands seized from them by the federal government. Yet the other members of the class have been subsequently federally recognized by the DOI or by Acts of Congress.

185.

The Chinook have therefore been denied equal protection of the laws under the Fifth Amendment because the BIA now has imposed a threshold prohibition on the Chinook again seeking federal acknowledgment under the Part 83 process when similarly-situated Pacific Northwest Tribes, such as the Cowlitz, either have been accepted and federally recognized under Part 83, or whose petitions for acknowledgement will be considered under the newly-approved and less stringent criteria.

186.

Further, the Defendants have violated the Equal Protection clause by failing to consider the Chinook in the same manner as similarly-situated tribes, such as the Cowlitz, despite the fact of their intertwined histories.

187.

Furthermore, the BIA's ban on re-petitioning creates a situation where the Chinook would be able to succeed in obtaining federal acknowledgement or reaffirmation under the current Part 83 process because of the required application of a "consistent baseline," *i.e.*, the same standards be applied to all similarly-situated Tribes petitioning the BIA for recognition. The Chinook therefore are being subjected to an unreasonable, inconsistent, rigid, biased, non-transparent, and subjective analysis that failed to apply the same "consistent baseline" to it as was applied to other tribal petitioners who participated in the

Page 71 - FIRST AMENDED COMPLAINT

same 1855 Treaty negotiations, and/ or who had monies appropriated by Congress for them to compensate them for the values of their seized lands, all of whom have now been successfully recognized, in violation of the Equal Protection component of the Fifth Amendment.

188.

Plaintiffs therefore seek a declaration from this court that the actions of the Defendants as set forth above constitute a violation of the Equal Protection component of the Fifth Amendment.

**FIFTH CLAIM FOR RELIEF**

**● Petition Clause of the First Amendment Challenge ●**

189.

Plaintiffs reallege and incorporate herein by reference the allegations contained in ¶¶ 1-188 above.

190.

The First Amendment to the Constitution protects "the right of the people ... to petition the Government for a redress of grievances." *Borough of Duryea, Pa. v. The Guarnieri*, 564 U.S. 379, 382 (2011). The Petition Clause of the Constitution protects a citizen's right of access to mechanisms for their redress of grievances.

191.

By prohibiting the Plaintiff as a once-denied petitioner for recognition from applying for reaffirmation of its Tribal status for a first time, or seeking to reapply for acknowledgment with introduction of new evidence and/or demonstrating their ability to satisfy all applicable criteria and data, Defendants have effectively foreclosed the ability of the Chinook to seek redress or to grieve its federal recognition status, and they have done so based only upon an invalid claimed need for greater administrative efficiency and reduced workloads, without regard to the interests of the Plaintiffs and without statutory

Page 72 - FIRST AMENDED COMPLAINT

authority to do so. Defendants have therefore violated the Petition Clause of the First Amendment. Plaintiffs therefore seek a declaration from this court that the actions of the Defendants constitute a violation of the Petition Clause of the First Amendment.

## SIXTH CLAIM FOR RELIEF

### ● Violation of APA ●

192.

Plaintiffs reallege and incorporate herein by reference the allegations contained in ¶¶ 1-191 above.

193.

The federal government has already concluded that the Chinook had aboriginal or Indian title over the lands taken from them:

> Upon the findings of fact this day filed herein and hereby made a part of this order, the Commission concludes as a matter of law, that ... the Chinook (proper) Indians [Lower Band of Chinook] had Indian title to the lands described ... and that the defendant [United States of America] assumed definite control over the lands of the Chinook (proper) tribe as of August 9, 1851, that said Indian tribal groups have the capacity and the right to assert claims for their respective lands....

6 Ind. C. Comm. 176a (1958). The federal government has further determined that those lands were and are deserving of compensation:

> [T]he lands of the Chinook Indians were taken as of the dates of the unratified treaties at which time "the defendant assumed definite control over the areas of land... disregarding the aboriginal rights of said Indians."

21 Ind. C. Comm. 143, 151 (1969), quoting 6 Ind. C. Comm. 177, 207 (1958).

194.

Defendants' actions in denying the federal acknowledgment of the Chinook Indian Nation are now being used to justify Defendant DOI's refusal of the Chinook to access the money awarded to them by Congress and the Indian Claims Commission for seizure of their land – denying the Chinook Indian Nation proper compensation for land over which the

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 • 503.224.4133 (facsimile

government has already determined the Tribe had "aboriginal or Indian title." See Ch 214, H.R. 2694, 43 Stat. 886.

195.

Despite the fact that partial payment was appropriated for and administered to the Chinook by Congress and the BIA, respectively, in 1912, the Indian Claims Commission in 1970 determined that such payment did not constitute just compensation and awarded the Chinook an additional sum of money. Dkt. 234, Ind. Cl. Comm. 56. Defendant DOI now flatly refuses to pay out that monetary award to the Chinook: "[B]ecause you are not recognized, the funds with our office cannot benefit your tribe." Letter from Catherine E. Ruge, Regional Trust Administrator, U. S. Department of the Interior Office of the Special Trustee for American Indians, to Tony A. Johnson, Chairman of the Chinook Indian Nation (August 25, 2015). Even though the money awarded to the Chinook by the Indian Claims Commission is now held in trust by the DOI for the Chinook, the fact that the DOI refuses to release the money to the Chinook means that the Chinook, by the terms set forth by the Indian Claims Commission, *have not been justly compensated* for the land taken from them following the signing of the 1851 treaties at Tansey Point.

196.

As DOI Regional Trust Administrator Rugen points out in her letter of August 25, 2015, 25 C.F.R § 83.2 provides that "Acknowledgment of tribal existence by the Department is a prerequisite to the protection, services and benefits of the Federal government available to Indian tribes by virtue of their status as tribes." She argues that because the *BIA* has not acknowledged the Chinook as a tribe, the Chinook Indian Nation is therefore ineligible to receive its award. However, the Indian Claims Commission made a preliminary determination of eligibility before the Chinook were allowed to proceed with their claim against the federal government. Further, when Congress appropriated money in 1912 to compensate the Chinook for land taken as a result of the 1851 Tansey Point

Page 74 - FIRST AMENDED COMPLAINT

treaties, it was the BIA that managed distribution of those funds to the Chinook. The Chinook Indian Nation has not been terminated and, further, has been recognized many times over by other branches and agencies of the federal government – including many within the Department of the Interior. The DOI's refusal to allow the Chinook Indian Nation to access funds awarded to it by the Indian Claims Commission as just compensation for land taken from it by the federal government therefore violates the APA. It is arbitrary and capricious, an abuse of discretion, and not in accordance with the law.

## SEVENTH CLAIM FOR RELIEF

### ● Procedural Due Process Challenge ●

197.

Plaintiffs reallege and incorporate herein by reference the allegations contained in ¶¶ 1-196 above.

198.

The actions of Defendants in forfeiting the monies previously appropriated by Congress and upheld by the Courts for the Chinook and/or its members, Defendants have deprived the Chinook of a protected property interest to which the Fifth Amendment's Due Process protection applies.

199.

Forfeiture of monies that have been appropriated over 100 years ago for the Chinook and/or its members by Congress as compensation for lands seized by the federal government in the aftermath of treaty negotiations is not, and should not, be dependent upon the results of any regulatory acknowledgment decision made in 2002, especially when the decision by the Defendants to declare the Chinook's property forfeited to them was not, in fact, made until almost two years ago (August 2015) without any prior notification, opportunity to be heard, or opportunity to challenge the decision. Such an ///

Page 75 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 ● 503.224.4133 (facsimile

action by the Defendants should be declared by this court to constitute a violation of the procedural component of the Due Process Clause of the Fifth Amendment.

## EIGHTH CLAIM FOR RELIEF

### ● Substantive Due Process Challenge ●

200.

Plaintiffs reallege and incorporate herein by reference the allegations contained in ¶¶ 1-199 above.

201.

In forfeiting monies previously appropriated by Congress and upheld by the courts for the Chinook and/or its members, Defendants have deprived the Chinook of a protected property interest to which the Fifth Amendment's Due Process protection applies and which enjoys protection from the substantive component of the Due Process Clause of the Fifth Amendment.

202.

Forfeiture of monies that have been appropriated beginning over 100 years ago that were appropriated for the Chinook and/or its members by Congress as compensation for lands seized by the federal government in the aftermath of treaty negotiations is not, and should not, be dependent upon the results of any regulatory acknowledgment decision made in 2002, especially when the decision by the Defendants to declare the Chinook's property forfeited to them was not, in fact, made until almost two years ago (August 2015) without any prior notification, opportunity to be heard, or opportunity to challenge the decision.  Such an action by the Defendants "shocks the conscience" and should be declared by this court to constitute a violation of the substantive component of the Due Process Clause of the Fifth Amendment.

///
///

Page 76 - FIRST AMENDED COMPLAINT

1    **WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

2    (1)    On their First Claim for Relief, for a declaration that the Chinook is entitled to

3           be federally recognized and acknowledged as an Indian tribe, that it and its

4           members are to be accorded the full panoply of services and benefits that

5           accompany federal recognition and an order enjoining the Defendants to

6           place the Chinook on the Federally Recognized Indian Tribe List, or in the

7           alternative, for an Order of Mandamus directing the Defendant to do so;

8    (2)    On their Second through Fifth Claims for Relief, without waiving the above,

9           for a declaration that the regulatory prohibition on petitioning for

10          reaffirmation or re-petitioning for recognition for a tribe previously denied

11          recognition under 25 C.F.R. 83.4(d) is unlawful, unconstitutional, arbitrary

12          and capricious, and unenforceable as it applies to the Chinook, and enjoined

13          the Defendants to allow the Chinook to reapply for recognition or

14          reaffirmation and to have their application considered promptly, fairly, and

15          consistent with the 2015 amendments;

16   (3)    On their Sixth through Eighth Claims for Relief, for a declaration that the

17          Defendants must maintain the entire value of their tribal trust account in

18          trust for the benefit of the Chinook as of the date of the filing of this

19          Complaint, together with interest accrued during the pending litigation;

20   (4)    For their reasonable attorney fees and costs and expenses pursuant to the

21          Equal Access to Justice Act; and

22   ///

23   ///

24   ///

25   ///

26   ///

Page 77 - FIRST AMENDED COMPLAINT

**LANDYE BENNETT BLUMSTEIN** LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224.4100 ● 503.224.4133 (facsimile

(5)     For such other and further relief as the Court deems just and equitable, including, but not limited to, the appointment of a Special Master as set forth in ¶¶ 2 and 160.

DATED:  November 8, 2017.

LANDYE BENNETT BLUMSTEIN LLP


By: *s/      Thane W. Tienson*
    Thane W. Tienson, WSBA #13310
    ttienson@lbblawyers.com
    Attorneys for Plaintiffs

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3600
Portland, Oregon 97201
503.224-4100 • 503.224-4133 (facsimile