UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CHINOOK INDIAN NATION, et al., | CASE NO. C17-5668 RBL |
| Plaintiffs, | ORDER ON MOTION TO DISMISS |
| v. | |
| RYAN K. ZINKE, et al., | |
| Defendants. | |

THIS MATTER is before the Court on Defendants' Motion to Dismiss [Dkt. #32]. Plaintiffs are descendants of the historic Chinook Indian tribe and bring suit against the Department of the Interior (DOI) and the Bureau of Indian Affairs (BIA) in an effort to compel those agencies to add the Chinook Indian Nation (CIN) to the list of federally acknowledged tribes. Plaintiffs also challenge regulations promulgated by Defendants which prohibit the CIN from re-petitioning the federal government for tribal acknowledgment. Finally, Plaintiffs seek access to funds from a 1970 Indian Claims Commission judgment currently held in trust by the DOI for the Lower Band of Chinook and Clatsop Indians. Defendants move to dismiss all claims, arguing that the Court lacks subject matter jurisdiction to confer federal acknowledgment on the CIN. Defendants also argue that Plaintiffs lack standing to challenge the re-petition ban,

and that the CIN's claims regarding the funds held in trust is not a final agency action which can be challenged under the Administrative Procedure Act (APA). The Court heard oral argument on May 8, 2018. For the reasons that follow, the Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

**A. Parties**

Plaintiff Chinook Indian Nation is a tribal group and nonprofit organization based in Bay Center, WA whose members primarily reside in Washington and Oregon. Dkt. 24 at 3–4. Members of the CIN trace their ancestry to "the historic Chinook Tribe, including the Lower Band of Chinook and Clatsop Tribe, that resided in the area of the lower Columbia River since time immemorial[.]" *Id*. at 4.[1] The historic Chinook Indians participated in treaty negotiations with the United States in the mid-1800s, however, the CIN is not on the list of federally acknowledged tribes maintained by the Secretary of the Interior. Dkt. 37 at 10. Plaintiff Anthony Johnson is the elected chairperson of the CIN. Dkt. 24 at 5.

Collectively, Defendants are the federal agencies and officials who oversee the tribal acknowledgment process for the United States. Defendant Ryan Zinke is the Secretary of the Interior. Defendant John Tahsuda is the Acting Assistant Secretary for Indian Affairs. Defendant BIA is the agency within the DOI responsible for providing services to American Indians and Alaska Natives as well as protecting and improving the trust assets of American Indians and Indian tribes. Defendant Office of Federal Acknowledgment (OFA) is the office within the DOI

---

[1] The CIN asserts that it is "the present-day political organization of, and successor-in-interest to The Lower Band of Chinook Indians, Wau-ki-kum ("Wahkiakum") Band of Chinook Tribe of Indians, Wheelappa ("Willapa") Band of Chinook Indians, Cathlamet Band of Chinook Indians, and Clatsop Tribe of Indians, that historically lived on both sides of the lower Columbia River[.]" Dkt. 24 at 3–4.

that implements the federal regulations regarding federal acknowledgment of American Indian tribes.[2] *See* 25 C.F.R. § 83 *et seq.* The OFA is responsible for reviewing petitions for federal acknowledgment and making recommendations and proposed findings to the Assistant Secretary for Indian Affairs (AS-IA) on whether or not to acknowledge tribal existence, thereby establishing a government-to-government relationship between the tribe and the United States.

**B. The Federal Power to Recognize Indian Tribes**

"Federal acknowledgment or recognition of an Indian group's legal status as a tribe is a formal political act confirming the tribe's existence as a distinct political society, and institutionalizing the government-to-government relationship between the tribe and the federal government." *Cohen's Handbook of Federal Indian Law* § 3.02[3] at 133–34 (2012 ed.). Federal acknowledgment "is a prerequisite to the protection, services, and benefits of the Federal Government available to" Indian tribes by virtue of their status as tribes. 25 C.F.R. § 83.2. Acknowledgment also means that the tribe is entitled to the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations and obligations of such tribes. *Id.*

"Historically, the federal government has determined that certain groups of Indians will be recognized as tribes or nations for various purposes. The power of Congress to establish and maintain such political relations with Indian tribes derives from the Constitution's Indian commerce clause." *Cohen's Handbook* § 3.02[4] at 136; *see also* U.S. Const. art. I, § 8, cl. 3. The

---

[2] The Office of Federal Acknowledgement was formerly known as the Branch of Acknowledgment and Research. *See The Federal Acknowledgment Process: Hearing Before the S. Comm. on Indian Affairs*, 109th Cong. (2005) (statement of R. Lee Fleming, Director, Office of Federal Acknowledgment) *available at* https://www.doi.gov/ocl/Federal-Acknowledgement.

United States Supreme Court has repeatedly described Congress as "possess[ing] plenary power over Indian affairs, including the power to modify or eliminate tribal rights." *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998); *see also United States v. Lara*, 541 U.S. 193, 200 (2004) ("the Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive.'") (citations omitted).

Congress has delegated general responsibility over matters pertaining to Indian tribes, including issues of tribal recognition, to the Executive branch. *See* 25 U.S.C. § 2 ("The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations."); *Cohen's Handbook* § 3.02[4] at 136 ("Congress has long delegated authority to the executive branch to take actions consistent with federal recognition of tribes. This delegation was the source of executive branch authority to adopt an administrative process for federal recognition, which was done in 1978.") (citing Mark D. Myers, *Federal Recognition of Indian Tribes in the United States*, 12 Stan. L. & Pol'y Rev. 217, 272–273 (2001)).

Federal recognition of tribes prior to the 1970s occurred on an ad hoc basis. *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1273 (9th Cir. 2004). In 1975, the congressionally-established American Indian Policy Review Commission "highlighted a number of inconsistencies in the Department of Interior tribal recognition process and special problems that existed with non-recognized tribes. As a result, in 1978, the Department of Interior exercised its delegated authority and promulgated regulations establishing a uniform procedure for 'acknowledging' American Indian Tribes." *Id.*; 25 C.F.R. § 83 *et seq.* Under these "Part 83" acknowledgment

regulations, a petitioning group's application for recognition must meet seven mandatory criteria

to achieve federal acknowledgment:

> (a) the group has been identified from historical times to the present, on a substantially continuous basis, as Indian; (b) "a predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present"; (c) the group "has maintained political influence or other authority over its members as an autonomous entity from historical times until the present"; (d) the group has a governing document; (e) the group has lists of members demonstrating their descent from a tribe that existed historically; (f) most of the members are not members of any other acknowledged Indian tribe; (g) the group's status as a tribe is not precluded by congressional legislation.

*Kahawaiolaa*, 386 F.3d at 1274 (citing 25 C.F.R. § 83.7 (1994)).[3] "Thus, through its broad

delegation and acknowledgment regulations, the Department of Interior has assumed much of the

responsibility for determining which tribes have met the requirements to be acknowledged as a

tribe with a government-to-government relationship with the United States." *Id.*

1. In 1994, Congress passed legislation requiring the DOI to annually publish a list of federally recognized tribes.

    In 1994, Congress passed the "List Act" requiring the Secretary of the Interior to publish

annually "a list of all Indian tribes which the Secretary recognizes to be eligible for the special

programs and services provided by the United States to Indians because of their status as

Indians." Federally Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, 108 Stat.

4791 (codified at 25 U.S.C. § 5131). Significant to the present lawsuit, Congress found: "Indian

tribes presently may be recognized by Act of Congress; by the administrative procedures set

forth in part 83 of the Code of Federal Regulations denominated 'Procedures for Establishing

that an American Indian Group Exists as an Indian Tribe;' *or by a decision of a United States*

---

[3] The criteria for acknowledgment as a federally recognized Indian tribe was renumbered as 25 C.F.R. § 83.11 after the BIA revised the federal acknowledgment regulations in 2015.

*court.*" *Id.* at § 103(3) (emphasis added). The legal significance of these Congressional findings is disputed by the parties in this suit.

2. <u>The DOI and the BIA revise the Part 83 tribal acknowledgment regulations through rulemaking in 2015.</u>

In 2015, the DOI and the BIA promulgated a Final Rule "revis[ing] regulations governing the process and criteria by which the secretary acknowledges an Indian tribe." Federal Acknowledgment of American Indian Tribes, 80 Fed. Reg. 37,862 (July 1, 2015) (codified at 25 C.F.R. pt. 83). In promulgating the 2015 amendments, the DOI and the BIA conceded "[f]or decades, the current process has been criticized as too slow (a petition can take decades to be decided), expensive, burdensome, inefficient, intrusive, less than transparent, and unpredictable." *Id.* The 2015 revisions were intended to make the acknowledgment "process and criteria more transparent, promote consistent implementation, and increase timeliness and efficiency, while maintaining the integrity and substantive rigor of the process." *Id.* The Proposed Rule would have provided a limited opportunity for tribes that had previously been denied federal recognition to re-petition for acknowledgment. *Id.* at 37,875. The BIA received numerous comments for and against re-petitioning, and ultimately decided not to allow re-petitions in the Final Rule:

> After reviewing the comments both in support of and in opposition to allowing for any opportunity for re-petitioning, limiting re-petitioning by providing for third party input, and other suggested approaches for re-petitioning, the Department has determined that allowing re-petitioning is not appropriate. The final rule promotes consistency, expressly providing that evidence or methodology that was sufficient to satisfy any particular criterion in a previous positive decision on that criterion will be sufficient to satisfy the criterion for a present petitioner. The Department has petitions pending that have never been reviewed. Allowing for re-petitioning by denied petitioners would be unfair to petitioners who have not yet had a review, and would hinder the goals of increasing efficiency and timeliness by imposing the additional workload associated with re-petitions on the Department, and OFA in particular. The Part 83 process is not currently an avenue for re-petitioning.

*Id.*

In addition to the re-petition ban, the 2015 revisions also made several changes to the way the OFA considers evidence and evaluates a petition for acknowledgment. Central to this lawsuit, the parties dispute whether the CIN would be able to meet the seven mandatory criteria for federal acknowledgment under the 2015 revisions.

**C. The Chinook Indian Nation's Petition for Federal Acknowledgment**

Not long after the DOI first promulgated the Part 83 acknowledgment regulations in 1978, the CIN gave notice of their intent to pursue administrative acknowledgment. Dkt. 37 at 9–10. The CIN submitted their initial documented petition for recognition to the BIA in 1981. *Id.*; Dkt. 32 at 8–9. The CIN revised and resubmitted their petition in 1987 after the BIA's Branch of Acknowledgment and Research identified several deficiencies with the petition. Dkt. 32 at 9. The BIA placed the CIN's petition for acknowledgment under active consideration in January 1994, formally beginning Plaintiffs' unpredictable pursuit of federal recognition. *Id.*

   1. <u>The DOI issues a Final Determination for Acknowledgment of the CIN in 2001.</u>

In 1997, AS-IA Ada Deer concluded that the CIN failed to meet three of the seven mandatory criteria under the Part 83 regulations, and issued a Proposed Finding Against Federal Acknowledgment of the Chinook Indian Tribe. Dkt. 33-1. Specifically, the Proposed Finding stated that the CIN failed to demonstrate that it had "existed as a tribal entity continuously since the time of first sustained contact in 1811" under § 83.7(a); that the CIN "has not formed a distinct social or geographical community since 1880" under § 83.7(b); and that "the evidence also demonstrates that the petitioner has not exercised political authority over its members since 1855" under § 83.7(c). Dkt. 33-2 at 2.

The BIA considered comments submitted by the CIN and other interested parties in response to the Proposed Finding throughout 1998. In the final days of the Clinton Administration in January 2001, AS-IA Kevin Gover issued a Final Determination for Federal

Acknowledgment, concluding the CIN should be federally recognized. Dkt. 33-3. AS-IA Gover departed from former AS-IA Deer's Proposed Finding after considering additional evidence of interactions between the Chinook and the United States in the early 1900s. Gover concluded, "while the petitioner meets the seven criteria throughout the period from first contact to the present, as an alternative basis for recognition, the petitioner has demonstrated prior federal acknowledgment in the form of a 1925 Act of Congress, and meets the seven criteria for the period from 1925 to present." Dkt. 33-4 at 2–3.

    2.  <u>The DOI issues a Reconsidered Final Determination Against Acknowledgment in 2002.</u>

Plaintiffs' victory was short-lived, and a new presidential administration brought a change of fortune for the CIN. Several groups including the Quinault Indian Nation requested that the Interior Board of Indian Appeals (IBIA) reconsider AS-IA Gover's decision to grant the CIN's petition for federal acknowledgment. Dkt. 33-5. The IBIA affirmed the final determination but referred several matters outside of its jurisdiction to newly-confirmed Secretary of the Interior Gale Norton, who in turn referred them to the new AS-IA, Neal McCaleb, for reconsideration. Dkt. 33-5; Dkt. 33-6.

In 2002, citing several perceived deficiencies with his predecessor's Final Determination, AS-IA McCaleb reversed course and issued a Reconsidered Final Determination Against Federal Acknowledgment, effectively rescinding the 2001 decision to federally recognize the CIN. Dkt. 33-7. McCaleb discounted several statutes AS-IA Gover had relied on as evidence that the United States had identified the Chinook as still existing in the early 1900s and ultimately concluded "the petitioner does not meet criteria 83.7(a), (b), or (c)." Dkt. 33-8 at 2–4.

3. The DOI stops sending account statements to the CIN for funds held in trust for the Lower Band of Chinook and Clatsop Indians.

In 1970, the Indian Claims Commission (ICC) awarded a final judgment of $48,692 to the Lower Band of Chinook and Clatsop Indians for claims stemming from the uncompensated taking of tribal lands by the United States following the negotiation of two unratified treaties in 1851. *See* 6 Ind. Cl. Comm. 177, 208, 229-a (1958); 24 Ind. Cl. Comm. 56, 64, 88 (1970). The funds from the ICC Judgment are presently worth approximately $500,000 and are held in trust by the DOI for the Lower Band of Chinook and Clatsop Indians.

The DOI sent monthly account statements to the CIN's tribal office for nearly 50 years. Dkt. 24 at ¶144. In 2015, without explanation the CIN stopped receiving account statements. *Id.* at ¶145. CIN Chairman Tony Johnson called the DOI Office of the Special Trustee (OST) to inquire why Plaintiffs were no longer receiving account statements. Dkt. 34 at 1. Catherine Rugen, the DOI's Regional Trust Administrator, explained that since the DOI had decided not to federally acknowledge Plaintiffs in 2002, the CIN were not the recognized beneficiaries of the trust account and were therefore not entitled to receive account statements. Dkt. 34. At Johnson's request, Rugen followed up with a letter explaining the same. Dkt. 24-4.

Plaintiffs filed the present lawsuit in 2017.

## II. LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6), the court construes the complaint in the light most favorable to the non-moving party. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005); *see also Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). Generally, the court must accept as true all well-pleaded allegations of material fact and draw all reasonable inferences in favor of

the plaintiff. *See Wyler Summit P'ship v. Turner Broad. Sys., Inc.,* 135 F.3d 658, 661 (9th Cir. 1998).

**A.  Subject Matter Jurisdiction under Rule 12(b)(1)**

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) addresses the court's subject matter jurisdiction. The plaintiff bears the burden of proving that the court has jurisdiction to decide the case. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  Article III of the U.S. Constitution limits the judicial power of the United States to actual cases or controversies. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). The closely-related doctrines of standing and ripeness arise out of the Article III case or controversy requirement and are intended to "prevent courts from becoming enmeshed in abstract questions which have not concretely affected the parties." *Pacific Legal Foundation v. State Energy Resources*, 659 F.2d 903, 915 (9th Cir. 1981). "Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a 12(b)(1) motion to dismiss." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121–22 (9th Cir. 2010). Courts also lack subject matter jurisdiction to decide cases that present non-justiciable political questions, which are appropriately raised in a 12(b)(1) motion to dismiss. *Corrie v. Caterpillar, Inc.*, 503 F. 3d 974, 982 (9th Cir. 2007).

**B.  Failure to State a Claim under Rule 12(b)(6)**

Dismissal under Fed. R. Civ. P. 12(b)(6) may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff's complaint must allege facts to state a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Although the court must accept as true the Complaint's well-pled facts,

conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper

12(b)(6) motion to dismiss. *Vazquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007);

*Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "[A] plaintiff's obligation

to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do. Factual allegations

must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007) (citations and footnotes omitted). This requires a plaintiff to plead

"more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Iqbal*, 556 U.S. at

678 (citing *id.*).

### III. DISCUSSION

This lawsuit stems from the CIN's decades-long quest for federal acknowledgment from

the United States. Federal acknowledgment is particularly significant because such recognition

"affords important rights and protections to Indian tribes, including limited sovereign immunity,

powers of self-government, the right to control the lands held in trust for them by the federal

government, and the right to apply for a number of federal services." *Kahawaiolaa*, 386 F.3d at

1273. Plaintiffs' Amended Complaint seeks a declaratory judgment from the Court that the CIN

is a federally recognized sovereign Indian nation, and that the Court direct the Secretary of the

Interior to place the CIN on the list of federally acknowledged Indian tribes. Dkt. 24 at ¶¶ 151–

60. In the alternative, Plaintiffs request that the Court invalidate the BIA's 2015 regulation

prohibiting the CIN from re-petitioning for federal acknowledgment. *Id*. at ¶¶ 161–91. Finally,

Plaintiffs seek a declaratory judgment from the Court recognizing their right to funds from the

1970 ICC judgment presently held in trust by the DOI. *Id*. at ¶¶ 192–202.

Defendants move to dismiss all of Plaintiffs' claims based on a perceived lack of subject matter jurisdiction. Defendants contend that Plaintiffs' claim for a judicial determination of federal acknowledgement poses a non-justiciable political question, that Plaintiffs lack standing to challenge the re-petition ban, and that Plaintiffs' claims to the ICC judgment funds held in trust does not challenge a final agency action. The parties' arguments are addressed in turn.

**A. Plaintiffs' claim seeking a judicial determination that the Chinook Indian Nation is a federally recognized tribe must be dismissed as a non-justiciable political question.**

Defendants argue Plaintiffs' first claim for a declaratory judgment that the CIN is a federally acknowledged tribe should be dismissed because it raises a non-justiciable political question and because the six-year statute of limitations to challenge the BIA's 2002 Reconsidered Final Determination Against Acknowledgment has passed.[4]

Plaintiffs respond that their first claim for relief does not pose a political question because the "or by a decision of a United States court," language contained in the 1994 List Act's Congressional findings specifically gives federal courts the authority to confer federal recognition upon tribes. Dkt. 37 at 13–19. Plaintiffs also note that the basic Indian law canons of construction provide that statutes be liberally construed in favor of Indians and that all ambiguities be resolved in their favor. *See Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 269 (1992); *Cohen's Handbook* § 2.02 at 113–15. Accordingly, the Court considers whether Plaintiffs' first claim poses a non-justiciable political question, or whether the 1994 List Act gives this Court the authority to confer federal acknowledgment on the CIN.

---

[4] Surprisingly, Plaintiffs did not respond to Defendants' statute of limitations argument in their opposition brief. Nevertheless, because the political question issue is dispositive on the first claim, the Court need not address Defendants' statute of limitations argument.

1    1.   The political question doctrine and issues of tribal acknowledgment.

2          The political question doctrine generally refers to particular subject matter that the United

3    States Supreme Court determines to be inappropriate for judicial review and is properly left to

4    Congress and the Executive as the politically accountable branches of government. *See* Erwin

5    Chemerinsky, *Federal Jurisdiction* § 2.6 (6th ed. 2012). One such category of political questions

6    not reviewable by courts are those issues that are committed by the Constitution to the exclusive,

7    unreviewable discretion of the executive or legislative branches. *Baker v. Carr*, 369 U.S. 186,

8    217 (1962). It is well-established precedent that issues of tribal acknowledgment present non-

9    justiciable political questions. *See United States v. Holliday*, 70 U.S. 407, 419 (1865). ("In

10   reference to all matters of this kind, it is the rule of this court to follow the action of the

11   executive and other political departments of the government, whose more special duty it is to

12   determine such affairs. If by them those Indians are recognized as a tribe, this court must do the

13   same."); *see also Kahawaiolaa*, 836 F.3d at 1276 (quoting *Miami Nation v. United States Dep't

14   of the Interior*, 255 F.3d 342, 347 (7th Cir. 2001)) ("the action of the federal government in

15   recognizing or failing to recognize a tribe has traditionally been held to be a political one not

16   subject to judicial review.").

17         Defendants argue that the well-established precedent that tribal status determinations are

18   the province of the political branches alone requires that this Court dismiss the first claim as a

19   non-justiciable political question. Dkt. 41 at 3. Plaintiffs contend that the Congressional findings

20   contained in the 1994 List Act "unambiguously acknowledges the power of this court to

21   recognize an Indian tribe." Dkt. 37 at 13.

22

23

24

2. <u>The district court for the Eastern District of New York considered the List Act's Congressional findings in *Shinnecock Indian Nation v. Kempthorne*.</u>

The parties identify a single case, *Shinnecock Indian Nation v. Kempthorne*, in which a court considered whether the Congressional findings accompanying the List Act authorize a district court to confer federal acknowledgment upon a tribe. 2008 WL 4455599 (E.D.N.Y. Sep. 30, 2008). Similar to the present case, members of the Shinnecock Indian Nation brought suit against the Secretary of the Interior seeking to compel the inclusion of the Shinnecock on the list of federally acknowledged tribes. Like the CIN, the Shinnecock argued that the "or by a decision of a United States court" language from the Congressional findings in the List Act empowered the federal courts to independently recognize Indian tribes. *Id*. at *16. The Shinnecock maintained that the List Act language, in conjunction with a federal court's prior determination under a common law standard that the Shinnecock were a tribe for purposes of litigation over the construction of casino, was sufficient to establish federal recognition. *Id*. at *14–18.

The district court noted that although Congressional findings are entitled to substantial deference, they do not create substantive rights. The district court found it inconceivable that Congress would make such a fundamental change to the federal acknowledgment process without referencing the modification in the text of the statute itself:

> [P]laintiff urges the Court to determine that Congress intended to create a significant substantive right—namely, the right to obtain federal tribal status through the federal courts . . . but failed to include language referring to that right in the primary text of the statute itself. The Court will not read such a significant affirmative right into a statute, the actual language of which makes no reference to cloaking the judiciary with the co-equal role of the political branches in the federal recognition process.

*Id*. at *16.

Plaintiffs argue that the *Shinnecock* decision relies on inapposite authority in that the district court looked to cases which do not concern congressional statements as to what the law

is, but rather that discuss findings as to the general background or purpose of the statute. Dkt. 37 at 19. Plaintiffs contend "[t]he List Act findings at issue in this case do not express general policy preferences or principles. They state clearly what the law is." *Id.*

Plaintiffs' effort to distinguish *Shinnecock*'s discussion of the List Act's Congressional findings is a strained and ultimately unpersuasive reading of that case. The *Shinnecock* court examined the historical context of the Congressional findings and explained that they are not a statement of what the law is, but rather a summary of the processes by which tribes were recognized prior to the adoption of the Part 83 acknowledgment regulations:

> [T]he Congressional findings in the List Act, appear to simply be a reflection of the historical practice of the political branches—prior to establishing any regulations, criteria, or procedures for recognition to adopt on an *ad hoc* basis judicial determinations of tribal status resulting from particular litigation. This historical practice of the political branches relying on such court decisions, however, does not lead to the conclusion that courts possess this inherent power; to the contrary, no constitutional or statutory provision provides such authority.

2008 WL 4455599 at *17. The *Shinnecock* court correctly observed that ad hoc judicial determinations of tribal recognition were displaced by the DOI's promulgation of the Part 83 regulations in 1978. *Id.* (citing *Western Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1056 (10th Cir. 1993)).

Plaintiffs' argument that the List Act's Congressional findings authorize the courts to completely bypass the DOI's federal acknowledgment process is further undercut by the complete lack of intelligible principles by which federal courts would determine whether a petitioning group should be formally recognized. *See Mistretta v. United States*, 488 U.S. 361, 371–79 (1989) (explaining the non-delegation doctrine and rejecting an impermissible delegation claim where Congress articulated intelligible principles to the Judiciary for how the U.S. Sentencing Commission should formulate federal sentencing guidelines). Indeed, the United States Court of Appeals for the Federal Circuit has noted that "courts ha[ve] no judicially

discoverable or manageable criterial by which to accord federal recognition." *Wynadot Nation of Kansas v. United States*, 858 F.3d 1392, 1402 (Fed. Cir. 2017) (citing *Samish Indian Nation v. United States*, 419 F.3d 1355, 1372 (Fed. Cir. 2005)). The Court agrees with Defendants that the "List Act contains no manageable standards for determining which groups seeking recognition should achieve that status and which groups should be denied that status." Dkt. 41 at 4.

Although not binding, the *Shinnecock* court's reasoning is sound, and this Court agrees that the Congressional findings accompanying the List Act do not authorize "a tribe to completely bypass the recognition procedure established by the political branches and create a government-to-government relationship through judicial fiat." 2008 WL 4455599 at *2. This conclusion is reinforced by the district court for the District of Columbia's recent decision in *Burt Lake Band of Ottawa and Chippewa Indians v. Zinke*, 2018 WL 1542418 (D.D.C. Mar. 29, 2018). Like the plaintiffs here, the *Burt Lake* plaintiffs sought an order from the district court requiring the Secretary of the Interior to place the previously-unacknowledged Burt Lake Indians on the list of federally recognized tribes. The district court dismissed the claim, concluding "[t]he Court does not have free-standing authority to by-pass the entire federal recognition process and order the agency to add plaintiff to the List." *Id.* at *8.

The Court is aware that the CIN's efforts to achieve federal acknowledgment has been a drawn out and frustrating process. The Court in no way diminishes what members of the CIN understandably view as an inconsistent process that lacks transparency. Yet, this Court is bound to adhere to the well-established legal principle that the issue of federal acknowledgment of Indian tribes is a quintessential political question that must be left to the political branches of government and not the courts. Absent a clear delegation of authority from Congress, the Court cannot bypass the existing federal acknowledgment process and bestow federal recognition upon

the CIN. Plaintiffs' first claim for relief presents a non-justiciable political question that is outside of this Court's subject matter jurisdiction. Accordingly, Defendants' motion to dismiss Claim 1 is **GRANTED**.

**B. Plaintiffs have standing to challenge the re-petition ban contained in the 2015 federal acknowledgment regulations.**

Plaintiffs' Amended Complaint alleges that the re-petition ban contained in the 2015 amendments to the BIA's acknowledgment regulations violate the U.S. Constitution as well as federal law. Specifically, Plaintiffs assert that the ban violates the APA's arbitrary and capricious standard (Claim 2); the Due Process Clause of the Fifth Amendment (Claim 3), the Equal Protection Clause of the Fifth Amendment (Claim 4); and the Petition Clause of the First Amendment (Claim 5). Dkt. 24 at ¶¶ 161–91.

Addressing all four of the re-petition claims together, Defendants argue that Plaintiffs do not have standing to challenge the re-petition ban. Standing is the determination of whether a specific plaintiff is the proper party to bring a matter to federal court for adjudication. *See* Chemerinsky, *Federal Jurisdiction* § 2.3 at 55. To establish Article III standing, a plaintiff must show that she (1) suffered an injury in fact that is (2) fairly traceable to the alleged conduct of the defendants, and that is (3) likely to be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The threshold question of standing "is distinct from the merits of [a] claim" and does not require "analysis of the merits." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (citations omitted), *see also Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1109 (9th Cir. 2014) ("But Article III standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.") (internal citations and quotations omitted).

Defendants argue that Plaintiffs cannot meet the redressability prong of the standing analysis because "[n]o factual allegation in plaintiffs' amended complaint demonstrates any likelihood that the outcome of a CIN petition for recognition will be any different if CIN is allowed to re-petition under the 2015 regulations." Dkt. 32 at 24; *see also* Dkt. 41 at 6. Defendants contend that the regulatory changes included in the 2015 amendments were relatively minor and "only made two substantive changes to the 1994 rules under which CIN's petition was previously evaluated and denied." Dkt. 32 at 19. According to Defendants, these two changes relate to the types of evidence the OFA will accept to demonstrate that a petitioning group has been identified as an American Indian entity on a substantially continuous basis and the manner in which the OFA tabulates marriages within a petitioning group. *Id*. at 19–21; *compare* 25 C.F.R. § 83.7(a) (1994); *with* 25 C.F.R. § 83.11(a) (2015). Defendants contend that neither change creates "a substantial likelihood . . . that the outcome will be different from the conclusion reached in 2002 on their original petition for recognition." Dkt. 41 at 5. Defendants also argue that the re-petition ban is not new but has "been a feature of the Part 83 regulations since 1994." Dkt. 32 at 18–19 n.17.

Plaintiffs argue "[t]he rules governing acknowledgment decisions changed in many ways in 2015, several of which have a significant impact on Plaintiffs' acknowledgment." Dkt. 37 at 21. According to Plaintiffs, these changes include consideration of how "evidence or methodology that the Department found sufficient to satisfy any particular criterion in a previous decision will be sufficient to satisfy the criterion for a present petitioner." 25 C.F.R. § 83.10(a)(4). Plaintiffs argue that if the OFA applied the same standard that was used to evaluate the Jamestown S'Klallam Tribe's petition for acknowledgment, it would allow the CIN to more easily demonstrate recent prior acknowledgment by the United States, thereby bolstering

evidence of the CIN's Indian Identity and Political Influence. Dkt. 37 at 23. Plaintiffs highlight

additional revisions in the 2015 regulations impacting how the OFA considers various types of

evidence including: (1) a petitioner's self-identification as an Indian tribe; (2) evidence of

children being placed into Indian boarding schools; (3) evidence of a petitioner's relationship

with other federally recognized tribes; (4) evidence of land being set aside by a State for a

petitioner; and (5) evidence of a continuous line of entity leaders. *Id*. at 24–25. Plaintiffs contend

that all of these revisions will bolster the CIN's petition and result in federal recognition if they

are permitted to re-petition.

Defendants respond that the changes highlighted by Plaintiffs are merely a codification of

longstanding OFA practice, and Plaintiffs are mistaken in their assertion that the 2015

amendments "fundamentally changed the Part 83 process, lowered the relevant regulatory

standards in their favor, or otherwise created any avenue for a different outcome on a second

petition." Dkt. 41 at 6.

1. The district court for the District of Columbia determined that the Burt Lake Band of Indians had standing to challenge the 2015 acknowledgment regulations' re-petition ban.

The district court for the District of Columbia's recent decision in *Burt Lake* is again

informative. In a strikingly similar situation to the present case, the district court considered

whether the Burt Lake Indian plaintiffs, who had their petition for federal acknowledgment

denied in 2006, had standing to challenge the re-petition ban contained in the 2015 regulations.[5]

2018 WL 1542418. Just as it does in the present case, the DOI made the identical argument that

the "prohibition was already put in place by regulations adopted in 1994, so the 2015 regulations

did not injure plaintiff as they merely continued the pre-existing bar on re-petitioning." *Id*. at *5.

---

[5] Unlike the present case, Defendants challenged whether the Burt Lake Indians could establish an injury-in-fact under the first element of the standing analysis. *Id*. at *6.

But the Court found this argument to be "completely irrelevant, since the agency undertook a rulemaking process in 2014 that proposed a new rule that would allow tribes to re-petition, and it is the agency's rejection of this provision in its final rule that plaintiff challenges." *Id*. at *8. The district court in *Burt Lake* ultimately determined, "[b]ecause the Court finds that plaintiff was plainly adversely affected and aggrieved by the choice made by the agency when it promulgated the 2015 Regulations, and that its injury is concrete and particularized, it will allow Count IV, V, and VI to proceed." *Id*. at *5.

2. *Loritz* is inapposite from the present case and does not foreclose the persuasiveness of *Burt Lake*.

At oral argument, Defendants' counsel acknowledged the *Burt Lake* decision, but explained he did not cite it because the Ninth Circuit's decision in *Loritz* forecloses the argument that was advanced by the plaintiffs in *Burt Lake* and because the Burt Lake Indians submitted comments on the proposed rule. Dkt. 44 ("at least it wasn't cited in the District of Columbia's decision, there is not a case like the *Loritz* case.").

Defendants' effort to distinguish the present case from *Burt Lake* is unpersuasive for several reasons. First, Plaintiffs' counsel clarified during oral argument that members of the CIN, like the Burt Lake Indians, had also commented on the proposed changes to the acknowledgment regulations in support of limited re-petitioning. Dkt. 44. This would seem to undercut Defendants' distinction and put the CIN on the same footing as the *Burt Lake* plaintiffs, having formally engaged in the notice and comment process and encouraged the BIA to permit tribes previously denied acknowledgment the ability to re-petition.

Next, Defendants argue that under the Ninth Circuit's decision in *Loritz v. Court of Appeals for Ninth Circuit*, the CIN's claims are too speculative and "[t]his Court in unable to provide any redress for plaintiffs' asserted injury. Thus, plaintiffs lack standing to challenge the

validity of the regulation." Dkt. 32 at 18–19. Defendants suggested at oral argument that the absence of a case like *Loritz* in the D.C. Circuit sets this case apart from *Burt Lake*. This argument is flawed for two reasons. First, there is nothing other than counsel's statement at oral argument to suggest that the D.C. Circuit has different Article III standing requirements than the Ninth Circuit.[6] Second, Defendants' reliance on *Loritz* is misplaced because Plaintiffs' situation in the present case is not analogous. *Loritz* involved an incarcerated plaintiff who was convicted by a jury of attempted murder in California state court. 382 F.3d 990 (9th Cir. 2004). Loritz's conviction was affirmed by the California Court of Appeals and the California Supreme Court denied Loritz's petition for review. *Id*. at 991. Loritz filed a habeas petition in district court for the Southern District of California, which was also denied. *Id*. The Ninth Circuit affirmed the denial of Loritz's habeas petition and the U.S. Supreme Court denied Loritz's petition for certiorari. *Id*. Loritz then filed a *pro se* lawsuit challenging the Ninth Circuit Rules which prohibit parties from citing unpublished opinions. *Id*. The district court dismissed Loritz's case for lack of standing, and the Ninth Circuit affirmed, concluding "Loritz does not show that the outcome of his particular case could have been affected were he able to cite an unpublished disposition. To assume that the court adjudicating his habeas appeal would have ruled differently is wholly speculative and unfounded, and cannot form the basis for Article III standing." *Id*. at 992.

---

[6] *Compare Low v. Trump University, LLC*, 881 F.3d 1111, 1116 (9th Cir. 2018) ("Standing under Article III of the Constitution requires a showing that: (1) the plaintiff has suffered an injury-in-fact, (2) the injury is fairly traceable to the challenged action of the defendant, and (3) the injury is likely to be redressed by a favorable decision."), *with National Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 11 (D.C. Cir. 2011) ("The irreducible constitutional minimum of standing contains three elements: (1) injury-in-fact, (2) causation, and (3) redressability. Thus, to establish standing, a litigant must demonstrate a personal injury fairly traceable to the [opposing party's] allegedly unlawful conduct and likely to be redressed by the requested relief.") (internal quotations and citations omitted).

Defendants' reliance on *Loritz* necessarily suggests that the CIN's arguments about the success of their re-petition under the 2015 regulations is similarly speculative. Dkt. 32 at 19; Dkt. 41 at 5. The Court disagrees that the CIN's situation is on par with an inmate whose efforts to overturn his conviction have been adjudicated unmeritorious at every step. For reasons discussed in the next section, the Court need not address the merits of a potential re-petition here. Simply put, there is far more substance to the CIN's arguments regarding a more favorable landscape for a petition for acknowledgment under the 2015 regulations than the situation the Ninth Circuit addressed in *Loritz*.

   3.  <u>Defendants' argument regarding the likelihood of a successful re-petition addresses the merits of Plaintiffs' claims, not whether Plaintiffs have standing to sue.</u>

Defendants assert that there is no likelihood that the CIN will be able to satisfy Part 83.7(a)'s "continuous identification," Part 83.7(b)'s "distinct community," or Part 83.7(c)'s "political influence or authority" criteria that they were deemed not to satisfy in the 2002 Reconsidered Final Determination Against Acknowledgment. Defendants conclude "[b]ecause the amended complaint lacks any specific factual allegations that establish any basis to believe that a new CIN petition is likely to succeed under the 2015 regulations, plaintiffs have failed sufficiently to allege that this Court can redress plaintiffs' purported injury." Dkt. 32 at 25. But this argument (and Plaintiffs' interpretation of this argument)[7] is faulty in that it conflates the redressability prong of the standing analysis with the merits of a potential re-petition for acknowledgment.

---

[7] Plaintiffs are also mistaken when they claim "Defendants present no argument concerning the merits of any of Plaintiffs' four claims for relief." Dkt. 37 at 20 n.10. To the contrary, Defendants' argument prematurely attacks the merits of a re-petition.

1     Whether intentional or not, Defendants' redressability arguments are actually directed at

2  the merits of the CIN's potential re-petition under the 2015 regulations. Both the United States

3  Supreme Court and the Ninth Circuit Court of Appeals caution against converting arguments on

4  the merits into a jurisdictional standing issue. *See Steel Co. v. Citizens for a Better Env't*, 523

5  U.S. 83, 96 (1998) ("Thus, the uncertainty about 'whether the plaintiff's injuries can be

6  redressed' to which Justice [Stevens] refers is simply the uncertainty about whether a cause of

7  action existed—which is precisely what *Bell* holds not to be an Article III 'redressability'

8  question."); *Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*, 624

9  F.3d 1043, 1049 (9th Cir. 2010) ("Nor can standing analysis, which prevents a claim from being

10 adjudicated for lack of jurisdiction, be used to disguise merits analysis, which determines

11 whether a claim is one for which relief can be granted if factually true.").

12     The parties spend considerable effort arguing the likelihood of success of a hypothetical

13 re-petition under the 2015 regulations. But under the redressability prong of the standing

14 analysis, the Court's inquiry is whether the injury is likely to be redressed by a favorable judicial

15 decision. *See Lujan*, 504 U.S. at 561. To be sure, the injury that Plaintiffs allege in Claims 2–5—

16 the deprivation of the opportunity to re-petition for acknowledgment—is redressable by a

17 favorable decision in this case. Plaintiffs do not have to prove at this stage of the litigation that

18 they will ultimately prevail in achieving federal acknowledgment via re-petition to establish that

19 they have standing to sue.

20     This Court reaches the same conclusion as the *Burt Lake* court and determines that

21 Plaintiffs have standing to challenge the re-petition ban contained in the 2015 federal

22

23

24

acknowledgment regulations.[8] Defendants' motion to dismiss Claims 2–5 seeks to have the Court prematurely address the merits of a re-petition under the 2015 regulations. At this juncture, however, the Court must construe the Amended Complaint in the light most favorable to the non-moving party and accept as true all well-pleaded allegations of material fact. Accordingly, the Court will not dismiss Plaintiffs' claims challenging the re-petition ban at this stage of the litigation. Defendants' motion to dismiss claims 2–5 is **DENIED**.

**C. The Court has subject matter jurisdiction over Plaintiffs' claims related to funds held in trust for the Lower Band of Chinook and Clatsop Indians.**

Plaintiffs' final three claims for relief relate to funds from a 1970 ICC judgment held in trust by the DOI for the Lower Band of Chinook and Clatsop Indians. *See* Part I.C.3. Plaintiffs allege that the DOI has violated the APA by unlawfully forfeiting the proceeds of a valid legal judgment (Claim 6). Dkt. 24 at 73–75. Plaintiffs also assert that the DOI's alleged forfeiture of these funds has denied Plaintiffs procedural due process (Claim 7) and substantive due process (Claim 8) under the Fifth Amendment. *Id*. at 75–76. Defendants argue that all three claims related to the funds held in trust should be dismissed because they are "purely hypothetical." Dkt. 41 at 13.

1. Plaintiffs are not required to exhaust their administrative remedies where the agency's position is already set.

Defendants argue that Claim 6 must be dismissed because Catherine Rugen's letter is not a final agency action which can be challenged under the APA. *Id*. at 11. According to Defendants, the DOI cannot take any final agency action until Plaintiffs formally request "access to those funds pursuant to the administrative processes established by OST for that purpose."

---

[8] Although Defendants do not specifically challenge Plaintiffs' ability to establish the first two prongs of Article III standing, the Court agrees with the *Burt Lake* court's injury-in-fact analysis.

Dkt. 32 at 26. Plaintiffs respond that their APA claim is viable because the CIN is not required to exhaust administrative remedies where formally requesting access to the trust funds through the OST process would be futile. Dkt. 37 at 30–31.

Although the Court agrees with Defendants that the letter from Catherine Rugen to Chairman Tony Johnson is not a final agency action under the APA, the Court also agrees that requiring Plaintiffs to exhaust their administrative remedies by making a formal request for access to the trust funds would be futile. *See El Rescate Legal Serv., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 747 (9th Cir. 1991) ("there is no requirement of exhaustion where resort to the agency would be futile. Thus, where the agency's position on the question at issue 'appears already set' and it is 'very likely' what the result of recourse to administrative remedies would be, such recourse would be futile and is not required."). Defendants argue that Plaintiffs have failed to show that Defendants have an "'already set' position on the question of plaintiffs' legal entitlement through proof of other ties to the funds." Dkt. 41 at 13 n.8. But having determined that the CIN is not entitled to so much as an account statement, Defendants cannot credibly argue that Plaintiffs might be able to gain access to and even spend the trust funds if only they make a formal application. There is virtually no chance that requiring Plaintiffs to go through OST's formal request process will make any difference. The Court declines to dismiss Claim 6 for lack of final agency action.

2. The Court declines to dismiss the Due Process claims related to the funds held in trust.

Defendants also contend that there has been no deprivation of due process because the "funds are being held in trust for the rightful beneficiaries of those funds, lawful descendants of the Lower Band of Chinook and Clatsop Indians, in whose favor the judgment was entered." Dkt. 41 at 10. Plaintiffs note that "a claimant need not have been a recognized tribe to be entitled to present a claim" before the ICC. Dkt. 37 at 28. Plaintiffs also observe that the ICC made its

1  final award to the Lower Band of Chinook and Clatsop Indians some seven years before the Part

2  83 federal acknowledgment regulations were promulgated. *Id*. Plaintiffs assert that they have a

3  vested property right in the funds from the ICC judgment and argue that the later-adopted

4  regulations cannot engraft a requirement of federal acknowledgment onto the CIN's access to

5  said funds.

6      Defendants' argument that they are simply holding the funds for the rightful beneficiaries

7  of the Lower Chinook and Clatsop Indians creates a Catch-22: the DOI has unequivocally

8  indicated that it will not allow the CIN to access the funding because they are not a federally

9  acknowledged tribe, yet the Part 83 regulations prohibit anyone associated with the rejected CIN

10  petition from re-petitioning. *See* 25 C.F.R. § 83.4. As Plaintiffs' counsel stated at oral argument,

11  "The idea that someone else could come along and establish a right to that money. . . These guys

12  [Plaintiffs] are the guys . . . . The idea that somebody else is going to come and establish federal

13  recognition by the process the government wants to limit everyone to, it is just not going to

14  happen." Dkt. 44. Defendants' position begs the question: who could conceivably establish a

15  sufficient connection to the funds held in trust that is not also banned from re-petitioning for

16  acknowledgment?

17      Plaintiffs' claims related to the ICC judgment are derivative of the larger issue of the

18  CIN's non-recognition by Defendants. To dismiss Claims 7 and 8 based on the argument that

19  there has been no due process deprivation would allow Defendants to hide behind a circular

20  argument. Plaintiffs articulate a plausible claim that Defendants have forfeited funds from the

21  ICC judgment to which Plaintiffs have a valid property interest. Claims 7 and 8 are also

22  sufficiently tethered to Plaintiffs' re-petition claims that the Court declines to dismiss them at

23  this time. Accordingly, Defendants' motion to dismiss Claims 6–8 is **DENIED**.

24

# IV. CONCLUSION

- Defendants' Motion to Dismiss Plaintiffs' claim for declaratory judgment that the Chinook Indian Nation is entitled to be a federally recognized and acknowledged tribe (Claim 1) is **GRANTED**.

- Defendants' Motion to Dismiss Plaintiffs' claims based on the re-petition ban (Claims 2–5) is **DENIED**.

- Defendants' Motion to Dismiss Plaintiffs' claims related to the funds from the Indian Claims Commission judgment held in trust by the Department of the Interior (Claims 6–8) is **DENIED**.


IT IS SO ORDERED.

Dated this 20th day of June, 2018.

Ronald B. Leighton
United States District Judge