HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CHINOOK INDIAN NATION, et al., <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF INTERIOR, et al., <br><br> Defendant. | CASE NO. C17-5668-RBL <br><br> ORDER ON CIN'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CLAIMS VI-VIII <br><br> DKT. # 102 |

## INTRODUCTION

THIS MATTER is before the Court on Plaintiff Chinook Indian Nation's (CIN) Motion for Summary Judgment on Claims VI-VIII. Dkt. # 102. In 1971, the Indian Claims Commission (ICC) awarded $48,692.05 to "the Lower Band of Chinook and Clatsop Indians" for land they lost in the 1800's. That money was then held in trust by DOI for several decades, with statements and other communications about the account periodically being sent to the tribe[1] at a P.O. box in

---

[1] Throughout this Order, the Court uses the words "tribe" and "Chinook" in a general sense to refer to the non-federally recognized Chinook tribe and the entities associated with it, including CIN. As DOI points out, the Confederated Lower Chinook Tribes And Bands, Inc., b/d/a "Chinook Indian Nation," came into existence on July 3, 2000. *See* https://ccfs.sos.wa.gov/#/BusinessSearch/BusinessInformation.

Chinook, WA. When these statements ceased, CIN's chairman inquired to the agency and was informed that the tribe was not receiving statements because it was not federally recognized and thus could not benefit from the funds. CIN claims that this change in policy violated the APA and the Due Process Clause of the Fifth Amendment. As relief, CIN asks the Court to issue a declaratory judgment naming CIN as a beneficiary of the funds. For the following reasons, the Court GRANTS CIN's Motion in part and DENIES it in part.

## BACKGROUND

**1. Legal Scheme for Funds Held in Trust for Indian Tribes**

Enacted on October 19, 1973, the Indian Tribal Fund Use or Distribution Act, 25 U.S.C. §§ 1401-08, provides:

> Notwithstanding any other law, all use or distribution of funds appropriated in satisfaction of a judgment of the Indian Claims Commission or the United States Court of Federal Claims in favor of any Indian tribe, band, group, pueblo, or community (hereinafter referred to as "Indian tribe"), together with any investment income earned thereon, after payment of attorney fees and litigation expenses, shall be made pursuant to the provisions of this chapter.

25 U.S.C. § 1401(a). The Distribution Act requires DOI to come up with a "plan for the use and distribution of the funds" that must include "identification of the present-day beneficiaries, a formula for the division of the funds among two or more beneficiary entities if such is warranted, and a proposal for the use and distribution of the funds." § 1402(a). DOI must complete the plan within one year of January 1, 1983 for funds appropriated before 1983, although the agency or affected tribe may request an extension. § 1402(b), (e).

As required by the Distribution Act, *see* § 1406(a), DOI's Bureau of Indian Affairs (BIA) has promulgated its own regulations governing distribution. *See* 25 C.F.R. § 87 et seq. Those regulations require DOI to "as early as possible" conduct research to determine the present-day beneficiaries of judgments in cooperation with the affected tribe(s). § 87.3(a). The result of this

research is then provided to "the governing bodies of all affected tribes" with the intention of "developing a use or distribution proposal" in which 20% of the funds must be used for "tribal programs" unless the agency determines that "particular circumstances . . . clearly warrant otherwise." § 87.3(b). The agency then holds a public hearing to "receive testimony on the tribal proposal(s)" and submits a proposed plan to Congress. § 87.4-5.

BIA's Part 87 regulations define "Indian tribe or group" as "any Indian tribe, nation, band, pueblo, community or identifiable group of Indians, or Alaska Native entity." § 87.1(g). "Use or distribution" is defined to include "programming, per capita payments, or a combination thereof." § 87.1(m). "Program means that aspect of a plan which pertains to using part or all of the judgment funds for tribal social and economic development projects," § 87.1(k), while "[p]er capita payment means that aspect of a plan which pertains to the individualization of the judgment funds in the form of shares to tribal members or to individual descendants," § 87.1(l).

Separate from the use and distribution of trust funds, the management of tribal trust funds is governed by the American Indian Trust Fund Management Reform Act of 1994, 25 U.S.C. §§ 4001-61, and DOI's accompanying regulations, 25 C.F.R. § 115 et seq. DOI must provide a "periodic statement of performance" to tribes, 25 U.S.C. § 4011(b); 25 C.F.R. § 801, and a tribe may withdraw funds upon submission of a written request, 25 U.S.C. § 4022(a); 25 C.F.R. § 115.815. Both the statute and its implementing BIA regulations define "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community . . . which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." § 4001(2); *see also* 25 CFR § 115.002. DOI's Office of Special Trustee for American Indians (OST) has its own set of regulations providing for withdrawal of tribal

funds, *see* 25 C.F.R. § 1200 et seq., but they also define "tribe" in terms of federal recognition. *See* § 1200.2.

**2.     The Chinook's Trust Funds**

In 1851, the Lower Band of Chinook and Clatsop Indians signed a treaty to relinquish their lands around the mouth of the Columbia River in exchange for concessions, including a reservation. DN-001419. Unfortunately, that treaty was never ratified by Congress and the tribes lost their land to white settler encroachment over the next few decades with no compensation. *Id.*; DN-001440. In 1912, Congress appropriated about $35,000 to the descendants of the tribes to account for their losses. *Id.* But in 1952, the ICC recognized that a group of petitioners calling themselves "the Chinook Tribe and Bands of Indians" had a right to assert claims on behalf of descendants of the Clatsop and Chinook (proper) Indians to obtain further compensation. DN-000036; DN-000053-54. These claims were titled "Docket 234." DN-000032. In 1970, the ICC recognized that the 1912 payment was unconscionably low and awarded an additional $48,692.05 to compensate "the Lower Band of Chinook and Clatsop Indians." DN-000363. Whether this new payment was adequate or merely another injustice is a legitimate question but not the one before this Court.

After the judgment was entered, funds to satisfy the award were appropriated to DOI in 1972, 86 Stat. 1498, but BIA delayed distribution of the funds and continued to hold them in trust. DN-001414. In 1974, a DOI memo labeled "persons who are identified as Clatsop or Lower Band of Chinook on the McChesney payment roll, or who are lineal descendants of such persons," as the beneficiaries and stated that the funds should be distributed per capita to such persons. DN-000797. However, at a 1976 meeting, Chinook tribal members decided to further delay distribution to allow the tribe to prepare their own plan for the funds. *Id*. It was also at this

meeting that tribal members resolved to petition the federal government for recognition. DN-001415.

In 1983, the Indian Judgment Fund Act of 1973 was amended to allow the Secretary of the Interior one year to submit a use and distribution plan for funds from old awards, such as the Chinook's. DN-001428. BIA planned to submit a plan to Congress calling for per capita distribution of the funds. *Id*. Although the tribe had proposed using the funds to create a scholarship, BIA expressed concern about "transferring control of the trust funds to an entity with which the Secretary has no trust relationship." DN-001427-28. Despite this, in 1984, BIA changed course and drafted a bill that would utilize the funds for educational purposes to benefit the tribe. DN-001434. This was apparently due to the low amount of per capita distribution ($35/person) and the tribe's own wishes. *Id*. But after a general meeting of the tribe, the Chinook rejected this plan as well and chose to keep the funds with BIA pending the outcome of their petition for recognition. DN-001452. The agency noted that the bill should be re-presented to the tribe if they failed to gain recognition. *Id*.

While the petitioning process dragged on, the record contains no further mention of the Chinook's funds until 1997, when a series of internal DOI emails discussed how OST[2] should "handle" communication with non-recognized tribes. DN-001462. The agency apparently had a list of contact information it used to "talk to [non-recognized] tribes" but needed to "verify that these are the tribe's representatives that govern their tribe's business." *Id*. OST would contact the "leaders" of non-recognized tribes "by letter, to furnish proof that they are authorized to receive information on the Tribe's trust accounts mainly to safe guard the trust fund(s)." *Id*. However,

---

[2] The emails were actually between officers in the Office of Trust Fund Management (OTFM), which is within OST. For the sake of simplicity, however, the Court will simply refer to "OST." For a table showing the internal breakdown of DOI and OST specifically, *see* DN-001497-98.

another memo overtly questioned whether there were "any regulations in existence that define how [OST is] to deal with" non-recognized tribes and expressed concern about "liability to the government for acts of both commission and omission in managing these funds for entities that the government does not recognize." DN-001465. There is no indication that these issues were resolved, but DOI did send letters to the "Chinook Clatsop" at a P.O. box in Chinook, WA, requesting verification of their tribal spokesperson. DN-001463; DN-001466. The record does not contain a response from the tribe.

In 2001, BIA formally recognized the Chinook, DN-001480-91, but the decision was appealed, DN-001492. Meanwhile, BIA still had no official plan to distribute the funds. *Id*. In August of 2001, OST representatives took a trip to the Northwest and met with the Chinook (it seems that Penny Harris, a "Tribal Council Member," was the only attendee). DN-001512. The representatives apparently explained how the funds were currently invested and OST's "objectives" and "recommendations" with respect to the funds. *Id*. The notes from the trip stated that the original award was to be distributed based on the McChesney roll and that OST and the tribe would work together on a use and distribution plan once the Chinook gained recognition. *Id*.

Unfortunately, the Chinook's brief success in 2001 was reversed in 2002 when their federal recognition was rescinded. 67 Fed. Reg. 46204, 46206 (July 12, 2002). The tribe did not appeal. Despite this, in 2006, OST sent a letter addressed to the "Chinook Tribe" stating the current balance of the trust account and requesting "assistance to determine whether the tribe's assets, currently invested in the U.S. Treasury 'Overnighter,' should remain as invested or be allocated to longer-term investments." DN-001529. Another letter in 2010 invited the tribe's chairman other members to a "financial skills training event." DN-001544.

In 2011, a vague email from Catherine Rugen, a regional trust administrator at OST, indicated that OST was "initiating a project to change the statements for all non-federally recognized tribes to file copy only." DN-001545. Rugen requested the account information for non-recognized tribes, and a responsive email identified the Chinook. *Id*. OST continued to communicate with the Chinook and sent a letter in 2012 stating that there was a new fiduciary trust officer for their region, Gino Orazi, that would visit the area in the future to discuss the Chinook's account with Chairman Ray Gardner. DN-001551. However, around the same time, Orazi emailed other OST officers requesting that they cease publishing and sending out statements for the Chinook's trust account because of its non-recognized status. DN-001553-63. In 2012, a letter inquiring about the status of the Chinook account was forwarded to Orazi. DN-001564. Orazi responded, "Because the Chinook Tribe and Bands of Indians are not federally recognized at this time, funds which were awarded as a settlement of Docket 234 cannot be distributed to the tribe, bands or individual tribal members." *Id*.

In August of 2015, CIN Chairman Tony Johnson called Rugen to ask why CIN was no longer receiving statements for the tribe's trust account. Rugen Decl., Dkt. # 34, at 2. Rugen responded that an internal review uncovered that OST had mistakenly been sending statements to several "Indian groups," including the Chinook, "that are neither federally recognized tribes nor otherwise able to claim to be rightful beneficiaries of the funds held in a particular account maintained by the OST." *Id.* Johnson apparently asked Rugen to memorialize her statement in writing, which prompted her to send a letter on August 25 stating the following:

> As you are aware, the Chinook Tribe is not Federally recognized. Section 25.83.2 of the Code of Federal Regulations provides that "Acknowledgement of tribal existence by the Department [BIA] is a prerequisite to the protection, services and benefits of the Federal government available to the Indian tribes by virtue of their status as tribes." Thus, because you are not recognized, the funds held with our office cannot benefit your tribe. The only suggestion that I can make to you is that

you continue to pursue recognition in accordance with the regulation set forth under CFR Section 25, Part 25.

DN-001590. Rugen emphasizes that Johnson made no request to withdraw funds and that she never intended her response to be a "decision on behalf of the agency." Dkt. # 34 at 2-3.

## DISCUSSION

**1. Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24.

**2. Administrative Procedure Act**

CIN argues that OST's decision to stop holding the Funds in trust for CIN because of the tribe's non-recognized status conflicts with the Tribal Fund Use or Distribution Act, 25 U.S.C.

§ 1401, and was an arbitrary and capricious shift in policy. DOI responds that the letter from Catherine Rugen does not constitute a "final agency action" and therefore is not subject to judicial review. Even if it is, DOI contends that the declaratory judgment requested by CIN is an improper remedy and the Court should instead remand to the agency for further proceedings.

### a. Final Agency Action

Under the APA, only a "final agency action for which there is no other adequate remedy in a court" may trigger judicial review. 5 U.S.C. § 704. An "agency action includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The Supreme Court has long taken a "pragmatic approach" to finality. *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)). Thus, even when an agency does nothing more than "give notice" of its interpretation of a relevant law, this can constitute a "final agency action" before the interpretation is ever applied. *Id*.

In *Bennett v. Spear*, the Supreme Court "distilled from [its] precedents two conditions that generally must be satisfied for agency action to be 'final' under the APA." *Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (citing *Bennett v. Spear*, 520 U.S. 154 (1997)). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id*. (quoting *Bennett*, 520 U.S. at 177-78).

In the prior Order on DOI's Motion to Dismiss, the Court held that the letter from Catherine Rugen was not a final agency action but that it was nonetheless reviewable because forcing CIN to formally request access to the funds would be futile. Dkt. # 45 at 25. Defendants

now request that the Court reconsider that holding because the Court erred by applying the futility exception—which normally applies to administrative exhaustion—to the finality analysis. Opposition, Dkt. # 109 at 12. As DOI explains, exhaustion and finality are different:

> "[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate."

*Darby v. Cisneros*, 509 U.S. 137, 144 (1993) (quoting *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 193 (1985)). Even if exhaustion does apply, DOI argues it is not at all clear that CIN would be unsuccessful if it attempted to gain beneficiary status by "invok[ing]" 25 C.F.R. § 87. Dkt. # 109, at 14.

DOI's position is unpersuasive. While the agency may be technically correct that the futility exception does not apply, the definition of a "final agency action" nonetheless encompasses the concept of futility. Consistent with the Supreme Court's pragmatic approach, an agency can arrive at a "definitive position," *Darby*, 509 U.S. at 144, that decides "rights or obligations," *Bennett*, 520 U.S. at 178, without going through all formal channels to reach it. Once such a position has been reached, it becomes futile to administratively challenge the agency's conclusion.

More importantly, although CIN may not have formally requested to access the funds under 25 C.F.R. Part 115 or distribute the funds under Part 87, DOI identifies no formal administrative method by which CIN can request that it receive account statements. Consequently, whatever opaque decision-making process took place within OST concluded when the agency determined that CIN should not receive statements because of its non-recognized status and statements ceased to be mailed out. *See* DN-001545. While Rugen's letter

was the catalyst for CIN's claims and explained OST's reasoning, it was simply the vehicle through which the agency's decision finally reached CIN. In short, OST reached a "definitive position" with the "legal consequence" that CIN was no longer entitled to receive account statements. *See Bennett*, 520 U.S. at 177-78. This is a final agency action.

However, DOI is correct that Rugen's letter did not constitute a final action regarding CIN's beneficiary status and ultimate right to the funds. Although there is admittedly some confusing overlap, whether a group is a beneficiary for purposes of use and distribution of funds under 25 C.F.R. § 87 and whether a group can access funds under 25 C.F.R. § 115.800 and § 1200 are separate questions. It is true that Rugen's letter states that the funds "cannot benefit" CIN because of its non-recognized status, DN-001590, but this was part of her *justification* for barring CIN from accessing or receiving information about the funds. It did not amount to a final decision about CIN's beneficiary status. The Court will thus limit its review to OST's decision to stop providing statements to CIN.

b. **Section 706 Review**

Under section 706(2)(A) of the APA, courts must set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). CIN argues that OST's decision to stop holding the funds in trust for CIN because the Chinook are not federally recognized was contrary to the Indian Tribal Fund Use or Distribution Act, which does not limit trust fund benefits to federally recognized tribes. Further, CIN contends that DOI treated CIN as a beneficiary of the funds until it arbitrarily and capriciously changed position in 2015 by requiring federal recognition for the funds to benefit the tribe. CIN thus asks the Court to issue a declaratory judgment identifying CIN as a

beneficiary of the funds. DOI advances no arguments about the legality of OST's decision but does contend that remand is the proper remedy if the agency's action violated the APA.

Agency interpretations promulgated under congressionally-delegated authority to speak with the "force of law" are given deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). "Such rules are characteristically promulgated only after notice and comment." *Tablada v. Thomas*, 533 F.3d 800, 806 (9th Cir. 2008) (citing *Mead*, 533 U.S. at 230). "If, on the other hand, the agency rule or decision is not within an area of express delegation of authority or does not purport to have the force of law, it is entitled to a measure of deference proportional to its power to persuade, in accordance with the principles set forth in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *Id*. Among the factors to consider under *Skidmore* are "the degree of the agency's care, its consistency, formality, and relative expertness." *Mead*, 533 U.S. at 230 (citing *Skidmore*, 323 U.S., at 139-40).

Furthermore, "'[u]nexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). "[A] policy change complies with the APA if the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'" *Id*. (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).

1    Here, the decision to stop sending account statements to non-recognized tribes like the
2    Chinook was reached in an opaque manner. The policy was vocalized in Rugen's letter to
3    Johnson, but there is no other documentation besides cryptic emails referencing "a project to
4    change the statements for all non-federally recognized tribes to file copy only," DN-001545, and
5    Rugen's allusion to an "internal review" process, Dkt. # 34 at 2. And yet some change clearly
6    took place, since OST previously had a policy of obtaining contact information for the
7    representatives of non-recognized tribes so that they could be updated about accounts. DN-
8    001462. However it occurred, the decision at issue here was reached through informal channels
9    and is about as far from notice-and-comment rulemaking as possible. The Court will therefore
10   apply *Skidmore* deference.

11   Considering the relevant factors, the decision described in Rugen's letter is unpersuasive
12   and must be set aside for multiple reasons. First, OST's interpretation of 25 C.F.R. § 83.2 as
13   barring CIN from benefitting from the funds because of its non-recognized status conflicts with
14   the Indian Judgment Distribution Act, which states that funds can be held for "*any* Indian tribe,
15   band, group, pueblo, or community, " 25 U.S.C.A. § 1401 (emphasis added), and its
16   implementing regulations, which define "Indian tribe or group" as "*any* Indian tribe, nation,
17   band, pueblo, community or identifiable group of Indians, or Alaska Native entity," 25 C.F.R. §
18   87.1(g) (emphasis added). The use of the word "any" means that both recognized and non-
19   recognized tribal entities can be beneficiaries of funds held in trust if BIA's research so
20   indicates.[3] *See* 25 C.F.R. § 87.3.

---

[3] DOI itself seems to accept this conclusion. In its opposition brief, the agency states: "A non-federally recognized tribe or group of Indians that can show it is the present day successor in interest to a Indian tribe or Indian group recipient of a ICC judgment award that is presently held in trust may obtain access to and withdraw said judgment funds pursuant to and in accordance with 25 C.F.R. Part 87." Dkt. # 109 at 13.

This reading is bolstered by the purpose of the Distribution Act. As explained in *Wolfchild v. U.S.*, the Distribution Act was intended to cover judgments issued by the ICC, which had jurisdiction over claims by "any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska." 101 Fed. Cl. 54 (2011) (reversed in part on other grounds) (quoting Indian Claims Commission Act, Act of Aug. 13, 1946, § 2, 60 Stat. 1049, 1050). As the court observed, "Congress intended to enlarge [beyond 'recognized tribes or bands'] the category of groups of Indians entitled to present claims for hearing and determination when it added the words 'or other identifiable groups,' not theretofore customarily used." *Id*. (quoting *Thompson v. United States*, 122 Ct. Cl. 348, 360 (1952)). The language in the Distribution Act mirrors the ICC Act, meaning that both encompass non-recognized tribal entities. Indeed, in this case, the ICC repeatedly described the historical Chinook and Clatsop Indians as "groups" when determining whether to allow the Chinook petitioners' claim to go forward. DN-000054.

The Distribution Act also does not reference the need for federal recognition or a government-to-government relationship as a prerequisite to benefits. Other statutes pertaining to Indian benefits do contain such limiting language. *See, e.g.*, Indian Self-Determination and Education Assistance Act, 25 U.S.C.A. § 5304(e) (defining "Indian tribe" as "Indian tribe, band, nation, or other organized group or community . . . which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians"); Indian Financing Act, 25 U.S.C. § 1452(c) (defining "tribe" as "any Indian tribe, band, group, pueblo, or community . . . which is recognized by the Federal Government as eligible for services from the Bureau of Indian Affairs"). Its absence in the Distribution Act should not be viewed as an accident. Admittedly, the American Indian Trust Fund Management Reform Act of

1994 limits the definition of "Indian tribe" to recognized entities. 25 U.S.C. §§ 4001(2). But Rugen's letter does not reference that statute or state that OST regards it as excluding non-recognized tribes from receiving account information. Given the incongruity between the definitions in the Distribution Act and the Trust Fund Management Reform Act, such a conclusion is not obvious.

Even if DOI's interpretive justification was not flawed, the sudden shift in policy announced by Rugen's letter was arbitrary and capricious. As previously noted, DOI had a policy of communicating with non-recognized tribes about trust funds by verifying the identity of the tribal representative in 1997 and perhaps later. DN-001462. It is unclear exactly when DOI departed from this policy, but whenever that was, no explanation or acknowledgement was provided until CIN Chairman Johnson inquired directly to the agency. Furthermore, DOI's statement that the Chinook tribal entity could not possibly be a beneficiary was also a shift. Although DOI argues that it only ever considered distributing the funds on a per capita basis to lineal descendants of the awardee, the record reveals that DOI also drafted a bill that would have utilized the funds to create a scholarship fund for Chinook students. DN-001434. This type of use would qualify as a "program . . . for tribal social and economic development" under 25 C.F.R. § 87.1(k) and is inconsistent with the idea that DOI never considered using the funds to benefit the Chinook tribal entity. DOI's shift in position, as conveyed by Rugen's letter, is thus arbitrary and capricious. *See Organized Vill. of Kake*, 795 F.3d 966.

The Court expresses no opinion as to whether the entity known as CIN is, in fact, a beneficiary of the funds. While it is true that DOI sought input from and sent account statements to the Chinook, the agency apparently never performed the required research to identify the present-day beneficiaries. *See* 25 C.F.R. § 87.3. Indeed, the agency appears to have strayed far

from any established regulations by continuing to hold the Docket 234 funds in trust for decades without ever properly identifying the beneficiaries and coming up with a use and distribution plan. This was an imprudent course that gave rise to false impressions and ambiguity. However, it does not make CIN an official beneficiary. *See id.* In any case, the Court lacks authority under the APA to issue the declaratory judgment requested by CIN. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 657 (2007) (If an agency's action is arbitrary and capricious, "the proper course would [be] to remand to the Agency for clarification of its reasons.").

But this does not change the fact that DOI's decision to stop sending CIN account statements for the reasons set forth in Rugen's letter was in error. That decision is remanded to the agency for further consideration and clarification consistent with this Order.

**2. Constitutional Claims**

In addition to its APA claim, CIN also claims procedural and substantive due process violations under the Fifth Amendment of the U.S. Constitution. CIN argues that the change of policy conveyed by Rugen's letter deprives CIN of its vested property right in the Docket 234 funds without any process. DOI responds that CIN has failed to establish that it has any interest in the trust funds that is protected by the Due Process Clause.

"To succeed on a substantive or procedural due process claim, the plaintiffs must first establish that they were deprived of an interest protected by the Due Process Clause." *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1029 (9th Cir. 2010) (citing *Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008) and *Kildare v. Saenz,* 325 F.3d 1078, 1085 (9th Cir. 2003)). To have a property interest in a benefit, a plaintiff must have a "legitimate claim of entitlement to it," not just a "unilateral expectation of it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). "A legitimate claim of entitlement 'is determined largely by the

language of the statute and the extent to which the entitlement is couched in mandatory terms.'" *Rancho Santiago*, 623 F.3d at 1030 (quoting *Wedges/Ledges of Cal., Inc. v. Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994)).

As the Court previously explained, there is no evidence that CIN in particular has a legitimate property interest in the funds. The judgment was awarded to "the Lower Band of Chinook and Clatsop Indians," DN-000363, but CIN is not necessarily equivalent to that tribe or group. 25 C.F.R. § 87 et seq. spells out the process for determining whether that is the case, but there is no evidence that DOI engaged in that process and identified CIN as a beneficiary. Consequently, CIN's constitutional claims fail.

## CONCLUSION

For the above reasons, CIN's Motion for Summary Judgment is GRANTED in part and DENIED in part. The decision to stop sending account statements to CIN because of its non-recognized status is remanded to DOI for further consideration and clarification consistent with this Order.

IT IS SO ORDERED.

Dated this 22nd day of January, 2020.

Ronald B. Leighton
United States District Judge